UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SONY BMG MUSIC ENTERTAINMENT, *et al.* )<br>)<br>)<br>) | |
| Plaintiffs, ) | Civ. Act. No. 1:07-cv-11446-NG |
| ) | (ORIGINAL DOCKET NUMBER) |
| v. ) | |
| ) | |
| JOEL TENENBAUM ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S OPPOSITION TO ENTRY OF JUDGMENT AND INJUNCTION**

## I. INTRODUCTION

Joel Tenenbaum through counsel undersigned, speaks to a judge of both law and equity, master of the power of the least dangerous branch, *see* Bickel, *The Least Dangerous Branch* (1962). We seek to open the Court and the Law to Internet and to preserve the freedom of the people of the Internet Age against the tyranny of copyright. This case is not only about the size of the verdict. Bigger questions are at stake. From the very first the prosecution of this case under Title 17 Section 504(c) was not legal. Congress never considered the effect of the Internet on copyright law as embodied in Title 17 Section 504(c). Congress never authorized statutory damage suits against consumers. At stake here is not only the fate of a young man emblematic of his generation[1] found guilty and sentenced to bankruptcy. At stake for the future is whether the check of fair use on the tyranny of copyright will be taken away from the jury.  At stake is our citizenry's right to a full and fair trial by an empowered jury. At stake ultimately is the proper balance among creative artists, the corporate copyright industry, the federal court, and the rights of the people in the age of Internet.

The defendant deserves a new trial. The Court in the trial just completed committed critical errors on central issues. First and foremost, this case should have been dismissed at the outset because the statute in question does not permit a lawsuit against an individual

---

[1] John Palfrey and Urs Gasser, *Born Digital: Understanding The First Generation of Digital Natives* (2008).

consumer for statutory damages. Second, the Court committed reversible error when it granted summary judgment against fair use, improperly assessing some factors of fair use, improperly excluding others from consideration, improperly shifting the burden of proving infringement to the defendant, and improperly directing the jury's verdict that he infringed. Third, in an erroneous and prejudicial application of Rule 408 of the Federal Rules of Evidence, the Court excluded evidence of the defendant's willingness to take responsibility for his actions and admitted his offer to do so in a redacted form that allowed the plaintiffs to twist it into an unwarranted and damning attack on the defendant's character. Fourth, in the Court's final instructions to the jury the Court distorted the jury's common sense of a "just award" by improperly telling the jury to return a verdict within the legislatively prescribed range.

Given the Court's failure to address the significant, basic, constitutional issues presented by the case, it is no surprise that the resulting verdict is radically disproportionate to any actual harm the defendant may have caused, and blatantly inconsistent with fairness and justice. The verdict is itself an impeachment of the law and process that produced it. The impermissible and unnecessary injunction sought by the plaintiffs adds further insult to it.

The defendant opposes the entry of judgment.[2]

## II. BACKGROUND

Three strands of history come together in the issues presented by this case: copyright law, the music recording business, and Internet. Copyright law is grounded in a constitution written in the voice and name of We The People. The original balance struck by our Constitution authorized Congress to give creators limited monopolies in the legal form of copyright in order to incent creative production for the benefit of the consuming public. The balance between copyright and public freedom was first struck at a human level, before corporate copyright industry had formed.[3] Copyrights were held by individuals and were

---

[2] The Defendant reserves the right to move for new trial on issues other than those addressed herein, specifically including the Court's denial of the defendant's counterclaim for abuse of process, the Court's denial of the defendants motion to add RIAA as a party defendant, the Court's striking of prospective jurors who had ever downloaded music, and the Court's denial to the defendant of his right to record his case.

[3] Civic republicanism is represented by Lewis Hyde, *see* Daniel B. Smith, *What is Art For?*, N.Y. Times, Nov. 16, 2008 at MM39, *available at* http://www.nytimes.com/2008/11/16/magazine/16hyde-t.html?partner=permalink&exprod=permalink

truly limited in scope and time. But with the advent of the corporate copyright industry in the 19th century, and continuing into the 20th century, the industry used its increasing power to change the law to its advantage, shifting the balance between copyright and the public right to the consuming public's disadvantage.[4]

The Copyright Act of 1976 as amended in 1999, under which this case has been prosecuted, expanded the reach of copyright in scope, duration and process, including creating and then increasing statutory damages in lieu of proof of an infringer's profit. This law, Section 504 of the Copyright Act, authorized a copyright holder to recover "actual damages suffered by him or her as a result of ... infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages," 17 U.S.C. § 504(b); or, alternatively, the Act provides, "the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits" statutory damages, 17 U.S.C. § 504(c). There is no hint, and surely no clear statement, in the language or legislative history of this law that Congress intended to impose statutory damages in cases that involved no profit. § 504(c) was not meant to sweep beyond the class of cases covered in § 504(b) to include consumers using home copying equipment for private purposes, not selling copies for profit, treating consumers who may copy works on home equipment the same as commercial counterfeiters.

Wayne Marshall's rejected expert testimony would have put the business of the recording industry in the context of technological time. It was not just the invention of the printing press that made viable the business of copying and selling books, it was as well the relative ease for law enforcement to prevent others from doing so. Edison's relatively recent invention of the phonograph was for recorded music the equivalent of the printing-press for books, with audio recordings on various physical media the equivalent to salable books. As with the book industry, the recorded music industry's profit was based on its ability to make and sell physical copies of a master recording, coupled with the ability of law enforcement to prevent others from making and selling copies.

---

[4] Lawrence Lessig, *Code and Other Laws of Cyberspace* (1999); Lawrence Lessig, *Free Culture: How Big Media Uses Technology And The Law To Lock Down Culture* (2004).

Then came Cyberspace,[5] the open Internet. In 1994 Tim Berners Lee invented the World Wide Web. In 1999, Shawn Fanning invented Napster. Napster allowed anyone with a net connection to access and share recorded music on the World Wide Web. A global digitally networked environment suddenly emerged, a cyber space born of the PC and the Internet, that gave end-using consumers the ability to copy and share. The transfer of physical media was no longer necessary in the world of shared digital products. Public benefit was immense. Internet users around the world were enabled in a variety of new ways to have and enjoy the full catalog of already created and recorded music, and were empowered to create and publish new music of their own. On peer-to-peer networks, music was free, in both the sense of costless and in the sense of freely usable, freely transferable, free of incompatibilities created by encryption among the variety of hardware players that transform the digital code of the recorded song into analog music to the human ear.[6] As a consequence, the capacity of law enforcement to prevent copying of copyrighted works radically changed.[7]

In July 2000, Congress began a process of considering the proper course for copyright law in response to the alteration of the market brought about by the advent of open connected cyberspace. Under the leadership of Senators Hatch and Leahy, the Senate Judiciary Committee conducted a hearing titled, "MUSIC ON THE INTERNET: IS THERE AN UPSIDE TO DOWNLOADING?"[8] This hearing made eloquently clear that Congress was not only aware of but open to incorporating peer-to-peer music file sharing into our national copyright statutory scheme. As the Congressional Record demonstrates, the Senate Judiciary Committee certainly did not view peer-to-peer file sharing as illegal:

> *Senator Hatch: "Our reasons for holding this hearing are to learn more about what is taking place in the marketplace and, in doing so, better equip us to advance the interests of consumers and creators. Insofar as consumers are concerned, they desire access to downloadable music which is not unnecessarily restrictive or unduly*

---

[5] The word "cyberspace" (from *cybernetics* and *space*) was coined by science fiction novelist William Gibson in his 1982 story "Burning Chrome" and popularized by his 1984 novel *Neuromancer*. Cyberspace, *available at http://en.wikipedia.org/wiki/Cyberspace*.

[6] *See*, Milner, *Perfecting Sound Forever: An Aural History of Recorded Music* (2009).

[7] John Perry Barlow, *The Economy of Ideas*, Wired, Mar. 1994, *available at* http://www.wired.com/wired/archive/2.03/economy.ideas.html.

[8] 106th Cong., S. Hrg. 106-1060, *available at* http://www.access.gpo.gov/congress/senate/senate14ch106.html.

*burdensome, I want to ensure that the marketplace provides them with the opportunity to access the music they want to hear over the Internet and to do so legally. Insofar as creators are concerned, I want to ensure that artists and creators are protected through an approach to copyright that empowers them to generate maximum revenue for their creative works. ...*

*"As chairman of the Judiciary Committee, I take it as a basic premise that our copyright laws must play a role, a strong role, in protecting creative works over the Internet. These protections, however, must be secured in a manner which is mindful of the impact regulation can have on the free flow of ideas that a decentralized, open network like the Internet creates. We must protect the rights of the creator, but we cannot, in the name of copyright, unduly burden consumers and the promising technology that Internet presents to all of us.*

*"With this in mind, it is my hope that we can learn more about the online music marketplace and why there is so much disharmony. We have with us this morning a number of different models of online music services.*

*"MP3.com shares revenues with artists, often on a 50/50 basis. And we have Emusic, which offers downloads of singles or whole albums, paid for either per song or per album. Emusic has deals with many independent record labels and offers deals to artists that are structured similarly to recording contracts. Both Emusic and MP3.com can track usage levels to accurately account to the artists for use of their music and pay them accordingly. And both Emusic and MP3.com are structured with a central server Web site that makes music licensing relatively easy for creators and consumers. Their organization is similar to the chart on display which diagrams a traditional Web-based search engine, where an individual's computer deals with information sources through the intermediary of a single server.*

*By way of contrast, consider the architecture of the Napster and Gnutella communities, as represented in these schematic charts over on the right here. As you can see, Napster, which is a business, operates with a central server site through which members submit requests. Requests proceed from the central site out to other Napster users. And with Gnutella, there is no central point, but we are linked directly to other Gnutella users' PC's. We can download the music directly from any Gnutella users' computer to which we are linked."*

*This organization has implications for both music licensing and for broader Internet technology. To quote Andy Grove, of Intel, "The whole Internet could be re-architected by Napster-like technology." Using this peer-to-peer technology to search for information on the Internet allows us to get the most up-to-date information direct from the source, as opposed to traditional Web search engines that are made through intermediaries. With regard to music licensing, however, as you might guess from the charts, peer-to-peer file-sharing poses a much greater challenge than single-source licensing. With each user being a publisher to a greater or lesser degree, the relative lack of a real distribution center makes licensing somewhat chaotic and haphazard, which brings us to the nub of this hearing. This technology presents a unique*

*opportunity to those who make a living by producing copyrighted works. They can be selfpublishers dealing directly with their fans. But it also presents a unique threat, if misused, to rob them of their livelihood, which could rob all of us of their continued work by destroying the incentives to create and publish their works, all of which will require much greater creativity in licensing or distributing copyrighted creative works."*

*"To illustrate the file-sharing technology that has proved so controversial, we will demonstrate how a search and download of music is done using Gnutella. If you will direct your attention to the monitors, you will be able to see the process from a live Internet connection. First, we submit a request for particular music or a particular artist. As I mentioned before, we do not submit the request to a central site, but rather we link directly to other Gnutella users and relay our requests through the individual hard drives of members of the new telecommunity who are online. If you look at the bottom left-hand corner of the screen, you can see how many connections we have made with other users. The search engine returns to us a list of the relevant music files available to us from other Gnutella users, together with information on the size of the file and the other users' bandwidth, and hence probable download speed. We can choose from among the many options returned which files to download, and can watch the progress of downloading. Since the downloading will take a few minutes, we will return to play the music after the ranking member's remarks. Once the file is downloaded, because the music is in a digital format, I can copy it onto a number of different listening devices to take the music with me. I think music fans have expressed a strong interest in getting popular, legitimate music in this format. One continuing problem raised throughout the evolution of online music, however, is the complaint that the major record labels have not been willing to license online music distributors to provide their music, or have offered licenses on terms much different than online entities related to those labels."*

U.S. Senate Judiciary Committee Hearing, July 11 2001, pages 1-3.

The new telecommunity of which Senator Hatch speaks are the citizens of cyberspace.

Senator Leahy then described how his own children download songs and send them to him:

*"But when you can move so quickly on some of these sites, and when I go on college campuses, as many of us do, to talk and everybody is talking about what they have downloaded, how they share, and so on, and when my kids pick up a "Black Muddy River," which happens to be one of my favorites of the Dead, and send it to me—they have heard a new version—and I log on in the morning while I am having my breakfast and there it is, I mean this is a whole different world, and I think we have to recognize that on where we go."*

U.S. Senate Judiciary Committee Hearing, July 11 2001.

The Senators themselves engaged in downloading, and urged the industry to adjust or face the prospect of new legislation:

> *"[I]f the parties don't quickly move to some voluntary licensing arrangements, then I suspect there is going to be pressure on Congress to create statutory, compulsory licenses. There will be pressure for Congress to create a single fee for the writers, the performers, the record companies, and all concerned. Think about that. Frankly, I am not sure everybody is going to be happy with it if we did do that, and I would hope that the parties might continue to work together. "*

 U.S. Senate Judiciary Committee Hearing, July 11 2001.

Later in 2000, Senator Hatch invited Shawn Fanning to speak at another Senate Judiciary Committee hearing held in Senator Hatch's home state to address: "Utah's Digital Economy and the Future: Peer-to-Peer and Other Emerging Technologies."[9] Senator Hatch described Napster as the "most famous example of peer-to-peer networking ..., whose creator is here with us today. ... [W]e're real proud of him and proud of the efforts he's made and proud of the things he's been able to accomplish.

> *"Peer-to-peer means that everyone's home computer becomes like a server. ... One of our witnesses today will be Shawn Fanning. Shawn Fanning is the inventor of the Napster software application and founder of the Napster Internet music community. A native of Massachusetts, Mr. Fanning developed the original Napster application and service in January 1999, while a freshman at Northeastern University. Napster is the fastest growing application in the history of the Internet. In early October 2000 the Napster community numbered over 32 million worldwide. Shawn continues to be active in the development and growth of the Napster technology and business. And of course as you all know, he's probably been on more front pages of magazines than almost anybody in history except perhaps John F. Kennedy. Now Shawn, we don't think you should run for office. We think you should keep doing what you're doing, although knowing a little bit about you, I'm not sure you shouldn't run for office too."[10]*

---

[9] 106th Cong., S. Hrg. 106-1070, *available at* http://www.access.gpo.gov/congress/senate/senate14ch106.html.

[10] Senator Hatch not only spoke with enthusiasm and appreciation for peer-to-peer sharing technology, he invited students in the audience to come up on stage and sit at Fanning's feet:

> *"It's this peer-to-peer technology approach that basically has formulated opportunities for people like never before. And we're moving more and more into peer-to-peer technology; and when you look at Gnutella, which doesn't even need a server, it's a slow system, but nevertheless someday somebody is going to break through on that. Napster was the reason I think we've been able to even move in that direction. So let's turn to Shawn Fanning, who at 18 years of age developed this application and this process, and deserves an awful lot of credit. We're very proud of him, and he's been with us back in Washington and agreed to come to Utah especially today just to chat with us a little bit about what his perspectives are. And if some of you young students would like to come up and sit on the floor up here, for those of you who are standing, we would be glad to have you come up here and surround this place, and we'll turn the time over to Shawn Fanning at this point."*

U.S. Senate Judiciary Committee Hearing, October 9, 2001, at 2-3.

Without waiting for Congress to act, the recording industry sued to shut Napster down. Ultimately it obtained a court order that Napster must use its centralized server architecture to block user access to copyrighted songs, *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001). But after Napster came Grokster, with a decentralized server architecture that left Grokster no ability to block user access. When the recording industry went to court to stop Grokster, it lost in the District Court, and then again in the Ninth Circuit Court of Appeals. *MGM Studios, Inc. v. Grokster, Ltd.,* 269 F. Supp. 2d 1213 (C.D, Cal., 2003), *MGM Studios, Inc. v. Grokster Ltd.*, 380 F.3d 1154 (9th Cir. Cal., 2004).[11] It was at this point, in 2003, that the industry decided to attack consumers.

The premise of its litigation campaign against Internet-using consumers is that 504(c) of the Copyright Act of 1976, as amended in 1999, authorizes statutory damages against consumers. Never before in any context previous to the Internet had infringement lawsuits for statutory damages been brought against individual consumers. [12]

Since the inception of the industry's litigation campaign in 2003 it has brought thousands of lawsuits against individual noncommercial Internet consumers for alleged misuse of home computers for purposes of private enjoyment of music. [13] These are people who by and large are students with little or no knowledge of the federal courts, no resources to handle the demands of a process designed for commercial litigation, no ability to duel with the industry's immensely skilled and lavishly financed prosecuting lawyers in resisting

---

[11] Only later, in 2005, did the Supreme Court give the industry the win it wanted against Grokster. *MGM Studios, Inc. v. Grokster Ltd.,* 545 U.S. 519 (2005).

[12] In *Capitol Records, Inc. v. Thomas*, 579 F. Supp. 2d 1210, 1227, Chief Judge Michael Davis noted Plaintiffs' failure to provide any support for a statutory damage award against a noncommercial, individual user: "All of [Plaintiffs'] cited cases involve corporate or business defendants and seek to deter future illegal commercial conduct. The parties point to no case in which large statutory damages were applied to a party who did not infringe in search of commercial gain." Language that supports protecting personal home uses arises in *Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.*, 780 F. Supp. 1283, 1293 (N.D. Cal. 1991), which quotes legislative history to this effect (articulating congressional "reluctance to interpret or enforce the Copyright Act by carrying copyright protection into the home"). *See also* 4 Nimmer on Copyright § 13.05[A][1][c] (2009) ("[G]iven the real-world difficulties of proof and enforcement, activity that is wholly noncommercial to the extent that it takes place within the home is, as a practical matter, typically beyond the reach of copyright holders."). *Cf. Columbia Pictures Indus. v. Prof'l Real Estate Investors, Inc.*, 866 F.2d 278, 281 (9th Cir. 1989) (stating in a copyright analysis that hotel rooms are "places where individuals enjoy a substantial degree of privacy, not unlike their own homes").

[13] *See, e.g.*, Electronic Frontier Foundation, *RIAA v. The People: Five Years Later* (Sept. 2008), *available at* http://www.eff.org/wp/riaa-v-people-years-later (placing the number of lawsuits at over 30,000 as of September 2008).

the imposition of process through the Federal Rules of Civil Procedure, and who therefore have had no choice but to default or pay whatever settlement fee the industry chose to exact.

The validity of imposing statutory damages on consumers has never been directly challenged. Such validation as the recording industry's litigation campaign has comes from cases in which no direct challenge was made. In *BMG Music v. Gonzales*, 430 F.3d 888 (7th Cir. 2005), the defendant was charged with downloading thirty songs. She defended on grounds of fair use and lost by summary judgment. She conceded that if found to be an infringer, she would be liable for statutory damages. The only real dispute was what level of statutory damages would apply She did not recognize the legal possibility that an end-user consumer could be an infringer, yet not be liable for statutory damages. The trial court's summary judgment was then affirmed on appeal, without address to the issues of statutory interpretation and constitutionality presented by the improper assumption that Congress intended statutory damages apply to consumers.

Since *Gonzalez*, only two consumers have had the temerity and courage to reach trial. The results for them both have been disastrous. For sharing 24 songs, Jammie Thomas first suffered a verdict of $221,000, and on retrial, $1.92 million dollars in statutory damages; For sharing thirty songs, Joel Tenenbaum was assessed $675,000 in statutory damages. In each of these trials, they were blanketed with motions, prevented from raising factual, legal and constitutional defenses, and then subjected to a jury instructed that their role was limited only to assessing statutory damages within a prescribed range. In this case the verdict form in itself is proof of how a jury can be brought to return a bankrupting verdict against a defendant for what is, even in the plaintiffs' metaphor, a non-criminal "shop-lifting" civil violation. The extent of the jury's role was reduced to filling in the form with a dollar figure between $750 and $150,000 for each song. Responsibility for the verdict lies not with the jury, which did just what it was told to do, but with the interpretation of the law that shaped the verdict form. The jury was prevented from considering the fairness of the defendant's actions and was mandated to award money according to a prescribed range. The jurors did just what they were told to do. We see now just where the application of this supposed law leads.

### III. IMPOSING STATUTORY DAMAGES ON CONSUMERS IS SUPPORTED NEITHER BY CONGRESSIONAL ACT NOR CONGRESSIONAL INTENT.

The Supreme Court clearly puts the responsibility with Congress for developing copyright law in response to new technological transformations:

> *From its beginning, the law of copyright has developed in response to significant changes in technology. Indeed, it was the invention of a new form of copying equipment -- the printing press -- that gave rise to the original need for copyright protection. Repeatedly, as new developments have occurred in this country, it has been the Congress that has fashioned the new rules that new technology made necessary. Thus, long before the enactment of the Copyright Act of 1909, 35 Stat. 1075, it was settled that the protection given to copyrights is wholly statutory. Wheaton v. Peters, 8 Pet. 591, 661-662 (1834). The remedies for infringement "are only those prescribed by Congress." Thompson v. Hubbard, 131 U.S. 123, 151 (1889). ... Sound policy, as well as history, supports our consistent deference to Congress when major technological innovations alter the market for copyrighted materials. Congress has the constitutional authority and the institutional ability to accommodate fully the varied permutations of competing interests that are inevitably implicated by such new technology.*

*Sony Corp. of Am. v. Universal City Studios, Inc.* 464 U.S. 417, 430-31 (1984).

According to the Supreme Court, it is Congress that should weigh the competing interests and Congress that should set the new rules that new technology makes necessary. Congress has not revised its 1976 statute to address copyright law in the new environment. Although it passed the Digital Theft Deterrence and Copyright Damages Improvement Act of 1999, the purpose of that act was to make sure that congressional concerns for large-scale criminal software piracy enunciated in the NET Act of 1997 were being dealt with effectively by law enforcement. The hearings held by Senator Hatch in 2000 could not make clearer that Congress had not addressed and certainly had not decided to extend statutory damages to consumers.

Interpreting 504(c), as the recording industry would have it, to impose statutory damages on noncommercial individual Internet consumers leads inevitably to absurd and unconstitutional results. In mathematics, proof can made by *reductio ad absurdum*. If logic leads to absurd result then premise must be wrong. .  Likewise in the law, an interpretation of a statute which would produce an absurd result is to be avoided if alternative interpretations consistent with the legislative purpose are available.  *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564 (1982).

In this case the logic of the recording industry's interpretation leads to directed verdicts for ludicrously large amounts controlled only by how much the copyright holding plaintiffs choose to ask for. The premise that Congress at some time in the past decided to impose statutory damages on Internet users of peer-to-peer sharing technology, or ever decided to impose statutory damages on consumers of any kind at any time., is wrong. It never happened. Statutory damages were created to apply to those who infringed for profit. The multiple anomalies created by extending statutory damages to end-user consumers all disappear if statutory damages are limited to mirror the target of 504(b) for which the statutory damages are to serve as alternative, namely infringers who cause real damage by selling unauthorized copies for profit: commercial infringers who have profits as opposed to consumers who have none.

To interpret 504(c) to extend beyond commercial abusers and apply to consumers as well requires one to imagine that Congress lumped together in a single paragraph a damage range that would apply alike to commercial counterfeiters and individual consumers, making no statutory distinction between them whatever. It requires imagining that Congress, without debate, authorized bankrupting damages against individual Internet users for using home consumer electronic equipment. [14] It means imagining that Congress intended to expose Internet users who are concededly innocent of even knowing that what they are downloading is copyrighted to liability of $200 per song (for as many songs as the industry might choose to sue for). These results are absurd.

Further, if Congress wanted to greatly expand the remedies available for copyright infringement against *noncommercial* infringers, the statutory damages provision of 504(c) as written would be an odd way to do so. After all, while 504(b) provides for a remedy based on "actual damages and profits," 504(c) is available to copyright holders "*instead* of actual damages and profits." According to Merriam-Webster's dictionary, "instead" means "as a substitute or equivalent."[15] But if the infringer makes no profit and causes no actual damages – and neither profit nor actual damages have ever been alleged here – then 504(c) is not an option at all, for it is in no way a reasonable substitute or equivalent to the main remedy available in 504(b). Congress making statutory damages available "instead of" actual damages

---

[14] In 2001, Apple Computer ran a famous ad campaign that notified customers that they could use the new iTunes software to "Rip. Mix. [And] Burn" music. *See* List of Apple, Inc. Slogans, http://en.wikipedia.org/wiki/List_of_Apple_Inc._slogans.

[15] *Available at* http://www.merriam-webster.com/dictionary/instead.

and profit in cases when a plaintiff's ability to prove profit and actual damages is difficult makes perfect sense, but envisioning that statutory damages are an equivalent option in a case with no profit motive or actual damage alleged would not naturally fit within the statute as worded. The provision is saved by constraining the applicability of 504(c) to cases where the damages allowed there can stand in for the profits of the infringer, and not applying it to individual, noncommercial infringers; this limiting interpretation avoids constitutional confrontations, unimaginable suppositions about Congressional behavior, and inevitably outlandish jury verdicts.[16]

## IV. THE COURT WRONGLY DECIDED THE ISSUE OF FAIR USE.

Charged with infringing in August, 2004 the copy rights owned by Plaintiffs in thirty songs, the defendant duly asserted his defense of fair use. The Copyright Act recognizes this defense without having created it, and requires a defendant to plead it affirmatively. The Seventh Amendment gives the defendant the right to make this defense to a jury of his peers if there are facts and mixed questions of fact and law in dispute. On the day before the defendant's trial commenced the Court ruled by summary judgment that the defendant had no fair use defense, and thereafter prevented its presentation to and consideration by the jury. The Court wrongly took decision of the fair use issue upon itself by acting on summary judgment when there were facts and factors of fairness in dispute. Having assumed responsibility for deciding the issue of fairness, the Court wrongly resolved it.

As of August 2004, Plaintiffs had made available to the consuming public a legitimate product equivalent to the thirty songs in mp3. Availability of an equivalent legitimate source is undoubtedly a fair use factor.[17] The essence of the mp3-formatted songs the defendant was found liable for downloading was their free transferability. He could play

---

[16] This interpretation is further supported by the provisions in 504(c)(2)(i) and (ii), which exempts libraries, educational institutions, and public broadcasting entities from statutory damages in certain cases. These clauses indicate that Congress was concerned that the high statutory damages provisions might discourage use in many contexts where the infringer would be disproportionately burdened by large awards because they are not profit-seeking enterprises – but to exempt *enterprises* not seeking a profit from the full brunt of statutory damages but not *individuals* not seeking a profit would make little sense unless the intent was that such individuals would not be able to reached by that provision in the first place. The explanation is that Congress never contemplated imposing statutory damages on consumers.

[17] "A key, though not necessarily determinative, factor in fair use is whether or not the work is available to the potential user." *Harper v. Nation*, 471 U.S. 539, 553 (1985) (quoting Copyright Law Revision, Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law, 87th Cong., 1st Sess., 41 (Comm. Print 1961)).

them in his car. This is exactly the quality of transferable usability to which Senator Hatch referred (*music fans have expressed a strong interest in getting popular, legitimate music in this format*).

The Court in this case agreed that availability of an equivalent legitimate source is a fair use factor, acknowledging the viability of a fair use defense for actions taken during "a period of time before the law concerning file-sharing was clear and paid outlets were readily available. . . . A defendant who shared files online during this interregnum but later shifted to paid outlet once the law became clear and authorized sources available would present a strong case for fair use." In other words, the Court would not have directed verdicts against Senator Hatch and Senator Leahy's daughter and the audience of young people Senator Hatch asked to come sit at Shawn Fanning's feet, had they been prosecuted at the time of the Senate Judiciary hearing in 2000.

The Defendant downloaded the 30 songs in question on or before August 10, 2004. He introduced evidence at trial that, as of August 2004, the plaintiffs had not yet made available any of the thirty songs in freely transferable form. Plaintiffs' witness Ron Wilcox testified as well that the songs were available in 2004 only in encrypted form not capable of free transferability among different players. The defendant could not have played the encrypted songs in his car without buying special equipment.

The question then becomes, where along the time line of industry transition from offering no downloadable digital product at all to finally offering freely transferable digital product should the line of fair use be drawn, before which peer-to-peer file-sharing sharing could be considered fair use and after which it would not? The Court drew the line in fashion that compromised the public interest. The Court's line means that it was fair of the plaintiffs to force the consuming public to accept an inferior product on pain of legal condemnation and bankruptcy.

Recognizing a defense of fair use viable at least until the time that the recording industry made freely transferable songs available for purchase is a better line than the line the Court chose. It would differentiate two legal spaces with a fair line between, fair not only is the sense of equitable but fair as well in the nautical, mathematical sense of efficient and elegant. A clean line of demarcation makes far more sense in terms of fairness, notice, clarity and principle than the indistinct boundary line the Court chose. It would recognize the consuming public's interest in having the best product, and rightly put the doctrine of fair use in service of that public interest in its application to the facts of this case. It could be

understood as a principled line to mark the end of "the interregnum" and transition to a fair beginning of liability. Drawing the line of fair use at the point at which the plaintiffs finally offered their songs to the consuming public in freely transferable format would leave the recording industry with the benefit of the change in norm that its litigation campaign has effectuated, yet relieve the transitional born-digital generation of undeserved guilt.

In contrast, the Court's summary judgment ruling identifies no clear point of time marking transition from one legal space to another. The Court says that by August, 2004 the law had become clear and the plaintiffs' digital offerings sufficiently equivalent. Both assertions are ambiguous and disputed. The assertion legal clarity is made on the basis of no congressional action whatever and judicial statements in cases involving intermediaries sued for secondary liability, none involving consideration of fair use in the case-by-case manner the doctrine of fair use calls for.

The Court's assertion that there were no facts in dispute and thus that summary judgment was appropriate was the consequence of excluding the defendant's witnesses who would have testified about these critical public interest factors, improperly imposing the burden of proof on the defendant, and improperly resolving facts and mixed questions of fact and law that were put in dispute both by the pleadings and by the evidence at trial.

The Court excluded John Perry Barlow, who would have testified to the tardiness of the recording industry in responding to the competitive demands of the new environment, which would have given court and jury basis to judge the significance in terms of fairness of the industry's failure to provide a freely transferable product for sale until 2007. The Court excluded John Palfrey, leading researcher on the way young people come to understand "fair use", and on what young people understand "fair use" to be, who would have testified to the cost and difficulty in human terms of children having to learn and parents and teachers having to teach and police the uncertain boundary between infringement and fair use. The Court excluded Wayne Marshall, ethnomusicologist, student of the free music world, offering to testify to the jury about the significance of "song" as the nature of the copyrighted works, including the significance of the transferability of the songs to any judgment of the fairness of the defendant sharing songs peer-to-peer in August 2004. Johan Pouwelse was prevented by the Court's fair use ruling from testifying about the burden of the plaintiffs rule on the development of peer-to-peer filesharing technology. Only copyright industry voices would be heard.

The Court improperly imposed the burden of proof on the defendant. The evidentiary burden on the defendant of affirmatively advancing the defense of fair use is only one of pleading, a burden of coming forward, not a burden of persuasion. Fair use and infringement are mated concepts, each the border of the other.  Fair use is not an excused infringement; it is not infringement at all. Section 107 of the Copyright Act declares "the fair use of a copyrighted work ... is not an infringement of copyright." To prove an infringement then, the burden of proof is on the *plaintiff* to prove infringement, which, once fair use has been pleaded as a defense, means proving that the defendant's use was not fair. To impose the burden of proving fair use, in the sense of persuasion, on the defendant necessarily shifts the burden of proof on infringement, which Federal Rule of Evidence 301 makes clear cannot be done. The "burden of proof in the sense of the risk of nonpersuasion ... remains throughout the trial on the party on whom it was initially cast." FED. R. EVID. 301. This seems so elementary that one might wonder why there is even dispute. It is because the term "affirmative" is unfortunately misleading and often taken thoughtlessly to mean not only that fair use must be affirmatively pleaded but also affirmatively proved. Snow, *Proving Fair Use: Burden of Proof as Burden of Speech* (2009),[18] offers a thorough and persuasive analysis why this is historically and analytically wrong.[19]

The Court justifies its summary judgment against fair use with the claim that: "[Tenenbaum's] demand for a jury determination on this issue appears all but standardless; "fair use" would, in effect, be any use whatsoever that a jury deemed fair." Fair use is a standard, not a rule.[20] The very essence of the standard is that it cannot be reduced to rule.

---

[18]http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1340128 (concluding that "The fair use burden of proof is repugnant to the fair use purpose. Adding to this repugnancy is the fact that the burden is the product of a mistake. For over a century, courts recognized that speakers of fair use expression should not bear this burden. Then modern courts mistakenly interpreted fair use as excusing, rather than defining, infringement, and as a result, they placed the burden on the party seeking to invoke the excuse.")

[19] The Supreme Court in *Sony* emphasized the defining nature of fair use and declared[19] as the core of its opinion that noncommercial users consuming for private use do not bear the burden of proving fair use. As in this case, *Sony* involved the assertion of fair use on behalf of consumers benefitting from the use of consumer electronics at home for private purposes, not for profit.

[20]*See, e.g., Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 549 (1985)("Section 107 requires a case-by-case determination whether a particular use is fair, and the statute notes four nonexclusive factors to be considered."); 4-13 Nimmer on Copyright § 13.05 ("Section 107 of the statute does not, and does not purport to, provide a rule that may automatically be applied in deciding whether any particular use is 'fair.'); H.R. Rep. No. 94-1476, p. 66 (1976)("Section 107 is intended to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way.")

Determinations of fairness call for human judgment. That is why the defense of fair use is for jury decision and why it is improper to resolve by summary judgment.

The Court asserts that "fair use" is not a standard of fairness, but rather is "an effort to measure the purpose and effects of his particular use against the incentives for artistic and literary creation that Congress established in the Copyright Act." This is a partial but limited and one-sided industry-centered view of fair use. Neither the court nor the jury is bound to consider fair use solely from the copyright industry's point of view. Recall, the point of view from which the Constitution speaks is We the People. Fair use is a defining constraint on copyright in service of the public interest.  Incentives for artistic and literary creation are but one element of a case-specific inquiry of fairness in which all factors of fairness are to be considered. Equally powerful considerations of fairness to those of the copyright industry are the interests of Internet users and the consuming public on whom the burdens of copyright enforcement fall. The Court simply ignored all burdens on the consuming public, all incapacities, inequities and costs of enforcement: the fear and confusion imposed on our nation's children by teaching them to follow the plaintiff's rule; the burdensome and frightening duty imposed on parents to teach and police their children under legal threat of family ruin.

The jury is to decide the issue of infringement/fair use in the context of the facts of the specific case before it, with decision about what factors are to be considered, and what facts and inferences from facts bear on each factor, and what weight each factor is to have in the ultimate judgment of infringement/fair use the jury is to make.[21] Whether the plaintiffs had made available an equivalent product, or even a "sufficiently equivalent" product as of August 2004 is but the clearest example of a disputed issue of mixed fact and law clearly relevant to fair use, which means it was an issue that should have been entrusted to the jury to decide. The Court appears to have lost faith in the jury. Despite the Court's evident respect for jurors as people, the Court disrespects the jury as an institution by usurping the

---

[21] *See* Snow, *Fair Use, Summary Judgment and the Constitution* (2009), *available at SSRN* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1457352 ("For well over a century, juries routinely decided issues of fair use. Courts recognized that the subjective nature of inferences in the fair use analysis made those inferences factual, precluding a summary disposition. They understood that the Seventh Amendment right to a jury and the First Amendment right of free speech demanded juries in fair use cases.")

jury's function of deciding the mixed questions of fact and law involved in the fairness judgment, and leaving the jury nothing meaningful to do.[22]

## V. AT TRIAL THE COURT ERRED BY PREJUDICIALLY REDACTING DEFENDANT'S OFFER OF EVIDENCE THAT HE WAS WILLING TO TAKE RESONSIBILITY FOR HIS ACTIONS, TWISTING IT INTO DEVASTATING IMPEACHMENT OF HIS CHARACTER.

The Court erroneously redacted Ex. 23, the defendant's offer of settlement of November 21, 2005, offered in evidence by the defendant. This in itself is reversible error requiring a new trial.

Plaintiffs did their best throughout the trial to make the defendant appear to the jury to be a liar, a perjurer, and a person dodging responsibility for his actions and blaming others under oath for his conduct. Joel Tenenbaum's most powerful evidence to the contrary was his November 2005 letter to the plaintiffs with its offer of settlement and attached money order for $500.00 (Ex. 23). This letter showed that he took responsibility for his actions, that he was not looking for a fight but had had this fight imposed on him, and wanted to make amends to the best of his ability..

The letter in full:

*I am enclosing a money order for $500.00 as a final and complete settlement of any lawsuits that any company you represent may file against me.*

*I am a college student and on scholarship to attend my college. I use a bicycle around Baltimore. I was able to scrape together $500.00 to send to you from the money the college pays me to tutor. It would be a hardship to send you more money as the college only pays me $6 an hour. Of course, I am tutoring in addition to carrying a full-time schedule of classes.*

---

[22] The Anglo-American jury is a remarkable political institution. We have had it with us for so long that any sense of surprise over its main characteristics has perhaps somewhat dulled. It recruits a group of twelve laymen, chosen at random from the widest population; it convenes them for the purpose of the particular trial; it entrusts them with great official powers of decision; it permits them to carry on deliberations in secret and to report out their final judgment without giving reasons for it; and after their momentary service to the state has been completed, it orders them to disband and return to private life. The jury thus represents a deep commitment to the use of laymen in the administration of justice ...
The Law of Juries, 2d ed. Gertner and Mizner (Thompson 2009), quoting Harry Kalven, Jr. and Hans Zeisel, *The American Jury* 3 (1971)

*It was very nice of my mom's childhood friend who became an attorney to contact you since I couldn't afford to hire an attorney.*

*While I do not have access to the computer at college, I will be home on November 22nd. If there are any files existing in violation of copyrights, I will destroy them at that time.*

*Very truly yours,*

To the defendant's great prejudice, the Court excluded by redaction all mention of settlement from the letter and excluded the $500.00 money order, admitting only the last paragraph of the letter in which the defendant stated that he would destroy the offending files. Ripped from its context as part of a settlement offer that the Plaintiffs summarily rejected, this paragraph was thereby transformed from a conditional commitment contingent upon acceptance of the defendant's settlement offer by the Plaintiffs into an apparently unconditional unilateral commitment by the defendant. This in turn gave the Plaintiffs a basis for their devastating impeaching attack on the defendant for not destroying the offending files as he had apparently and unequivocally promised to do.  This letter thus became damning evidence of perfidy.

The Court's exclusion of the defendant's settlement offer was based on a misunderstanding and erroneous application of Rule 408 of the Federal Rules of Evidence. The rule by its express terms applies only to exclude evidence of settlement negotiations offered to prove liability for, invalidity of, or amount of a claim. Here the erroneously excluded evidence was offered to show the defendant's acceptance of responsibility, not to prove the invalidity or amount of a claim. "The principle of exclusion does not operate when compromise-related evidence is used to establish some other fact of consequence in the litigation." Weissenberger's Federal Evidence 148 (Anderson 1999). *Central Soya Co. v. Epstein Fisheries, Inc.*, 676 F.2d 939, 944 (7th Cir. 1982).

Moreover, Rule 408 applies only to admissions. The rule seeks to avoid one party use a settlement offer *against* the party who made it.  The Advisory Committee notes state:

> evidence of an offer to compromise a claim is not receivable in evidence <u>as an admission</u> of, as the case may be, the validity or invalidity of the claim." As with evidence of subsequent remedial measures, dealt with in Rule 407, exclusion may be based on two grounds. (1) The evidence is irrelevant, since the offer may be motivated by a desire for peace rather than from <u>any concession of weakness</u> of position. ... While the rule is ordinarily phrased in terms of offers of compromise, it

is apparent that a similar attitude must be taken with respect to completed compromises <u>when offered against a party</u> thereto. [Emphasis added.]

As McCormick puts it in his section discussing "Admissions by Conduct", "The exclusionary rule [of FRE 408] is designed to exclude the offer of compromise only when it is tendered as an admission of the weakness of the offering party's claim or defense, not when the purpose is otherwise." McCormick on Evidence, § 274 at 812. The underlying fear addressed by Rule 408 is that, without the rule, settlement negotiations would be inhibited if the parties knew that statements made in the course of settlement might later be used against them as admissions of liability. As stated in S. Salzberg & K. Redden, Federal Rules of Evidence Manual 191 (3d ed. 1982): "The philosophy of the Rule is to allow the parties to drop their guard and to talk freely and loosely without fear that a concession made to advance negotiations will be used [against them] at trial."

Ex. 23 is an offer of compromise offered as evidence of acceptance of responsibility by the party who made the offer. It was not offered as an admission of weakness made in settlement negotiations to prove liability or amount. It should not have been redacted. And, if redacted at all, it should not have been done in a way that distorted its meaning and allowed the plaintiffs to characterize the defendant as a liar. This was not harmless error. The defendant's willfulness was established by it.

## VI. IN ITS JURY INSTRUCTIONS THE COURT ERRED BY INFORMING THE JURY OF THE STATUTORY DAMAGE RANGE.

Telling the jury to return a verdict that is "just" makes sense both in terms of the statutory language, which calls for a "just" award, and in terms of jury function. But then telling the jury that if they find that the defendant acted willfully they may increase the top limit on their award per song from $30,000 to $150,000 operates as an overwhelming outside influence on the jury's common sense judgment of justice.

There was neither need, nor warrant for the Court to so influence the jury. The jury could have been given the task of saying what award of damages against the defendant it deemed "just". This is not only the term of moral value used in the statute, it is, like the assessment of "reasonableness" or the consideration of "the totality of circumstances," a function ideally suited to a jury. Had the jury returned with an award either less than the minimum or more than the maximum of the statutory range, the Court could have adjusted

the award as she thought the law required. Any such adjustment would then have been subject to proper legal challenge.

The Court derives no warrant from the statute, and in fact contravenes the statute, by giving the jury the task of conforming its award to the statutory range. That task is assigned by the statute exclusively to the judge. Facing a Seventh Amendment challenge to the statute, the Supreme Court in *Feltner* considered whether the language of Section 504(c) could be interpreted to allow reference to "court" in the statute to mean "jury," and specifically decided (over Scalia dissent) that it could not.  The statute's assignment of function was solely to the judge. It is only by reason of the Seventh Amendment's right to jury trial overriding the statute that the task of determining a just award is taken from the judge and given to the jury. The Seventh Amendment surely does not require the jury to be told it must conform its award to the statutory range. The task of confining the award to the statutory range should have remained where the statute placed it, with the judge.

## VII. THE JURY'S DAMAGE AWARD IS GROSSLY EXCESSIVE, VIOLATED DUE PROCESS, AND SHOULD BE REMITTED

The court should remit the jury's outrageously high award to the minimum before addressing whether the imposition of this minimum award violates due process. The minimum within the statutory range for a willful infringement is $750. Applying this minimum to the Court's directed verdict of thirty infringements would make a total award of $22,500. The Court should remit the award by limiting it the seven songs with which the Defendant was originally charged, thus to a total award of $5250. Having so reduced the amount of the jury's award, the Court should recognize the disproportion of the award to the offense and set it aside altogether as unconstitutional. Even as remitted this vastly smaller award would still exceed the limits of due process articulated by the Supreme Court for punitive damage awards. See, Pamela Samuelson, Statutory Damages in Copyright Law: A Remedy in Need of Reform.[23]

Statutory damages violate the constitutional guarantee of due process if they are "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable."  See *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 67–8 (1919); *Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.,* 492 U.S. 257, 277 (1989).

---

[23] http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1375604.

Plaintiffs seek to escape the constraints on punitive damages that the Supreme Court has been articulating by claiming that statutory damages are different. But if anything the difference should make the due process analysis even more stringent. Punitive damages are calibrated to the facts of the specific case in which they are awarded. The statutory damages in this case are entirely punitive, mandated alike in cases large and small, and imposed in a manner that negates the due process involved in considering a specific case.

*Williams* involved a suit for statutory damages by railroad passengers against the railway company for overcharging her for her ticket. A state regulatory statute provided that a railroad company that charged a passenger more than the statute allowed was subject to a penalty of "not less than fifty dollars, nor more than three hundred dollars and costs of suit, including a reasonable attorney's fee." *Williams*, 251 U.S. at 64.  Two women who were each overcharged 66 cents sued the railroad company and won judgments of seventy-five dollars and costs. The *Williams* court found this statutory damage penalty not "so severe and oppressive as to be wholly disproportioned to the offense or obviously unreasonable." *Id.* at 67.

*Williams*, it should be noted, involved award of statutory damages against a big company for the benefit of individuals who had been victimized by corporate overreaching. By comparison, this is a case by giant companies <u>against</u> a consumer, the equivalent of the railway company suing the passengers. The size of the damage award against the railway company was trivial in relation to the company's assets to pay it, while in this case the statutory penalty imposed on an individual is bankrupting on an on into the future. The offense in this case, if there be one, is more like a passenger riding the train without a ticket than like a railroad company overcharging consumers. Whereas the *Williams* penalty was reasonable as a consumer protection measure against an overreaching corporation and only a financial slap on the wrist as far as the corporation was concerned, the penalty here is outrageous and can be defended if at all only by amoral economic logic.

Nobel prize-winner Gary Becker, a founder of the Chicago school of law and economics, famously argued that, to deter widespread parking violations, the optimal policy would be to threaten and impose very high sanctions theoretically up through torture and death on a few individuals so unlucky as to be caught. [24] While this may be "rational", it is

---

[24] http://en.wikipedia.org/w/index.php?title=Gary_Becker&action=edit&section=3

not just. This case puts Becker's theory into action and the issue to the test. Bankruptcy is the maximum penalty the civil law can impose. By hypothesis, no civil penalty could be more severe and oppressive. This penalty, by any stretch that includes consideration of culpability, actually caused injury, or resource to pay, is disproportionate to the conduct for which the defendant has been found liable. Even using the industry's metaphor of theft, this is bankruptcy for shoplifting.

Courts applying *Williams* have focused on whether statutory damages are reasonable in light of the harm the defendant caused. *See, e.g., United States v. Citrin*, 972 F.2d 1044, 1051 (9th Cir. 1992) (applying *Williams* but finding that the statutory damages at issue were not unreasonable "given the resources necessary to find a doctor to practice in an underserved area"). The Thomas court facing this issue after the first Thomas trial echoed *Williams*, suggesting that, given the noncommercial nature of individual file-sharing, the Copyright Act's statutory damages provision violates due process as applied to such defendants. *Capitol Records, Inc. v. Thomas*, 579 F.Supp.2d 1210, 1227 (D. Minn. 2008).. In *Thomas*, the jury awarded $222,000 in statutory damages against defendant Jammie Thomas for downloading 24 songs and placing them into her KaZaA "share folder." In granting the defendant's request for a new trial, Chief Judge Michael Davis described the damages as "wholly disproportionate" to the damages suffered by Plaintiffs. Id. at 1227 ("[Defendant's] status as a consumer who was not seeking to harm her competitors or make a profit does not excuse her behavior. But it does make the award of hundreds of thousands of dollars in damages unprecedented and oppressive.").

The Supreme Court has particularized the *Williams* standard in the context of excessive punitive damage jury awards. *See, e.g., BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574–575 (1996); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (applying *Gore* test and finding punitive damages of 145 times the actual damages violated due process). As applied to noncommercial defendants such as Jammie Thomas and Joel, the statutory damage authorization is grossly excessive under the due process articulations of both *Williams* and *Gore*. While punitive civil damage awards and minimum statutory damages awards differ in that juries make civil damage awards only after hearing evidence in a particular case under judicial instruction and supervision, minimum statutory civil damage awards are made by a legislative judgment, one-size-fits-all. The difference between the two, the

particularity of judgment to the facts of a specific case versus the blunderbuss of across-the-board legislative judgment, should, if anything, require greater strictness in judging the constitutional due process limits of punitive Congressional mandates. This is especially so where the aggregation of claims is totally within the power and discretion of corporate plaintiffs, who by virtue of their ability to aggregate claims, can transform a statutory minimum that might be reasonable in the context of a single claim, into a grossly excessive award. *See, e.g., Kline v. Coldwell Banker & Co.*, 508 F.2d 226, 235 (9th Cir. 1974); *Blanco v. CEC Entertainment Concepts L.P.*, No. CV-07- 0559-GPS, 2008 WL 239658 at *2 (C.D. Cal. 2008); *Parker v. Time Warner Entertainment Co., L.P.*, 331 F.3d 13, 22 (2d Cir. 2003); *Serna v. Costco Wholesale Corp. Inc.*, No. CV-07-1491-AHM, 2008 WL 234197 at *1 (C.D. Cal. 2008); *Azoiani v. Love's Travel Stops & Country Stores, Inc.*, No. CV-07-90-ODW, 2007 WL 4811627 at *4–*5 (C.D. Cal. 2007); *Najarian v. Avis Rent A Car System*, No. CV-07-588-RGK, 2007 WL 4682071 at *4–*5 (C.D. Cal. 2007).

While "[p]unitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition," *BMW of North America, Inc.* v. *Gore*, 517 U.S. 559, 568, 116 S. Ct. 1589, 134 L. Ed. 2d 809, unless a State insists upon proper standards to cabin the jury's discretionary authority, its punitive damages system may deprive a defendant of "fair notice . . . of the severity of the penalty that a State may impose," *id.,* at 574, 116 S. Ct. 1589, 134 L. Ed. 2d 809, and threaten "arbitrary punishments," *State Farm Mut. Automobile Ins. Co.* v. *Campbell*, 538 U.S. 408, 416.

Most significantly, the Due Process Clause forbids a State to use punitive damages award to punish a defendant for injury inflicted on or by strangers to the litigation. A civil penalty must be related to punishing and deterring a defendant for *his* conduct and the injury that *he* caused. *See Philip Morris USA v. Williams*, 549 U.S. 346, 353–54 (2007). The plaintiffs in this case asked the jury to consider harm that all of peer-to-peer filesharing had done to the recording companies and to their employees. The defendant is being punished not just for his behavior but for the behavior of a whole generation.

## VIII. PLAINTIFFS' REQUEST FOR INJUCTION AGAINST THE DEFENDANT SHOULD BE DENIED.

To date the proceedings in this case have been legal as opposed to equitable. Legality, as it has been wielded by the plaintiffs and applied by the Court in the form of its legal interpretations of the Copyright Act and its legal applications of the rules of civil procedure and the local rules of the Court, has, to date, entirely stifled the fair use argument of the defendant and his generation. But now the plaintiffs go even further, requesting the Court to use its equitable power to gag the defendant.

On the equitable side of the Court, a judge is expected and empowered to use her fairness and wisdom. The RIAA's lawyers , in addition to seeking enforcement of an outrageous, bankrupting verdict against Joel Tenenbaum,  are now demanding that he be enjoined from speaking about it to his peers and noting what interest others take. It is one thing to demand his current assets and the great bulk of his expected future earnings; it is another to stifle his right to complain about it. The plaintiffs' demand for use of judicial power to police the speech of the defendant is overbearing and in flagrant violation of his First Amendment rights.

Plaintiffs' claim to fit the four-factor test of *CoxCom, Inc. v. Chaffee*, 536 F.3d 101, 112 (1st Cir. 2008). Palpably, they do not.

(1) Irreparable harm. To invoke the power of injunction the plaintiffs must demonstrate that the defendant is irreparably harming them. Plaintiffs in this case neither alleged nor proved that the defendant did them any real harm. The harm they fear him doing now is the doubt he has cast and will continue to cast on the legitimacy of the plaintiffs' litigation campaign. He and his counsel will push forward in law, equity and in the court of public opinion, the illegality of the recording industry's abusive litigation campaign against consumers and the moral condemnation of his generation. The plaintiffs, having noted irreparable harm as a requisite to injunction, assert that it should be ignored by presumption, citing no case involving a consumer.

(2) Legal Remedy Inadequate. Here the legal remedy plaintiffs have obtained is bankruptcy, the maximum legal penalty that civil legal process can impose. The idea that the recording industry wants more than that of Joel Tenenbaum reeks of vengeance and the industry's publicity campaign, not of equity.

(3) Balance of Hardship. The hardship on the plaintiffs is none. Whether or not the defendant maintains in his possession the mp3's, for which he is to pay $22,500 a piece is a matter of no economic consequence whatever to the plaintiffs. To make sure of this, and to

emphasize that freely transferable files are now legitimately available for purchase, the legal team of JoelFightsBack has purchased and given to the defendant mp3's of the thirty songs. By contrast to the lack of hardship on the plaintiffs, the hardship on the defendant of an injunction not to behave in a way that offends plaintiffs (the injunction they request is in truth no narrower than that), to be enforced by more civil process from plaintiffs, is the threat of continued abuse through the imposition of process to which he has been subject since the filing of the complaint.

(4) Public Interest. Public interest is clearly served by advancing the public interest of fair use as a limitation on the expansion of copyright, and by advancing the awareness of the issues of copyright in the age of Internet that are raised by the plaintiffs' blunderbuss use of law in a way that Congress never intended. Public interest will be served by the defendant and his counsel speaking out about the issues and experience of this trial. The Twitter message of which Plaintiffs complain was posted not by the defendant but by his legal team. Public interest and the First Amendment will be disserved by the use of the Court's equity powers to stifle such expression.

The plaintiffs' request for an injunction is nothing less than a demand that the Court ally itself with the narrow interests of the corporate copyright holders in this case. The Court should reject the demand, and rather affirm the right of We the People, and Joel Tenenbaum, to speak out on the issues of public interest that are at stake in this case.

Respectfully submitted,


*/s/ Charles R. Nesson*
Charles R. Nesson[*]
BBO #369320
1575 Massachusetts Avenue
Cambridge, Massachusetts 02138
617 495-4609
nesson@gmail.com

Fern L. Nesson
5 Hubbard Park Road
Cambridge, Massachusetts 02138

---

[*] With assistance from Harvard Law students Jason Harrow, Stephanie Weiner and Debbie Rosenbaum.

Matthew H. Feinberg
BBO #161380
Matthew A. Kamholtz
BBO #257290
FEINBERG & KAMHOLTZ
125 Summer St.
Boston, Massachusetts 02110

October 5, 2009

CERTIFICATE OF SERVICE


I, Charles R. Nesson, hereby affirm that the within document was this day filed through the ECF system and will be sent electronically to the registered participants as identified in the Notice of Electronic filing, and that paper copies will be sent to those indicated as non-registered participants.


Date: October 5, 2009                    */s/  Charles R. Nesson*

                                        Charles R. Nesson