UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

SONY BMG MUSIC ENTERTAINMENT, et al.,    )
     Plaintiffs,    )
        )
    v.    )     Case No. 07cv11446-NG
        )
JOEL TENENBAUM,    )
     Defendant.    )
_____)

GERTNER, D.J.:

## TABLE OF CONTENTS
### MEMORANDUM AND ORDER
December 7, 2009

I.    **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **-1-**

II.    **EQUITABLE DEFENSE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **-8-**

III.    **SUMMARY JUDGMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **-9-**
        A.    **Legal Standard** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **-9-**
        B.    **Fair Use Standard** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **-11-**
        C.    **Fair Use Analysis** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **-15-**
                1.    **Statutory Factors** . . . . . . . . . . . . . . . . . . . . . . . . . . . **-16-**
                        a.    **Purpose and Character** . . . . . . . . . . . **-16-**
                        b.    **Nature of the Copyrighted Work** . . . **-18-**
                        c.    **Portion of the Work Used** . . . . . . . . . **-19-**
                        d.    **Effect on the Potential Market for the**
                             **Work** . . . . . . . . . . . . . . . . . . . . . . . . . . . **-21-**
                  2.    **Non-statutory Factors** . . . . . . . . . . . . . . . . . . . . . . . . **-24-**
                        a.    **Assumption of Risk** . . . . . . . . . . . . . . **-25-**
                        b.    **Marketing Activities and Failure to**
                            **Protect** . . . . . . . . . . . . . . . . . . . . . . . . **-28-**
                        c.    **Availability of Paid Alternatives** . . . **-30-**
                        d.    **Policing Costs** . . . . . . . . . . . . . . . . . . . **-33-**
                        e.    **The Injustice of this Action** . . . . . . . . **-34-**

IV.    **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **-35-**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SONY BMG MUSIC ENTERTAINMENT, et al., ) | |
|     Plaintiffs, ) | |
| ) | |
|     v. ) | Case No. 07cv11446-NG |
| ) | |
| JOEL TENENBAUM, ) | |
|     Defendant. ) | |

GERTNER, D.J.:

## MEMORANDUM AND ORDER
December 7, 2009

## I.    INTRODUCTION

Joel Tenenbaum ("Tenenbaum"), the defendant in this copyright infringement action, was accused of using file-sharing software as a college sophomore to download and distribute 30 copyrighted songs belonging to the plaintiffs.  More than one and a half years after Tenenbaum filed his original answer to plaintiffs' complaint, and seven months after his attorney entered an appearance (and assured the Court that he would seek no further amendments because Tenenbaum wanted an immediate trial),[1] counsel moved to amend Tenenbaum's answer to argue that his file sharing constituted a "fair use" under the Copyright Act.  What has since become a capstone of the defense, both in this court and the court of public opinion, was litigated -- candidly-- as an afterthought, and literally on the eve of trial.

The plaintiffs, four recording companies, moved for partial summary judgment on the fair use issue, claiming that there were no material facts in dispute and that only a question of law remained for the Court, not the jury, to decide (document # 871).  Plaintiffs argue that the law

---

[1]At a September 23, 2008, status conference, defendant's counsel requested "a trial date at the earliest convenience, ideally before the end of October."  (Tr. of Sept. 23, 2008, Status Conference at 13:21-14:24, document #820-2.)  Defendant also assured the Court that there would be "[n]o amendments, Your Honor."  Id. at 14:17.

and precedent is overwhelming, ruling out fair use as a valid defense to Tenenbaum's file

sharing on the facts he presented.

A word on process: The Court, deeply concerned by the rash of file-sharing lawsuits, the

imbalance of resources between the parties, and the upheaval of norms of behavior brought on

by the internet, did everything in its power to permit Tenenbaum to make his best case for fair

use. Over the record companies' strenuous objection, the Court allowed the fair use defense to

be added at the eleventh hour. Again over plaintiffs' objection, the Court allowed limited

discovery on the issue, even though discovery had otherwise been closed.[2] The Court did what it

could to focus the issue, notwithstanding what can only be described as a truly chaotic defense.[3]

---

[2] The order permitting the Defendant's Third Motion to Amend Answer and Counterclaims (document #806) was entered on June 15, 2009, with this endorsement:

> [While] [t]he late addition of the fair use defense is . . . troubling to the Court . . . it believes that this amendment will not significantly prejudice the Plaintiffs nor substantially delay trial, see Fed.R.Civ.P. 15(a) (permitting amendments "when justice so requires"), and that fair use is more appropriately resolved on a factual record as most courts have done . . . . See, e.g., BMG Music v. Gonzalez, 430 F.3d 888 (7th Cir. 2005) (appeal from summary judgment); UMG Recordings, Inc. v. MP3.com, Inc., 92 F.Supp.2d 349 (S.D.N.Y. 2000) (partial motion for summary judgment); E. Gluck Corp. v. Rothenhaus, 585 F.Supp.2d 505, 514-15 (S.D.N.Y. 2008) ("[A]lthough affirmative defenses may be raised in a motion to dismiss, defenses such as the fair use doctrine involve a more detailed analysis of the facts at issue and are best resolved by summary judgment or adjudication at trial.") (citation omitted)). As a practical matter, the Court believes that any new discovery required by this defense is limited and, accordingly, the parties will face strict deadlines in relation to any discovery sought...

[3] Defense counsel repeatedly missed deadlines, ignored rules, engaged in litigation over conduct that was plainly illegal (namely, the right to tape counsel and the Court without consent), and even went so far as to post the illegal recordings on the web. See Feb. 23, 2009 Order at 4 (document #759) ("The parties are advised that any . . . recording without permission of the participants as well as the broadcast of such communications, runs afoul of Mass. Gen. L. c. 272 § 99."); June 16, 2009 Order at 2 (noting that defense counsel had been "taping opposing counsel without permission (and in violation of law)"). Examples, which are legion, include the following: On March 9, 2009, the Court warned defendant's counsel that he was expected to follow the Federal Rules of Civil Procedure and that "[t]he Court will not hesitate to impose appropriate sanctions" if he continued to flout them. (March 29, 2009 Order.)

On July 7, 2009, the Court entered an order in response to counsel's posting of private, unconsented to audiotapes of depositions on the internet, noting:

> The Court is deeply concerned that the Defendant has violated the Court's June

Unfortunately, the chaos meant that the fair use issue was briefed on the very eve of Tenenbaum's trial. Indeed, defendant's papers, submitted little more than a week before trial was to begin, can only be described as perfunctory

At the pre-trial conference, the Court forecast to the parties the likelihood that the fair use defense would be rejected. Then, after a full examination of the parties' arguments, the Court issued its formal ruling, rejecting fair use and stating that a published opinion would follow. See July 27, 2009 Order. This Memorandum describes in greater detail the reasons for the Court's decision -- why fair use, ultimately, was not appropriate for a jury in this case.

As it made clear previously, the Court was prepared to consider a more expansive fair use argument than other courts have credited -- perhaps one supported by facts specific to this individual and this unique period of rapid technological change. For example, file sharing for the purposes of sampling music prior to purchase or space-shifting to store purchased music

---

16, 2009 Order as well as the Court's oral order at the June 26, 2009 hearing. Both orders made clear that deposition recordings, while permitted within the terms of Rule 30(b)(3), were not to be made public via the internet. Indeed, at the hearing, the Court said that "recording" the upcoming deposition did not mean "posting it on the internet," to which Mr. Nesson replied, "Okay. Thank you." Although Mr. Nesson did not object to the order, seek to clarify it, or raise any issue with respect to either the fact of the order or its breadth, he nevertheless made portions of the Palfrey deposition available to the public on the Berkman Center website. See http://cyber.law.harvard.edu/~nesson/palfrey%20_deposition01.mp3 (last visited July 7, 2009); http://cyber.law.harvard.edu/~nesson/after_my_tweet.mp3 (last visited July 7, 2009). As a result, the Defendant is hereby ORDERED to SHOW CAUSE, by July 9, 2009, why he or his counsel should not be sanctioned for what appears to be blatant disregard of a court order on an issue that the Court has addressed repeatedly in this case.

While counsel may have been able to raise arguments under the First Amendment regarding the Court's orders (arguments that the Court would have welcomed), see, e.g., Seattle Times Co. v. Rhinehart, 467 U.S. 20 (1984), he chose not to do so. Instead, counsel made specious objections, i.e. that opposing counsel knew they were being recorded (which they denied and which were irrelevant to the question of consent) and that the portions of the proceedings that were posted were not done for the purpose of tainting the jury pool (also irrelevant to the question of whether Massachusetts state law was violated). (Decl. of Charles Nesson in Response to the Court's Order to Show Cause, document #867.)

more efficiently might offer a compelling case for fair use.  Likewise, a defendant who used the new file-sharing networks in the technological interregnum before digital media could be purchased legally, but who later shifted to paid outlets, might also be able to rely on the defense.

But the defendant would have none of it.  Rather than tailoring his fair use defense to suggest a modest exception to copyright protections, Tenenbaum mounted a broadside attack that would excuse all file sharing for private enjoyment.  It is a version of fair use so broad that it would swallow the copyright protections that Congress created, defying both statute and precedent.  See 17 U.S.C. § 107; Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913 (2005); A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1012-19 (9th Cir. 2001).  In his view, a defendant just needs to show that he did not make money from the files he downloaded or distributed -- i.e., that his use was "non-commercial" -- in order to put his fair use defense before a jury.  And every non-commercial use, to him, is presumptively fair.  Beyond that threshold, the matter belongs entirely to the jury, which is entitled to consider any and all factors touching on its innate sense of fairness -- nothing more and nothing less.  See Def.'s Proposed Jury Instructions at 4 (document #893-4) ("Fairness is a principle not capable of bright-line definition.  We know it when we see and feel it.").  Defendant's version of fair use is, all in all, completely elastic, utterly standardless, and wholly without support.  See Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 584 (1994) ("[T]he mere fact that a use is . . . not for profit does not insulate it from a finding of infringement.").

To be sure, the Seventh Amendment guarantees the right to a jury trial, but only on issues that turn on reasonably disputed facts.  See Nancy Gertner & Judith H. Mizner, The Law of Juries 1-25 (2d ed. 2009); see also Calvi v. Knox County, 470 F.3d 422, 427 (1st Cir. 2006).

-4-

The purpose of pre-trial summary judgment procedures is to determine whether there are in fact any material facts in dispute and, given the existing legal framework, whether a reasonable jury could find in the defendant's favor.  See Fed. R. Civ. P. 56(c) (permitting summary judgment where moving party has shown that "there is no genuine issue as to any material fact").  The Court is supposed to be a gatekeeper.  If the defendant does not offer facts that present even a colorable legal defense of fair use, the Court is obliged to say so, and it did.  The doctrine of fair use is not infinitely malleable, requiring a jury determination every time it is intoned, no matter what the facts.  See Barton Beebe, An Empirical Study of U.S. Copyright Fair Use Opinions, 1978-2005, 156 U. Pa. L. Rev. 549, 584 (2008) (cataloging 297 dispositive opinions in which a judge resolved fair use).  The defendant has to show the Court that the law, when properly applied to the facts he intends to prove at trial, could produce a verdict in his favor.

Tenenbaum did not meet this burden; in truth, he did not come close.  He offered few disputed facts and little, if any, legal authority for his position.  His opposition briefs were not accompanied by any affidavits, expert reports, deposition testimony, or other evidence of the kind required by Federal Rule of Civil Procedure 56(e)(2).  "Creating a genuine issue of material fact requires hard proof," as one court noted, not, as here, "spongy rhetoric."  Kearney v. Town of Wareham, 316 F.3d 18, 22 (1st Cir. 2002).  Plaintiffs, in contrast, presented a raft of facts in support of their motion.  See Pls.' Statement of Material Facts (document # 874); Opp'n to Summ. J. at 5-9 (document #889).  The following details were not in genuine dispute: (1) the main purpose of Tenenbaum's file sharing was his own private enjoyment and that of his friends, that is, the very use for which the artist or copyright holder is entitled to expect payment as a reward; (2) he downloaded entire songs, although not entire albums of music; (3) he did not

transform the 30 works at issue (i.e., turn them into his own creative work); (4) his file sharing spanned more than four years and several different software platforms, both before and after this activity was detected in August 2004; and (5) during that time, his file-sharing software made more than 800 songs available to other Kazaa users to download.  See Pls.' Statement of Facts at 1-4, 6.  His activity continued notwithstanding changes in the case law, making it clear that the conduct was not protected; by 2001, for example, the Ninth Circuit had held that peer-to-peer file sharing was not fair use.  See A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1012-19 (2001).  And his activity continued even after digital music was lawfully available; the iTunes Music Store, which made authorized digital downloads widely available, debuted in April 2003, approximately 15 months before Tenenbaum's computer was detected on the Kazaa network. See Apple Launches the iTunes Music Store, http://www.apple.com/pr/library/2003/apr/28musicstore.html (last visited Dec. 4, 2009).  Tenenbaum did not contest these facts at summary judgment; he argued, instead, that they just did not matter.

The only fair use factor on which the defendant offered any challenge to was the effect of his file sharing on the potential market for or value of the copyrighted works.  See 17 U.S.C. § 107(4).  He argued that file sharing has not diminished the record companies' revenues nor curtailed overall artistic creation.  But here, again, the Court was offered a vacuum --  no affidavits, no facts.  In any event, the issue is not the impact on the universe of artistic creation or whether record companies are making enough money in Tenenbaum's view.  The issue is the impact of file sharing on the market for *these specific works*.  And in this regard, the law and the evidence are clear:  A court must consider "'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the

potential market' for the original." Campbell, 510 U.S. at 590 (quoting 3 M. Nimmer & D.

Nimmer, Nimmer on Copyright § 13.05[A][4], at 13-102.61 (1993)).

There can be no question that on this record continuous, high-volume file sharing --

offering exact duplicates to millions of peer-to-peer users for free -- would negatively affect the

market for these copyrighted works.  While the Court recognizes that not every download would

represent a lost sale, it is clear that some portion of paying consumers would shift to free

downloads if this activity were considered a fair use.  Given the record, the plaintiffs' factual

presentation, and the defendant's extraordinarily meager response, the Court was obliged to find

as a matter of law that Tenenbaum's use would negatively impact the potential market for the

downloaded works if it were widespread.

Perhaps the most telling arguments supporting the Court's conclusion came from an

unlikely source – defendant's counsel himself.  Counsel offered the identical conclusion in an

amicus submission invited by this Court earlier in the litigation,[4] before he was representing

Tenenbaum:  "As a general matter, the fair-use arguments that might be deployed to justify

uploading *are very weak*."  (Berkman Center Br. at 41 (signed by Charles Nesson), document

#177-3.) (Italics supplied.)  Nothing about the case made here suggests otherwise.[5]  In short,

finding fair use on this record would undercut the market for these artistic works, and would

undo the incentives Congress has provided to spur their creation  See Const. art. I, § 8, cl. 8

---

[4] Early on in the litigation, and before Tenenbaum was sued, the Court invited amicus participation on the substantive issues in this case. (Order re: Scheduling at 2, document #137.)  The Berkman Center of Harvard Law School responded.  (Mot. to File Amicus Br., document #176.)

[5] Indeed, the experts that defendant sought to use in this case -- experts cited in the pretrial memorandum of November 14, 2008 (document #694), a pretrial memorandum which did not mention fair use -- subsequently opined in emails made public by counsel for Tenenbaum that there was no fair use defense in this case.  (Document #820, Exs. B-E.)

("The Congress shall have Power . . . to Promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries.").

## II.    EQUITABLE DEFENSE

Before addressing the merits of the fair use issue, there is a preliminary question: The Court previously inquired whether fair use was historically an "equitable defense," as a number of other courts have suggested.  See July 14, 2009 Order (document #880); Weissmann v. Freeman, 868 F.2d 1313, 1324 (2d Cir. 1989) (addressing the "equitable defense of fair use"); Fisher v. Dees, 794 F.2d 432, 435 (9th Cir. 1986) ("The fair-use doctrine was initially developed by courts as an equitable defense to copyright infringement."); Clean Flicks of Colo., LLC v. Soderbergh, 433 F. Supp. 2d 1236, 1242 (D. Colo. 2006) ("Section 107 is a partial codification of the equitable defense of fair use as an affirmative defense to copyright infringement that has long been a part of the common law of copyright."); see also Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 448 & n.31 (1984) (noting that fair use requires a court to apply an "equitable rule of reason"); Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 550-51 (1985) (same).  If fair use is indeed "entirely equitable," it is not clear that its determination requires a jury trial; judges -- not juries -- traditionally resolve equitable defenses. Iowa State Univ. Research Found., Inc. v. Am. Broad. Cos., 621 F.2d 57, 62 (2d Cir. 1980); see also Danjaq LLC v. Sony Corp., 263 F.3d 942, 962 (9th Cir. 2001) (finding no right to jury trial on the equitable defense of laches in copyright infringement action); Granite State Ins. Co. v.

Smart Modular Techs., Inc., 76 F.3d 1023, 1027 (9th Cir. 1996) ("A litigant is not entitled to have a jury resolve a disputed affirmative defense if the defense is equitable in nature.").[6]

Since two leading copyright historians suggest that the equitable label may be a misnomer, and since neither party pressed the point, the Court will assume that fair use is a jury question, and leaves the equitable origins of this defense for another court to answer.  4 William F. Patry, Patry on Copyright § 10:3 (2009); Pierre N. Leval, Toward a Fair Use Standard, 103 Harv. L. Rev. 1105 (1990).

## III.    SUMMARY JUDGMENT

### A.    Legal Standard

The plaintiffs seek summary judgment on the defendant's fair use defense, asking the Court to find that fair use is foreclosed by the established facts of this case.  They believe that the relevant facts are not in serious dispute, only their legal significance, which the Court should resolve before trial.  At summary judgment, a court considers whether sufficient facts have been established to warrant a decision as a matter of law.  If material facts are in genuine dispute, the question must go to a jury to decide, but if the relevant facts are clear, the Court is entitled to determine the legal consequences of those facts.  Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  When making this assessment, the Court must view the facts in the

---

[6] At the same time, it is clear that a number of courts have permitted the fair use question to go to a jury -- but without addressing the issue raised by this Court.  See, e.g., Compaq Computer Corp. v. Ergonome Inc., 387 F.3d 403, 410-11 (5th Cir. 2004) (upholding the jury's fair use finding); Jartech, Inc. v. Clancy, 666 F.2d 403 (9th Cir. 1982) (upholding special jury verdict finding that defendants' use of films was fair use); July 14, 2009 Order (document #880) (citing additional cases).

light most favorable to Tenenbaum as the non-moving party, drawing all reasonable inferences

in his favor.  See Barbour v. Dynamics Research Corp., 63 F.3d 32, 36-37 (1st Cir. 1995).

It is not enough for Tenenbaum to rest on the allegations in his amended answer.  He is

obliged to put factual evidence in the record that creates a triable issue of fact.  "Once the

moving party avers the absence of genuine issues of material fact, the nonmovant must show that

a factual dispute does exist" in order to reach a jury.  Ingram v. Brink's, Inc., 414 F.3d 222, 228-

29 (1st Cir. 2005).  Here, the existence of a factual dispute must be supported in the record by

affidavits or other credible evidence.  See Fed. R. Civ. P. 56(e)(2).  "[S]ummary judgment

cannot be defeated by relying on improbable inferences, conclusory allegations, or rank

speculation."  Ingram, 414 F.3d at 228-29.

Whether Tenenbaum's use was fair, as he claims, is ultimately a legal question.  See

Harper & Row, 471 U.S. at 560.  He has the right to put this matter to a jury only if he shows --

through specific, credible evidence -- that the facts relevant to that legal analysis are in dispute.

He has no right to a jury, constitutional or otherwise, if he has not adequately contested the

underlying facts.  See Hustler Magazine, Inc., v. Moral Majority, Inc., 796 F.2d 1148, 1151 (9th

Cir. 1986) ("If there are no genuine issues of material fact, or if, even after resolving all issues in

favor of the opposing party, a reasonable trier of fact can reach only one conclusion, a court may

conclude as a matter of law whether the challenged use qualifies as a fair use of the copyrighted

work."); Fisher v. Dees, 794 F.2d 432, 436 (9th Cir. 1986) ("Because, under Harper & Row,

these judgments [as to the ultimate conclusions to be drawn from admitted facts] are legal in

nature, we can make them without usurping the function of the jury."); Calvi v. Knox County,

470 F.3d 422, 427 (1st Cir. 2006) ("[A] grant of summary judgment does not compromise the

Seventh Amendment's jury trial right because that right exists only with respect to genuinely disputed issues of material fact.").

Indeed, this is often the case in copyright cases: In literally hundreds of instances, a judge has decided whether the use of a copyrighted work was fair. See Barton Beebe, An Empirical Study of U.S. Copyright Fair Use Opinions, 1978-2005, 156 U. Pa. L. Rev. 549, 584 (2008).[7] The Supreme Court itself has done so. See Campbell, 510 U.S. 569; Harper & Row, 471 U.S. at 560. In short, the availability of summary judgment on uncontested facts does not impinge on Tenenbaum's Seventh Amendment right to a jury.

### B. Fair Use Standard

Fair use was originally a common law doctrine developed by judges who recognized that the monopoly rights protected by copyright were not absolute. These rights were limited by their public purpose, which set out to promote the arts by offering private incentives to authors and artists. See Leval, supra, at 1108-10. Where a use did not injure the market for the original work, and itself advanced a public purpose -- like education, commentary, scholarship, or further artistic innovation -- it could be considered "fair," and not infringing. See Folsom v. Marsh, 9 F. Cas. 342, 348 (C.C.D. Mass. 1841) (Story, J.) (describing the fair use doctrine applied by early courts).

Thus, while fair use may often be called "an equitable rule of reason," its origins are remarkably utilitarian. Leval, supra, at 1127 (pointing to the "misleading assumption" that "fair use is a creature of equity"); see also id. at 1126-27 (cautioning against the "temptation to

---

[7] While it is difficult to quantify the number of cases in which fair use has been presented to a jury, if this were a frequent occurrence one would expect to see a large number of court opinions denying summary judgment -- i.e., non-dispositive decisions. The Court, however, has found only a limited number of these opinions.

determine fair use by reference to morality"). It is the flip side of the copyright coin, embracing

at its core those uses that advance public purposes without unduly diminishing the market for the

original work. Campbell, 510 U.S. at 578 (stating that fair use factors should be "weighed

together, in light of the purposes of copyright"). At the same time, fair use may shield those

types of uses that are truly de minimis, having little or no impact on the market for or value of

the original work. See Sony, 464 U.S. at 450-51 & n.34 (1984) ("In certain situations, the

copyright owner suffers no substantial harm from the use of the work . . . . Here again, is the

partial marriage between the doctrine of fair use and the legal maxim *de minimis non curat lex*.")

(quoting Latman, Fair Use of Copyrighted Works (1958)).

Prior to its codification in 1976, fair use operated as a flexible doctrine in the service of

these principles, permitting courts to look carefully at the facts of a case. Campbell, 510 U.S. at

577 (observing that Section 107, "like the doctrine it recognizes, calls for a case-by-case

analysis"). It had no fixed criteria, though a number of factors were traditionally part of this

analysis. See Folsom, 9 F. Cas. 342. When Congress codified fair use as a defense to

infringement, it did not purport to change the existing doctrine. Although Section 107 sets out

four factors that a court "shall" consider, this list was not intended to be exhaustive:

> Beyond a very broad statutory explanation of what fair use is and
> some of the criteria applicable to it, the courts must be free to
> adapt the doctrine to particular situations on a case-by-case basis.
> Section 107 is intended to restate the present judicial doctrine of
> fair use, not to change, narrow, or enlarge it in any way.

H.R. Rep. No. 94-1476, at 65-66 (1976), as reprinted in 1976 U.S.C.C.A.N. 5659, 5679-80. The

four factors identified in the statute are: (1) the purpose and character of the use, including

whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the

nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation

to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or

value of the copyrighted work.  17 U.S.C. § 107.  Notably, the provision's introduction identifies

some of those non-commercial purposes targeted by the fair use doctrine: "[P]urposes such as

criticism, comment, news reporting, teaching . . . , scholarship, or research."  Id.

These purposes suggest, in turn, a fifth factor that is not expressly mentioned in the

statute but has been frequently cited by courts -- "whether and to what extent the new work is

'transformative.'"  See Campbell, 510 U.S. at 579; A&M Records, Inc. v. Napster, Inc., 239 F.3d

1004, 1015 (9th Cir. 2001).  When an alleged infringer alters the original work in a way that

adds to its literary or artistic value, he engages in precisely the activity that copyright seeks to

promote.  The Act "encourages others to build freely upon the ideas and information conveyed

by a work."  Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 349-50 (1991).  In these

instances, the injury to the original copyright holder is offset by the public's gain.  See Sony, 464

U.S. at 429-30 (noting that the Copyright Act balances "the interests of authors . . . in the control

and exploitation of their writings . . . on the one hand, and society's competing interest in the

free flow of ideas [and] information . . . on the other hand").  As a result, when evaluated in

combination with the other factors, a transformative use may often be deemed fair.

This analysis is not some open-ended referendum on "fairness," as the defendant would

have it, but an effort to measure the purpose and effects of a particular use against the incentives

for literary and artistic creation that drive copyright protections.  As the history and statutory

factors above suggest, while fair use is an elastic inquiry, it is not infinitely so.  Instead, "[t]he

central purpose of this investigation is to see, in Justice Story's words, whether the new work

-13-

merely 'supersede[s] the objects' of the original creation, or instead adds something new, with a further purpose or character, altering the first with new expression." Campbell, 510 U.S. at 579 (citations omitted).

Broadly speaking, if a use devalues the copyright granted by Congress, it must do so with a commensurate public benefit. See id. (noting that fair use guarantees "breathing space within the confines of copyright" for transformative works); Sony, 464 U.S. at 429 (stating that copyright law balances the "interests of authors" with "society's competing interest in the free flow of ideas, information, and commerce"). If the potential market for the work is relatively undisturbed, then the tie goes to fair use. See Sony, 464 U.S. at 456 (approving fair use where plaintiff failed to demonstrate"any likelihood of nonminimal harm to the potential market"); Gaylord v. United States, 85 Fed. Cl. 59 (2008) (finding fair use where postal stamp did not diminish potential market for sculptures depicted thereon).

Significantly, fair use does not amount to an evidentiary presumption of fair use for all private or not-for-profit uses, as defendant argues. The defendant relies on the holding in Sony to claim that because his use was "non-commercial," he is entitled to a *presumption* of fair use -- notwithstanding the defendant's usual burden to prove an affirmative defense. While Tenenbaum's position might have found some support in Sony when it was issued, the Supreme Court's holding in Campbell dispelled any notion that the Court intended to formally shift this burden. See 510 U.S. at 590 ("Since fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets." (footnote omitted)). The burdens remain where they traditionally lie, with affirmative defenses on defendant. Even more, the Court in Campbell merely reiterated the

-14-

commonsense point that "when a commercial use amounts to mere duplication of the entirety of an original, it clearly . . . serves as a market replacement for it, making it likely that cognizable market harm to the original will occur." Id. at 591. If anything, this observation cuts sharply against Tenenbaum's effort to show fair use.

### C.    Fair Use Analysis

The defendant has offered the Court no legal authority that file sharing of the kind he engaged in constitutes fair use. In fact, a number of courts, including the Supreme Court, have found exactly the opposite. See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913 (2005); A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004 (9th Cir. 2001); BMG Music v. Gonzalez, 430 F.3d 888, 890 (7th Cir. 2005). The defendant is correct when he points out that these courts have generally considered the secondary liability of peer-to-peer software makers, rather than the conduct of an individual user as here. But see BMG Music, 430 F.3d 888. Nonetheless, the Napster court addressed the possibility of fair use in great detail, ultimately rejecting such a theory. 239 F.3d at 1014-19. In Grokster, 545 U.S. 913, the defendants conceded that the swapping of copyrighted works was not fair, yet the issue was not divorced from the Supreme Court's decision, which held that the software maker could be liable for its users' file-sharing activities. The majority opinion found that "the probable scope of infringement was staggering," and neither concurrence disputed the notion that swapping copyrighted works was, as a general matter, unlawful. Id. at 923 (finding "reason to think that the vast majority of users' downloads are acts of infringement"); id. at 929 (remarking on "the number of infringing downloads that occur every day using StreamCast's and Grokster's software"). Indeed, Grokster's secondary liability was premised on the fact that file sharing

constituted a form of primary infringement, rather than a fair use. All in all, a finding that file sharing for personal enjoyment is fair would have the practical effect of overturning <u>Grokster</u>.

The Court does not end its inquiry with these authorities, however. It is prepared to examine the relevant factors in this particular case, as it must, to determine whether the facts and law would permit a finding of fair use here.

       1.     **Statutory Factors**

          a.     **Purpose and Character**

The parties do not dispute that the ultimate purpose of Tenenbaum's use was his own private enjoyment and that of the friends with whom he discussed and explored new music. They argue over the label that should be applied to his file-sharing activity -- whether it is to be classified as "commercial" or "non-commercial." <u>See</u> 17 U.S.C. § 107(1). It is clear that Tenenbaum did not seek to profit from his use of file-sharing networks. He did not sell these songs, nor did he demand anything directly in exchange from those who might have downloaded them from him. MediaSentry, the plaintiffs investigative service that uncovered the file sharing, certainly did not "pay" anything for the downloads that spawned this lawsuit. On the other hand, the plaintiffs correctly point out that the Copyright Act broadly defines "financial gain" as the "receipt, or expectation of receipt, of anything of value, including the receipt of other copyrighted works." 17 U.S.C. § 101. File sharing is not far off. Peer-to-peer networks are based on an informal kind of exchange, whereby each user "shares" his or her files and, at the same time, gains access to the files made available by others on the network.[8]

---

[8] While one may access files without necessarily sharing anything oneself -- i.e., free-riding -- in this case, it seems undisputed that Tenenbaum both shared and received the copyrighted works in question. <u>See</u> Pls.' Statement of Material Facts (document #874).

As this case reveals, the commercial/non-commercial binary is a misleading one. The purpose and character of a use must be classified along a spectrum that ranges, in reality, from pure, large-scale profit-seeking to uses that advance important public goals, like those recognized in the statute. See 17 U.S.C. § 107 (locating criticism, comment, news reporting, teaching, scholarship, and research at the core of fair use). Tenenbaum's file sharing may well fall somewhere in the middle. He is not the prototypical commercial infringer, yet his use was hardly "educational." Downloading new music may have been eye-opening for him personally, but it surely did not carry any public benefit of the kind contemplated by Section 107.

Under the circumstances, the Court will not label Tenenbaum's use "commercial," despite the plaintiffs' urging. So far as purpose is concerned, there is a meaningful difference between personal file sharing and a business strategy that exploits copyrighted works for profit. These activities have different goals and dimensions; they should not be reduced to a single category in this analysis. But see Napster, 239 F.3d at 1015 (holding that "repeated and exploitative copying of copyrighted works," even without direct economic benefit, is sufficient for a court to find commercial use).

But the label is not critical to the "fair use" analysis. More important for this inquiry, and weighing against defendant, is the conclusion that this use was not accompanied by any public benefit or transformative purpose that would trigger the core concerns of the doctrine. Tenenbaum might argue that online file sharing increases public access to these artistic works, a broad social benefit. See Sony, 464 U.S. at 440, 451 (underscoring the "public interest in access" to literary and artistic works). But this is not enough. Nearly every unauthorized reproduction or distribution increases access to some degree. See Harper & Row, 471 U.S. at

569 ("Any copyright infringer may claim to benefit the public by increasing public access to the copyrighted work"). In any case, the balance between unlimited public access and the desire to spur artistic creation is the very policy choice embodied by the provisions of the Copyright Act. Congress has purposefully restricted access by vesting an exclusive right in the copyright holder. The Supreme Court has ratified this legislative judgment in the specific context of peer-to-peer file sharing. Grokster rejected the notion that this unprecedented access somehow dissolved the traditional boundaries of copyright infringement. Rather, the Court drew a clear line between today's file sharing and the time-shifting approved in Sony. Grokster, 545 U.S. at 923; id. at 951 (Breyer, J., concurring) (contrasting infringing file sharing with fair use by Betamax users). The prototypical Betamax user simply captured a TV program he would have been able to watch for free, so that he could view it at a more convenient time. The file-sharer, by contrast, makes a permanent copy he would otherwise be required to pay for.

Since fair use operates as an exception to the exclusive rights of the copyright holder, which broadly serve to promote artistic creation, it is critical that a proposed fair use carry its own public benefits. "The use must be productive and must employ the [copied] matter in a different manner or for a different purpose from the original." Leval, supra, at 1111. Nothing about Tenenbaum's use of these sound recordings was remotely transformative, or served other public ends.

### b.     Nature of the Copyrighted Work

The species of copyrighted work at issue in this case is music, which commands robust copyright protections. 17 U.S.C. § 107(2); see also Campbell, 510 U.S. at 586 (stating that Roy Orbison's "Oh, Pretty Woman" falls "within the core of the copyright's protective purposes").

Although hardly dispositive, as <u>Campbell</u> itself showed, this factor weighs against fair use.  <u>See</u>

Berkman Center Br. at 38 ("The nature of the copyrighted work (the second factor) and the

substantiality of the portion used (the third factor) appear quite clearly to favor the Plaintiffs in

virtually all relevant fact patters.") (signed by Charles Nesson) (document #177-3).[9]

### c.    Portion of the Work Used

The third statutory fair use factor requires the Court to consider the "amount and

substantiality of the portion used in relation to the copyrighted work as a whole."  17 U.S.C. §

107(3).  Tenenbaum is alleged to have downloaded individual songs in their entirety, but not full

albums.  He claims that it is the albums in which the plaintiffs registered their copyrights, while

the individual songs are "works made for hire."  <u>See</u> 17 U.S.C. § 101 (defining a "work made for

hire" as "a work specially ordered or commissioned for use as a contribution to a collective

work").  As a result, the defendant suggests that his use was only partial, supporting fair use.

This is the proverbial distinction without a difference.  Individual songs are regularly

treated as the relevant unit for evaluating the infringement or fair use of musical works.  <u>See</u>

Berkman Center Br. at 38 (document #177-3).  The Supreme Court took exactly this view in

<u>Campbell</u>, when it measured the substantiality of 2 Live Crew's parody against Orbison's "Oh,

Pretty Woman," rather than the album on which that song appeared.  <u>See</u> 510 U.S. 569; <u>see also</u>

<u>BMG Music v. Gonzalez</u>, 430 F.3d 888, 890 (7th Cir. 2005) (considering fair use of individually

downloaded songs); <u>Szabo v. Errisson</u>, 68 F.3d 940, 942-43 (5th Cir. 1995) (finding each song

---

[9] Tenenbaum suggests that the medium matters here -- the fact that these reproductions were "free mp3 files openly available on the internet."  (Def.'s Opp'n to Pls.' Mot. for Summ. J. at 6, document #889).  While the format in which the work was distributed is not a quality of the work itself, and does not traditionally fall within this factor, the ease of obtaining these free digital reproductions is of serious concern to the Court.  This consideration, however, is addressed as a non-statutory factor below.

on a registered album an individual copyrightable work). Likewise, the copying of even extremely small portions of protected works may not be fair use. See, e.g., Fred Fisher, Inc. v. Dillingham, 298 F. 145 (S.D.N.Y.1924) (L. Hand, J.) (holding that eight-note "ostinato" infringed copyright in song). That is especially so where the portion copied is distinctive or unique. "Even if a copied portion be relatively small in proportion to the entire work, if qualitatively important, the finder of fact may properly find substantial similarity." Baxter v. MCA, Inc., 812 F.2d 421, 425 (9th Cir. 1987).

More substantively, however, these cases indicate that the amount of the work used must be judged in tandem with the purpose identified in the first fair-use factor. Thus, a parody may copy the original's "most distinctive or memorable features" in order to "assure identification" by the audience, but not so much that it serves as a market substitute. Campbell, 510 U.S. at 588. Substantiality is not an abstract quantitative measure, but a contextual one. Compare Harper & Row, 471 U.S. at 569 (verbatim copying of 300 words in 2,250-word piece did not constitute fair use), with Sony, 464 U.S. at 449-50 (entire copy of television program used for time-shifting qualifies as fair use).

In this context, Tenenbaum has not claimed that he just sampled individual songs as a prelude to purchasing the full albums on which those songs appeared. That could well present a compelling argument for fair use. Rather, his purpose was the enjoyment of the songs themselves, for free, which he accomplished by downloading each in its entirety. Without doubt, the reproductions that he obtained were full market substitutes for the works in question by August 2004, after the works were available on the internet for a fee.[10] Sony acknowledged that

---

[10] This analysis might be different if a suitable market for individual digital works was not yet available, as discussed below.

the reproduction of an entire work has the "ordinary effect of militating against a finding of fair use." 464 U.S. at 449-50. The Betamax recordings in that case proved an exception just because they allowed viewers to watch broadcast programming, already available to them for free, at a later, more convenient, time. Most users, the Court concluded, would only watch the program once, as they were otherwise entitled to do, so the reproduction amounted to mere time-shifting. See id. at 421. As such, the copies increased access and convenience without diminishing the market for the protected product.

Not so here. First, the plaintiffs did not authorize even one free broadcast or distribution. Nor does Tenenbaum claim that he only listened to each song once. Instead, the principal advantage of Tenenbaum's downloads was the fact that they could be obtained without paying for authorized copies, and then enjoyed as much as he liked. Nothing about Tenenbaum's downloading of these songs for his private enjoyment takes this case outside the ordinary rule that use of an entire work counsels against fair use.

### d.    Effect on the Potential Market for the Work

While the first statutory fact asks about the "purpose" of the work, the fourth factor inquires into its effects -- specifically, its impact on the "potential market for or value of the copyrighted work." 17 U.S.C. 107(4). Here, the Court considers not only Tenenbaum's conduct taken by itself, but "'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the

-21-

original." Campbell, 510 U.S. at 590 (quoting 3 M. Nimmer & D. Nimmer, Nimmer on Copyright § 13.05[A][4], at 13-102.61 (1993)). Tenenbaum argues that his file sharing made little economic difference to the plaintiffs because the songs at issue were immensely popular, and therefore widely available on Kazaa. But that is not the framework for this analysis. If thousands of others were engaged in the same activity, as he seems to acknowledge, it is the sum of that conduct that matters here.

Although the purpose of Tenenbaum's file sharing may not have been "commercial" in any classic sense, as noted above, from a consequential perspective the difference becomes harder to make out. The Court sees little difference between selling these works in the public marketplace and making them available for free to the universe of peer-to-peer users. If anything, the latter activity is likely to distribute even more copies -- and therefore result in a bigger market impact -- because there is no cost barrier at all. It is difficult to compete with a product offered for free. The plaintiffs provide evidence that the widespread availability of free copies of copyrighted works on the internet has decreased their sales revenue, a market reality that other courts have credited. See Pls.' Statement of Material Facts ¶¶ 18-19 (document #874); Liebowitz Report (document #875-4); BMG Music v. Gonzalez, 430 F.3d 888, 890 (7th Cir. 2005). Again, as described above, the defendant, for his part, offered no affidavits or expert report on summary judgment to disprove or dispute this assertion. See Fed. R. Civ. P. 56(e).

-22-

Even if every download does not represent a lost sale, as the Court recognizes, it is plain that consumers who regularly pay for music would shift to free downloads if given the chance. Indeed, that is the very premise of Tenenbaum's sweeping argument -- that this music should be free to individuals simply because it has "gone digital."  He all but concedes the lost sales that would result from his version of fair use.  He claims that copyright law does not protect what he labels "an outdated business model" and that the plaintiffs have other means of profiting from these works.  What he seems to be arguing is that, even in the era of file sharing, the plaintiffs still make a enough money from their copyrights.  But the sufficiency of the plaintiffs' profits is not the measure of fair use, nor is Tenenbaum's view of what amount of profits are "enough."  Congress has not capped the revenue that a copyright holder may derive from its monopoly, and that is indeed a quintessential legislative judgment.

To be sure, some authorities suggest that the "network effects" of making these works available for free may in fact enhance their overall value, especially for lesser-known artists, by increasing buzz and publicity.  See Atip Asvanund et al., An Empirical Analysis of Network Externalities in Peer-to-Peer Music-Sharing Networks, 15 Info. Sys. Res. 155 (2004); Stan J. Liebowitz, Pitfalls in Measuring the Impact of File-Sharing on the Sound Recording Market, 51 CESifo Econ. Stud. 439, 446-50 (2005); Devin Leonard, Music Blogs' Network Effect, Fortune,

June 16, 2008, <u>available at</u> http://money.cnn.com/2008/06/16/technology/music_blogs.fortune.[11]  That may be so

in certain mixed systems, where some free distribution feeds demand for legitimate online sales.

But Tenenbaum's version of fair use would destroy even that equilibrium.  It would simply

eliminate the market for digital downloads among individual consumers by transforming all file

sharing for private enjoyment into fair use.  Who would continue to use the iTunes Store or its

equivalents, under the circumstances?  The Copyright Act grants the plaintiffs an exclusive right

to distribute these works; file sharing effectively displaces that right, and the market it

represents, by offering the same works for free.

### 2.    Non-statutory Factors

Both the text of Section 107 and its history make clear that a court considering fair use is

not confined to the four factors above.  <u>See</u> 17 U.S.C. § 107 (stating that the court "shall"

consider the listed factors, but without limitation); H.R. Rep. No. 94-1476, at 65-66 (1976), <u>as</u>

<u>reprinted in</u> 1976 U.S.C.C.A.N. 5659, 5679-80 ("Beyond a very broad statutory explanation of

what fair use is and some of the criteria applicable to it, the courts must be free to adapt the

---

[11] The Court is not persuaded by the assertion of plaintiffs' expert that the network effect is a zero-sum phenomenon, increasing demand for one song only at the expense of others.  In short, he assumes that the overall demand for music remains constant even while the popularity of individual songs may change as a result of increased exposure, buzz, and visibility.  <u>See</u> Liebowitz Report ¶¶ 16-17 (document #875-4).  This assumption appears to have little rigorous foundation.  <u>See</u> Stan J. Liebowitz, <u>Economists Examine File-Sharing and Music Sales</u>, http://www.utdallas.edu/~liebowit/intprop/MIT.pdf (assuming passive radio listening is a near-perfect substitute for active online music browsing and that the social value of music corresponds to time spent listening).  It is certainly plausible that, by making more music available for individuals to independently sample and enjoy, file sharing increases the overall demand for and consumption of music.  Sampling and network effects may, in fact, positively reinforce each other.

doctrine to particular situations on a case-by-case basis."); <u>Harper & Row</u>, 471 U.S. at 560 ("The factors enumerated in the section are not meant to be exclusive.").  In practice, however, courts often rely heavily, if not exclusively, on the statutory factors.  <u>See</u> <u>Iowa State Univ. Research Found., Inc. v. Am. Broad. Cos.</u>, 621 F.2d 57, 60 (2d Cir. 1980) (acknowledging that fair use jurisprudence has traditionally concentrated on the enumerated factors); Berkman Center Br. at 33-34 (document #177-3).  Moreover, to the extent that the Court considers additional factors, it must do so "in light of the objectives of copyright law." <u>Kelly v. Arriba Soft Corp.</u>, 336 F.3d 811, 818 (9th Cir. 2003).

Tenenbaum urges the Court to add a host of new factors to its analysis.  He offers little legal authority for the considerations he would add, relying again on the elasticity of the fair use doctrine and the particular facts of this case.  The Court addresses these arguments in turn.

### a.    Assumption of Risk

The defendant suggests that the plaintiffs' release of these works -- in an environment where file sharing was rampant -- amounts to a waiver of their copyrights and opens the door to fair use.  Plaintiffs knew that these sound recordings would be shared, yet chose to produce and release them anyway.  This view of the plaintiffs' conduct is coupled with a narrative about the ease and extent of file sharing among the defendant's generation.  Beginning with Napster, file sharing was ubiquitous, with the software easily obtained and music readily available on peer-to-peer networks.  Plaintiffs knew exactly where their sound recordings would end up;

-25-

Tenenbaum's use, so the argument goes, was fairly contemplated by their decision to release these songs in the internet era. As a result, the plaintiffs allegedly assumed the risk that their hugely popular music would be dispersed over peer-to-peer networks like Kazaa.

These arguments, while they perhaps should have been compelling to Congress, do not sound in fair use, at least given the law as it exists. They are not arguments about the productive purpose of Tenenbaum's use or the absence of injury to the copyright holder -- that is, the rationales that generally inform fair use. See 17 U.S.C. § 107; Campbell, 510 U.S. at 579 (noting that transformative works "lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright"); Sony, 464 U.S. at 456 (approving fair use where plaintiff failed to demonstrate"any likelihood of nonminimal harm to the potential market"). Instead, they lie much closer to a claim of acquiescence or abandonment, a separate affirmative defense.[12] Acquiescence has a different logic, akin to laches or equitable estoppel, which centers on a plaintiff's failure to enforce its copyrights. Unlike fair use, which looks to the net social benefits of a particular use, acquiescence is focused on the conduct of the copyright holder in relation to its rights. See Cherry River Music Co. v. Simitar Entm't, Inc., 38 F. Supp. 2d 310, 318 (S.D.N.Y. 1999) (describing the elements of acquiescence).

---

[12] Acquiescence also frequently appears in trademark cases, and many copyright decisions properly draw on these precedents. 4 Nimmer on Copyright § 13.07 (2003) ("Principles of estoppel applicable elsewhere in the law are equally applicable in copyright infringement actions.").

The defense of acquiescence is unavailable in this case for the simple reason that the defendant never asserted it. Yet, in all likelihood, the defense would also fail on its merits. In order to prevail, a defendant must show that "(1) the plaintiff knew of and manifested acquiescence in the defendant's infringing conduct, actual or proposed, (2) the plaintiff intended that the defendant rely on its conduct, and (3) the defendant reasonably relied to its detriment on the plaintiff's actions." See id.; see also Thornton v. J Jargon Co., 580 F. Supp. 2d 1261, 1282 (M.D. Fla. 2008). Moreover, as the Napster court stated, waiver or abandonment of copyright "occurs only if there is an intent by the copyright proprietor to surrender rights in his work." A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1026 (9th Cir. 2001) (quoting 4 Nimmer On Copyright ¶ 13.06 (2000)); see also Dodd, Mead & Co. v. Lilienthal, 514 F. Supp. 105, 108 (S.D.N.Y. 1981) (requiring "some overt act which manifests an intent to surrender rights in the copyrighted material"). Nothing in the record remotely suggests that the plaintiffs foreswore any effort to enforce their copyrights or otherwise intended to surrender the rights to these sound recordings. In fact, the plaintiffs' distribution of these works with copyright notices affixed, and the aggressive litigation campaign they have pursued, suggests the opposite.

The defendant proposes, in effect, that the Court reduce the standard for acquiescence to one of recklessness or a version of implied consent. But again, he has offered no cases to support this position; on the contrary, most decisions expressly require intent. See Ross v. CCS Int'l Ltd., No. 98cv4090(RO), 2000 WL 1804103, at *4 (S.D.N.Y. Dec. 8, 2000) ("[W]aiver,

-27-

acquiescence, and consent require an *intentional* relinquishment of rights.").  In any case, the argument goes too far:  The mere act of producing and releasing artistic works where there is a known risk of piracy cannot amount to a deliberate waiver of copyright.  Such a rule would hand control over copyright to counterfeiters and pirates; copyright protections would be weakest, practically and legally, precisely where piracy efforts were most concerted or successful.  The result would undermine copyright on a grand scale, offering greatly diminished incentives to produce the most vulnerable artistic and literary works.[13]  Notably, these implications run exactly counter to the notion of fair use, which carves out an exception for uses that redound to the public's net benefit or do not reduce the incentives for creators.  Encouraging piracy would do an immense disservice to the public purposes that animate copyright, with little commensurate gain.

### b.    Marketing Activities and Failure to Protect

Closely related to defendant's waiver argument is his view that the plaintiffs aggressively marketed these works, contributing to their popularity, while failing to protect them from online infringement in any meaningful way.  Plaintiffs promoted these artists and albums heavily, making the works that much more attractive to young music fans.  At the same time, the compact discs that these songs appeared on were not encrypted, allowing them to be easily transferred to a computer hard-drive and then over the internet.  Moreover, Tenenbaum did little more than millions of other college students were doing at that time, using a platform that allowed him to

---

[13] In fact, the most fiercely pirated works are often the most popular.

download these songs with only a few clicks on his computer.  His eager downloading was, in

reality, the very measure of success of the plaintiffs' marketing strategies.  Having lured him in,

in essence, Tenenbaum argues that it is unfair for the plaintiffs to turn around and sue him.

      In effect, the defendant suggests that plaintiffs all but created an "attractive nuisance" by

virtue of their marketing activities and their failure to encrypt these works.  <u>See</u> Restatement

(Second) of Torts § 339; Mass. Gen. Laws ch. 231, § 85Q (adopting attractive nuisance liability

in Massachusetts).  In tort law, a landowner is subject to liability for physical harm to trespassing

children caused by an artificial condition upon the land, where there is a substantial risk of

serious bodily harm and the landowner fails to exercise reasonable care to eliminate the danger.

<u>Id.</u>; <u>see also</u> <u>Sioux City & Pacific R. Co. v. Stout</u>, 84 U.S. (17 Wall.) 657 (1873).  An in-ground

swimming pool that its owner has failed to fence off is perhaps the classic example.  In this case,

the defendant argues that the plaintiffs failed to "fence off" these songs from infringement, that

the songs were highly appealing to him and his generation, and that he fell into the vast ocean of

file sharing.  It is an intriguing theory, to say the least, particularly because file sharing has been

widespread among teenagers and students.

      Unfortunately, this principle has no foothold in copyright law.  Indeed, the idea that a

copyright holder could lose the rights to his work precisely because of its popularity runs counter

to the purposes of copyright.  It would punish those authors and artists whose works are most

attractive and pleasing to the public.  As for the plaintiffs' failure to encrypt, the Copyright Act

-29-

makes plain that not even copyright registration, deposit, or notice is needed to legally protect artistic works. See 17 U.S.C. §§ 405(a), 407(a), 408(a). Requiring even more substantial affirmative steps by copyright holders, like encryption, would be inconsistent with these provisions. As a practical matter, it would be akin to the idea that the copyright holders of literary works must mount a campaign against the photocopier or scanner in order to preserve their legal rights. The ease of reproduction or transmission is simply not relevant to liability; copyright law is itself the source of protection.[14]

### c.    Availability of Paid Alternatives

Defendant also offers the difficulty of obtaining authorized digital alternatives in support of his fair-use argument. As a legal matter, he is on firmer ground here, yet again his position is defeated by the facts of this case. A number of courts have suggested that the fair use determination may be affected by the availability -- or absence -- of authorized ways to obtain the work in question. "[I]t is sensible that a particular unauthorized use should be considered

_____

[14] Nonetheless, the ease of reproduction could be relevant to a jury's determination of statutory damages under Section 504(c), as it may bear on individual culpability. See Masterfile Corp. v. Country Cycling & Hiking Tours by Brooks, Inc., No. 06cv6363(SAS)(FM), 2008 WL 313958, at *2 (S.D.N.Y. Feb. 4, 2008). The internet made many types of media far more accessible than ever before, dramatically lowering the threshold for potentially infringing activities. As in this case, downloading 30 songs required little more than 30 clicks. The fact that Congress may have increased the penalties for copyright infringement to address, in part, the threat of unauthorized online distribution, does not preclude a jury from considering the means employed. The elevated penalties are reflected in the minimum and maximum that fix the range of statutory damages -- that is, Congress' concerns are built into the very upper and lower limits. See Digital Theft Deterrence and Copyright Damages Improvement Act of 1999, Pub. L. No. 106-160, 113 Stat. 1774 (increasing minimum statutory damages from $500 to $750 and maximum statutory damages from $100,000 to $150,000 per infringed work). Within this new range, a jury is entitled to look to any mitigating factors it deems relevant -- including the ease and temptation teenagers and students may have faced in the form of file-sharing software. See Jury Instructions at 3 (document #909).

'more fair' when there is no ready market or means to pay for the use, while such an

unauthorized use should be considered 'less fair' when there is a ready market or means to pay

for the use." Am. Geophysical Union v. Texaco Inc., 60 F.3d 913, 931 (2d Cir. 1994); cf. Harper

& Row, 471 U.S. at 553 ("A key, though not necessarily determinative, factor in fair use is

whether or not the work is available to the potential user.  If the work is 'out of print' and

unavailable for purchase through normal channels, the user may have more justification for

reproducing it." (quoting S. Rep. No. 94-473, at 64 (1975))).

　　　Here, the defendant points out that the emergence of easy-to-use, paid outlets for digital

music -- such as the iTunes Music Store -- lagged well behind the advent of file sharing.[15]

Before that time, it was hard to obtain individual songs in digital format; most copyrighted music

was instead offered on compact disc and sold only as multi-track albums.  In order to get one

song, a consumer had to pay for ten to twenty separate tracks, many of which she might not

want.  In order to translate this music into a digital format, she then had to transfer the contents

of the CD onto her computer (a practice commonly called "ripping"), where it could be easily

stored, played, or placed on a portable music device.  The considerable advantages of digital

---

[15] The plaintiffs suggest that there were a panoply of paid alternatives to file sharing all but instantly available.  See Pls. Memo. of Law in Support of Mot. for Summ. J. at 24 (document #872) ("[B]y 2004 . . . there were more than 230 online services available for consumers to purchase music legally online." (citing IFPI:05 Digital Music Report, available at http://www.ifpi.org/content/library/digital-music-report-2005.pdf)).  Yet this was hardly the case.  The story of commercially available digital music prior to the iTunes Music Store is largely a history of failures; few of these services can even be remembered today.  See Edward C. Baig, At the iTunes Music Store, Shopping is a Breeze, USA Today, April 29, 2003, available at http://www.usatoday.com/tech/columnist/edwardbaig/2003-04-29-itunes_x.htm ("Leave it to Steve Jobs & Co. to deliver the first legitimate Net music service to hit all the high notes.").

media are not difficult to discern.  File-sharing software, by contrast to CDs, made individual songs directly available as digital mp3 files.  Music listeners could get exactly the songs they wanted, in exactly the format they wanted -- an alternative that the plaintiffs did not offer consumers for several years.

These benefits are difficult to deny, but their role in this particular fair use analysis is less clear.  The advantages of digital music plainly touch on some of the very concerns that the Supreme Court acknowledged in <u>Sony</u>:  For instance, the ability to "space-shift," by moving music to a more compact and portable medium; the ability to obtain individual tracks, increasing consumer choice; and the ability to sample music prior to purchasing it.  <u>See</u> 464 U.S. at 454 (observing the time-shifting virtues of Betamax recording, increasing the public's access to television broadcasts).  In other circumstances, all these factors might belong in the fair use calculus, as the court sought to weigh the net public benefit of this use in the absence of a viable commercial market.  <u>See</u> Berkman Center Br. at 36-37 (document #177-3).

Whatever the availability of authorized digital alternatives when peer-to-peer networks first became widespread in 1999, it is clear that by August 2004 -- when Tenenbaum's file sharing was detected -- a commercial market for digital music had fully materialized.  The iTunes Music Store debuted in April 2003, selling millions of individual digital tracks over its first months and offering a catalog of hundreds of thousands of songs.  A different defendant, who was accused of file sharing prior to the iTunes Music Store's market-changing debut, might

have a different case.  In light of the chronology here, the unavailability of paid digital music is simply not relevant.

### d.    Policing Costs

Tenenbaum argues that the costs borne by parents and universities, who have to police the online activities of children and students, weigh in favor of fair use.  In many ways, this argument is a corollary to the defendant's point about the ease of file sharing:  Infringement has become so easy, and the temptation is so great for children, that parents and universities have been all but conscripted to regulate internet use.

While the Court is very sympathetic to the parenting challenges posed by computers and the internet,  the defendant has offered no proof that this task is onerous or impossible.  It is often up to parents, and colleges *in loco parentis,* to teach and enforce the bounds of the law.  Although the social costs of policing infringement might factor into fair use[16] -- because they diminish the overall benefits of copyright protection -- these particular concerns are more appropriately part of an appeal to Congress to amend the statute.  Cf. Am. Geophysical Union v. Texaco Inc., 60 F.3d 913, 931 (2d Cir. 1994) (rejecting the argument that failing to find fair use

---

[16] And these costs should include the potential costs to individual privacy which enforcing the copyright protections may well entail, i.e. universities enlisted to disclose the names of their own students using certain computers (see document #6, order dated 8/22/07, docket #07-11458, outlining strict standards for that disclosure, creating an extensive procedure to protect the rights of the students whose records are sought (including "Court Directed Notice Regarding Issuance of Subpoena") and prohibiting disclosure under certain circumstances); and plaintiffs seeking to obtain access to computer hard drives which may well contain far more information than they are entitled to see (see document #832, order dated 5/19/2009, in docket #03-11661, strictly limiting the circumstances under which the plaintiff's hard drive may be examined).

-33-

for the photocopying of scientific journal articles would "require that an intellectual property lawyer be posted at each copy machine").

Again, the facts stand in Tenenbaum's way.  He was at least twenty years old at the time his file sharing was initially detected, and more significant,  even after his illegal file sharing came to light, he continued to download and share music online for at least three more years. See Pls.' Statement of Material Facts ¶ 16 (document # 874).  He was not someone who stumbled onto a peer-to-peer network and unknowingly found himself in trouble.  He knew file sharing was illegal, yet persisted.

### e.    The Injustice of this Action

Finally, Tenenbaum urges the Court to consider the injustice of this action in its fair use calculus -- an appeal that illustrates his view of what fair use really is at its core.  To him, fair use is not a legal doctrine tethered to the particular purposes of copyright, but a sweeping referendum on "fairness."  See Def.'s Proposed Jury Instructions at 4 (document #893-4) ("Fairness is a principle not capable of bright-line definition.  We know it when we see and feel it.").  It encompasses every possible inequity that might be found in the facts of this case, and owes little to precedent except -- according to the defendant -- its infinite elasticity.

As this Court has previously noted, it is very, very concerned that there is a deep potential for injustice in the Copyright Act as it is currently written.  It urges – no implores -- Congress to amend the statute to reflect the realities of file sharing.  There is something wrong

-34-

with a law that routinely threatens teenagers and students with astronomical penalties for an activity whose implications they may not have fully understood.  The injury to the copyright holder may be real, and even substantial, but, under the statute, the record companies do not even have to prove actual damage.  "Repeatedly, as new developments have occurred in this country, it has been Congress that has fashioned the new rules that new technology made necessary." <u>Sony</u>, 464 U.S. at 430-31.  It is a responsibility that Congress should not take lightly in the face of this litigation and the thousands of suits like it.

## IV.    CONCLUSION

As noted at the beginning of this opinion, the Court does not believe the law is so monolithic, or the principles of fair use so narrow that they could not encompass some instances of file sharing copyrighted works.  This Court, unlike others that have spoken on the subject, can envision a scenario in which a defendant sued for file sharing could assert a plausible fair use defense -- for example, the defendant who "deleted the mp3 files after sampling them, or created mp3 files exclusively for space-shifting purposes from audio CDs they had previously purchased."  (Berkman Center Br. at 36-37, document #177-3.)  The Court can also envision a fair use defense for a defendant who shared files during a period before the law concerning file sharing was clear and paid outlets were readily available.  The advent of widespread internet access in the 1990s threw a number of norms into disarray, offering sudden access to a wealth of digitized media and giving the veneer of privacy or anonymity to acts that had public

consequences.  At the beginning of this period, both law and technology were unsettled.  Courts had not yet addressed how copyright protections would operate in this new domain, and the music industry had not yet devised an effective way of distributing their copyrighted works in digital form.  See Am. Geophysical Union, 60 F.3d at 931 (suggesting that a use may be "more fair" where a commercial market does not exist).[17]

A defendant who shared files online during this interregnum, sampling the new technology and its possibilities, but later shifted to paid outlets once the law became clear and authorized sources available, would present a strong case for fair use.  It might matter, too, with whom he shared files -- a few friends or the world -- as well as how many copyrighted works he shared, and for how long.  As the Supreme Court and Congress have insisted, fair use calls for a case-by-case analysis that attends to a range of equitable considerations "in light of the ends of the copyright law[s]."  Campbell, 510 U.S. at 581; see also H.R. Rep. 94-1476, at 65 (1976), as reprinted in 1976 U.S.C.C.A.N. 5659, 5678 ("[S]ince the doctrine is an equitable rule of reason, no generally applicable definition is possible, and each case raising the question must be decided on its own facts.").  One of the equities in copyright is surely the disequilibrium produced by the advent of a novel, widely accessible technology.  Cf. Sony, 464 U.S. at 443 (observing, in

---

[17] The plaintiffs protest that ignorance is no defense to infringement, as the statute itself indicates.  See 17 U.S.C. § 504(c)(2) (providing reduced penalties for "innocent" infringement, but not a complete defense).  But it is one thing to unknowingly violate a settled law, where one has constructive notice of the rule and its meaning.  It is another thing to run afoul of a rule whose applicability to a radically new domain has nowhere been established -- especially where the personal sharing of music has rarely, if ever, given rise to liability for damages.  In commercial terms, fair use could encompass the period before the threat to the market for these works became apparent.

contributory infringement action, that many television producers were willing to allow private VCR-recording to continue "for an experimental time period").

Based on the undisputed facts, however, Joel Tenenbaum is not such a defendant. Whether the widespread, unlimited file sharing that the record suggests he engaged in benefits the public more than our current copyright protections is a balance to be struck by Congress, not this Court. Accordingly, this Court granted summary judgment in plaintiffs' favor on defendant's affirmative defense of fair use.

**SO ORDERED.**

**Date:  December 7, 2009**          */s / Nancy Gertner*
                                     **NANCY GERTNER, U.S.D.C.**