UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ─────────────────────── | ) | |
| SONY BMG MUSIC ENTERTAINMENT, *et al.* | ) ) ) | |
| Plaintiffs, | ) ) | Civ. Act. No. 1:07-cv-11446-NG |
| v. | ) ) | (ORIGINAL DOCKET NUMBER) |
| JOEL TENENBAUM | ) ) | |
| Defendant. | ) ) | |
| ─────────────────────── | ) | |

**DEFENDANT'S MOTION AND MEMORANDUM FOR**

**NEW TRIAL OR REMITTITUR**

| | |
|---|---|
| Charles R. Nesson* | Matthew H. Feinberg |
| BBO #369320 | BBO #161308 |
| 1575 Massachusetts Avenue | Matthew A. Kamholtz |
| Cambridge, Massachusetts 02138 | BBO #257290 |
| 617 49504609 | FEINBERF & KAMHOLTZ |
| nesson@gmail.com | 125 Summer St. |
| | Boston, Massachusetts 02110 |
| *With assistance of Jason Harrow. | |

*Attorneys for Defendant Joel Tenenbaum*

January 4, 2010

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................ iii

STATEMENT ............................................................................................................. 1

I. THE COURT WRONGLY DECIDED THE ISSUE OF FAIR USE. ........................... 1

    A. The Interregnum Period of Fair Use Recognized by the Court Should Continue Until 2007 When Plaintiffs Finally Began Licensing Their Songs DRM-Free ...... 1

    B. Plaintiffs' Complicity in the Attractiveness of the Online Music Environment in 2004 Should Have Been Recognized At Least as a Factor in the Balance of Fair Use. ....................................................................................................................... 5

II. AT TRIAL THE COURT ERRED BY PREJUDICIALLY REDACTING DEFENDANT'S OFFER OF EVIDENCE SHOWING THAT HE WAS WILLING TO TAKE RESONSIBILITY FOR HIS ACTIONS, ALLOWING IT TO BE TWISTED INTO DEVASTATING IMPEACHMENT OF HIS CHARACTER. ............................... 8

III. THE JURY'S DAMAGE AWARD, GROSSLY EXCESSIVE BY ANY MEASURE, VIOLATES DUE PROCESS. .......................................................................... 11

    A. The Award Against Tenenbaum Violates the *Williams* Standard .................... 11

    B. The Unconstitutionality of the Award is Affirmed by the Standards of *Gore* and *State Farm.* .................................................................................................. 15

IV. IF THE COURT DOES NOT GRANT THE DEFENDANT A NEW TRIAL, IT SHOULD REDUCE THE STATUTORY DAMAGE AWARD TO THE MINIMUM. .. 18

    A. The Legislative History of the 1999 Act Makes Clear that Congress Had No Intention of Imposing Statutory Damages on Music Consumers. ........................ 19

    B. Congress has Never Authorized the Procedure by Which the Jury Determined the Level of Statutory Damage. ........................................................................... 23

    C. The Court is Obliged Both by The Constitution and by Statute to Assure that the Statutory Damage Imposed Is Just. ............................................................... 25

# TABLE OF AUTHORITIES

Cases

*Cooper Indus. v. Leatherman Tool Group Inc.*, 532 U.S. 424 (2001) .............................. 25

*Accounting Outsourcing, LLC v. Verizon Wireless Pers. Commc'ns, L.P.*, 329 F.
   Supp. 2d 789 (M.D. La. 2004) ................................................................................... 13

*BMG v. Gonzalez*, 430 F.3d 888 (6th Cir. 2005) ............................................................ 17

*BMW v. Gore*, 517 U.S. 559 (1996) ......................................................................... passim

*Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257 (1989) ..... 14, 17

*Capitol Records, Inc. v. Thomas*, 579 F. Supp. 2d 1210 (D. Minn. 2008) ................. 16, 17

*Correa v. Hosp. San Francisco*, 69 F.3d 1184 (1st Cir. 1995) ........................................ 25

*Day v. Woodworth*, 54 U.S. (13 How.) 363 (1852) ......................................................... 14

*Douglas v. Cunningham*, 294 U.S. 209 (1935) ................................................................ 18

*Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340 (1998), .............................. 23

*Harper & Row v. The Nation*, 471 U.S. 539 (1985) .......................................................... 6

*Holtzman v. Caplice*, No. 07 C 7279, 2008 WL 2168762 (N.D. Ill. May 23, 2008) ........ 13

*Kim v. Nash Finch Co.*, 123 F.3d 1046 (8th Cir. 1997) .................................................... 13

*Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478 (7th Cir. 2003) .................................. 12

*Lowry's Reports, Inc. v. Legg Mason, Inc.*, 302 F. Supp. 2d 455 (D. Md. 2004) ....... 13, 14

*Milone v. Moceri Family, Inc.*, 847 F.2d 35 (1st Cir. 1988) ............................................ 25

*Philip Morris USA v. Williams*, 549 U.S. 346 (2007) ......................................... 11, 12, 17

*Sasaki v Class*, 92 F.3d 232, 237-38 (4th Cir. 1996) ..................................................... 24

*Sony v. Universal City Studios,* 464 U.S. 417 (1984) ....................................................... 6

*St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63 (1919) .................................... passim

*State Farm v. Campbell*, 538 U.S. 408 (2003) ........................................................... passim

*Swinton v. Potomac Corp.*, 270 F.3d 794 (9th Cir. 2001) ............................................... 12

*United States v. Bajakajian*, 524 US 321, 337 (1998) ..................................................... 17

*Verizon Cal. Inc. v. Onlinenic, Inc.*, No. C 08-2832 JF (RS), 2009 WL 2706393
   (N.D. Cal. Aug 25, 2009) ..................................................................................... 12, 13

*Wechsberg v. United States*, 54 Fed. Cl. 158 (Fed. Cl. 2002) ......................................... 15

*Zomba Enters., Inc. v. Panorama Records*, 491 F.3d 584 (6th Cir. 2007), *cert.
   denied*, 128 S. Ct. 2429 (2008) ........................................................................... 13, 18

Statutes, Regulations, and Legislative History

106th Cong., S. Hrg. 106-1060, *available at*
   http://www.access.gpo.gov/congress/senate/senate14ch106.html ............................... 22

106th Cong., S. Hrg. 106-1070, *available at*
http://www.access.gpo.gov/congress/senate/senate14ch106.html ............................... 23

137 Cong. Rec. S15484 ..................................................................................................... 24

145 Cong. Rec. E930-04 ................................................................................................... 21

145 Cong. Rec. H12884-01 ....................................................................................... 20, 21

145 Cong. Rec. H6798-02 ................................................................................................ 20

145 Cong. Rec. S15228-01. .............................................................................................. 22

42 USC § 1981a(c)(2) (2006) ........................................................................................... 24

The Cable Communications Policy Act of 1984 ("Cable Act"), 47 U.S.C. § 521 *et
seq* ................................................................................................................................. 11

The Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ............................................... 11

The Telephone Consumer Protection Act, 47 U.S.C. § 227 ............................................. 11

Other Authorities

"Digital Native," *Wikipedia*, http://en.wikipedia.org/wiki/Digital_native ........................ 1

3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 13.05 ............................................. 7

4 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 14.04 ........................................... 24

Ced Kurtz, *Let's Toast the Death of DRM*, Pitt. Post-Gazette, Jan. 26, 2008,
*available at* http://www.post-gazette.com/pg/08026/852399-371.stm .......................... 3

Defok, *Universities Come under Increasing Pressure from Music Recording
Industry*, The Patriot-News, May 4, 2003 ..................................................................... 16

Glen Weissenberger, *Weissenberger's Federal Evidence* § 148 (2009 ed.)...................... 9

Jefferson Graham, *Can Apple Convince Recording Industry?*, USA Today, Feb. 8,
2007, *available at* http://www.usatoday.com/tech/news/2007-02-08-apple-
drm_x.htm ....................................................................................................................... 3

Jessica Litman, *Lawful Personal Use*, 85 Texas L. Rev. 1871 (2007) ............................. 8

Kenneth S. Broun et. al, *McCormick on Evidence* § 274 (6th ed. 2006) ......................... 10

Lloyd L. Weinreb, *Fair's Fair: A Comment on the Fair Use Doctrine*, 103 Harv. L.
Rev. 1137 (1990) ........................................................................................................ 7, 8

*MIT Student Charged With Million Dollar Computer Software Piracy Scheme, U.S.
Attorney's Office Announces*, PR Newswire, April 7, 1994 .......................................... 19

*Napster's Highs and Lows*, Business Week, Aug. 14 2000, *available at*
http://www.businessweek.com/2000/00_33/b3694003.htm ......................................... 21

Nate Anderson, *No More Lawsuits: ISPs To Work With RIAA, Cut Off P2P Users*,
Ars Technica, Dec. 19, 2008, *available at* http://arstechnica.com/tech-
policy/news/2008/12/no-more-lawsuits-isps-to-work-with-riaa-cut-off-p2p-
users.ars......................................................................................................................... 17

Ray Delgado, *Law Professors Examine Ethical Controversies Of Peer-To-Peer File Sharing*, Stanford Report, Mar. 17 2004, *available at* http://news-service.stanford.edu/news/2004/march17/fileshare-317.html ........................................ 4

S. Salzberg & K. Redden, *Federal Rules of Evidence Manual* 191 (3d ed. 1982)........... 10

Pierre N. Leval*, Toward A Fair Use Standard*, 103 Harv. L. Rev. 1105 (1990)................ 7

Steve Jobs, *Thoughts on Music*, Feb. 6, 2007, *available at* http://www.apple.com/hotnews/thoughtsonmusic/......................................................... 3

**STATEMENT**

Copyright law took a step forward when this Court became the first to recognize a fair use interregnum for copyright infringement following the debut of Napster. Op. at 4, 36. The Court's recognition of unfairness in the disparity of choice faced by music consumers between the attractiveness of using Napster to download unencrypted cost-free music and the total absence of any authorized online source was a victory for a generation known as Digital Natives.[1] Yet this victory in principle turned out to be a catastrophic loss in practice for Defendant Joel Tenenbaum when the Court improperly identified the end of this interregnum period as occurring with the introduction of iTunes in the spring of 2003. Op. at 6. In so doing, the Court ignored the impact on encryption the fairness of music consumers' choice. The Court also erred by prejudicially redacting the evidence of defendant's initial attempt to settle.

The Court should substantially reduce the bankrupting $650,000 award against Tenenbaum, even if it recognizes no trial error. Such massive damages against individuals were never contemplated by Congress's statutory scheme. Moreover, as applied in this case, the award violates the Due Process standard that the Supreme Court first articulated nearly a century ago in *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63 (1919). Indeed, given the fact that Tenenbaum was one of many millions of people sharing music and that the plaintiffs have failed to show any actual damage from Tenenbaum's particular actions, this award is obviously "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *Id.* at 67-68.

Pursuant to FRCP 59, Defendant Tenenbaum moves for new trial or remittitur.

## I. THE COURT WRONGLY DECIDED THE ISSUE OF FAIR USE.

### A. The Interregnum Period of Fair Use Recognized by the Court Should Continue Until 2007 When Plaintiffs Finally Began Licensing Their Songs DRM-Free.

The Court recognized an unfairness in the choices confronting music consumers once Napster had transformed the music market place. Napster made music ubiquitously available to music consumers, not only cost-free but also in freely transferable, easily

---

[1] *See* "Digital Native," *Wikipedia*, http://en.wikipedia.org/wiki/Digital_native.

downloadable, easily playable form. But the combination of the convenience of using Napster together with the music industry's refusal to embrace digital downloads meant that music consumers who wanted a particular song faced a Hobson's choice. They could either buy the album containing the desired song on CD from a record store – paying for the whole album when they might want but one song – and then ripping the CD to their computer, or they could download the song online using Napster, thereby "getting exactly the songs they wanted, in exactly the format they wanted," Op. at 32, even though the download was unauthorized. In this circumstance, the Court could envision a fair use "interregnum" during which a defendant who used Napster could rightfully claim a fair use defense. *Id.* at 4. The Court reasoned that an "unauthorized use should be considered 'more fair' when there is no ready market or means to pay for the use, while such an unauthorized use should be considered 'less fair' when there is a ready market or means to pay for the use." *Id.* at 30-31. But the Court refused this interregnum defense to Tenenbaum because "it is clear that by August 2004 – when Tenenbaum's file sharing was detected – a commercial market for digital music had fully materialized." *Id.* at 32.

The Court's "clarity" on this issue is mistaken. Until 2007, the songs the record companies authorized for online purchase were encrypted. Not until 2007 did they make songs available online DRM-free. This difference is critical. The fact that digital media was DRM-free on Napster and Kazaa contributed substantially to their immense public appeal. Encryption, by contrast, limited transferability and necessitated proprietary hardware and software to play the encrypted songs. The advent of iTunes did nothing to correct these deficiencies. The inconvenience of having songs only in an encrypted format was (and continues to be) altogether comparable to the inconveniences of having to buy a whole album to obtain a single song, or having to travel physically to a store instead of purchasing online. Any assertion that encryption should be ignored as an encumbrance on the use of downloaded songs undercuts the concept that there should be any interregnum at all. After all, although there were encumbrances, it was at all times possible to go to a store and buy DRM-free music on CD.

Tenenbaum and all other music listeners could not get "exactly the songs they wanted, in exactly the format they wanted" until the industry giants changed their position in 2007. It was not until then that they finally responded to the marketplace and

to the public urgings of Steve Jobs, CEO of Apple (maker of iTunes software), by licensing DRM-free music online. Jobs prompted this change with his famously open letter in February of 2007[2]:

> Imagine a world where every online store sells DRM-free music encoded in open licensable formats. In such a world, any player can play music purchased from any store, and any store can sell music which is playable on all players. *This is clearly the best alternative for consumers*, and Apple would embrace it in a heartbeat. . . .

> Though the big four music companies require that all their music sold online be protected with DRMs, these same music companies continue to sell billions of CDs a year which contain completely unprotected music. *That's right! No DRM system was ever developed for the CD*, so all the music distributed on CDs can be easily uploaded to the Internet, then (illegally) downloaded and played on any computer or player.

> In 2006, under 2 billion DRM-protected songs were sold worldwide by online stores, while over 20 billion songs were sold completely DRM-free  and unprotected on CDs by the music companies themselves. . . . So if the music companies are selling over 90 percent of their music DRM-free, what benefits do they get from selling the remaining small percentage of their music encumbered with a DRM system? *There appear to be none.*

Steve Jobs, *Thoughts on Music*, Feb. 6, 2007, *available at* http://www.apple.com/hotnews/thoughtsonmusic/ (emphasis added).

The emergence of easy-to-use, paid, online outlets for DRM-free music followed in 2007 (the last of the Big 4, Sony BMG, capitulated in January, 2008) as each of the major labels, one by one, licensed their songs DRM-free for online distribution.[3] All of the thirty songs for which Tenenbaum has been held liable are now available DRM-free from Amazon.[4]

The fact that in August 2004, the recording companies had not made their copyrighted music available DRM-free online meant that they had essentially boxed

---

[2] Eric Garland, CEO of BigChampaigne, the primary tracker of online music, is quoted in the USA Today article reporting Jobs open letter: "Digital music continues to be an overwhelmingly pirate market, because consumers realize the experience is better than the online store – they don't like songs with restrictions." Jefferson Graham, *Can Apple Convince Recording Industry?*, USA Today, Feb. 8, 2007, *available at* http://www.usatoday.com/tech/news/2007-02-08-apple-drm_x.htm.

[3] Ced Kurtz, *Let's Toast the Death of DRM*, Pitt. Post-Gazette, Jan. 26, 2008, *available at* http://www.post-gazette.com/pg/08026/852399-371.stm.

[4] The industry is now taking the further step of offering DRM-free music cost-free to music consumers willing to watch an advertisement. Newman, With Ads, Music Downloads Sing a New Tune, New York Times Dec. 29, 2009.

music consumers like Tenenbaum into an unfair choice. He could go through the concededly inadequate process of purchasing a full album of unencrypted songs on CD and then transferring the songs to his computer and other listening devices. Op. at 31-32 He could buy individual songs online, but only in encrypted form, and decrypt them to make them freely transferable, but this would make him a federal criminal under the anti-circumvention provision of the DMCA. His third option was to continue to use a peer-to-peer platform that allowed him to download these songs DRM-free with only a few clicks on his computer. This was the best and most commonly used of the three options that the record industry presented to music consumers. Indeed, in early 2004, estimates were that at least 70 million people were regularly engaging in file sharing.[5] It was also the option most likely to encourage the recording companies to change their position in a way that would give consumers the product they wanted and could easily get peer-to-peer, as it eventually did.

Accordingly, the Court's recognition of a fair-use interregnum period, itself an advance for the transitional Napster generation toward lifting the opprobrium of thievery that has been heaped upon it, is a step that, once taken, should be seen as encompassing Tenenbaum's file sharing in 2004. The end-point of the interregnum comes logically and clearly in 2007 when the industry finally offered a choice unquestionably equivalent to what was available to music consumers online through the peer-to-peer networks. This end-point for the Court's fair-use interregnum would avoid placing the force of law behind the imposition on the public of inferior encrypted products during a period when superior DRM-free products were ubiquitously available on the Internet. It would relieve the transitional Napster generation from the obloquy of being thieves. Going forward, it would *not* wipe out copyright, but rather would give the recording companies all the copyright protection they need, and would ensure that, going forward, copyright continues to do its dual job of both protecting artists and allowing the fruits of their cultural production to be enjoyed widely.

---

[5] Ray Delgado, *Law Professors Examine Ethical Controversies Of Peer-To-Peer File Sharing*, Stanford Report, Mar. 17 2004, *available at* http://news-service.stanford.edu/news/2004/march17/fileshare-317.html.

**B. Plaintiffs' Complicity in the Attractiveness of the Online Music Environment in 2004 Should Have Been Recognized At Least as a Factor in the Balance of Fair Use.**

Plaintiffs, in August 2004, could reasonably be considered to have been at least partially responsible for the wide-spread dispersion of their recordings over peer-to-peer networks like Napster and Kazaa. Their continued conduct of releasing their recordings into a digitally networked environment on DRM-free CD's made the proliferation of their recordings on the peer-to-peer networks trivially easy. Their aggressive promotion of their recordings made such proliferation entirely predictable. Indeed, their mode of publication all but invited sharing. Plaintiffs knew, or should have known, exactly where their sound recordings would end up.

In August 2004, when Tenenbaum downloaded the thirty songs here in issue, he did nothing more than millions of other college students were doing at that time, using a platform that allowed him to download the songs DRM-free with only a few clicks on his computer. His downloading was, in reality, an expression of both the social force of technological revolution and a consequence of the plaintiffs' marketing strategies. The plaintiffs' conduct can be seen as effectively luring Tenenbaum into a vibrant technologically-assisted youth culture. The plaintiffs' affirmative marketing activities and their refusal to offer an equivalent online alternative created a situation akin to "attractive nuisance." In tort law, as the Court recognized, Op. at 29, a landowner is subject to liability for physical harm to trespassing children caused by an artificial condition upon the land where there is a substantial risk of serious bodily harm and the landowner fails to exercise reasonable care to eliminate the danger. An unfenced in-ground swimming pool is the classic example. In this case, the plaintiffs facilitated and enhanced the comparative availability and attractiveness of their songs on the peer-to-peer networks. They failed to fence off the songs they published on CD by encrypting them, and they refused to provide an unencrypted online alternative for obtaining them. In consequence Tenenbaum, along with millions of others like him, fell into the vast, unfenced pool of unauthorized peer-to-peer file-sharing.

Plaintiffs conduct in releasing DRM-free recordings on CDs while refusing to make these same recordings available DRM-free for authorized purchase online, all the while aggressively promoting the attractiveness of their recordings, should have been

considered as a factor in judging the fairness of Tenenbaum's use. Yet the Court ruled that any responsibility the plaintiffs had for the technological and marketing context in which Tenenbaum's file-sharing use took place was not relevant to whether his use was fair. Op. at 30. In doing so, the Court ignored the Supreme Court's decision in *Harper & Row v. The Nation*, 471 U.S. 539 (1985), in which the Supreme Court rejected *The Nation*'s fair use defense to copying and publishing key items from President Ford's as yet unpublished memoirs. The actions of the plaintiff in that case, contrasting with those of the plaintiffs here, figured prominently in the Supreme Court's tipping of the fair-use balance in the plaintiffs favor. The Court emphasized the care the plaintiffs had taken to keep tight control of the Ford manuscript, despite which *The Nation* had obtained a purloined copy. The Supreme Court clearly recognized that factors such as "implied consent through *de facto* publication . . . or dissemination" might "tip the balance of equities in favor of prepublication use." *Id*. at 551. Surely, if "implied consent" by reason of the copyright holder's conduct could be considered not only as a relevant factor but one which could "tip the balance" in the Supreme Court's analysis, then it follows that a copyright holder's conduct in publishing its product on DRM-free CD's into a digitally networked environment and offering no equivalent online alternative may be considered among the elements of fairness in this case. Had Harper & Row been lax about maintaining control of the Ford manuscript and at the same time been affirmatively promoting the news-value of what it was about to publish, the Supreme Court would likely have tipped the balance the other way. In *Sony v. Universal City Studios,* 464 U.S. 417 (1984)*,* the conduct of the plaintiff copyright holders also figured prominently in the Supreme Court's fair use balancing in that case. In recognizing consumer time-shifting as fair use the Supreme Court considered it relevant to the balance that the copyright holders had made little effort to prevent consumers from recording television broadcasts. *Id.* at 456.

Together, *Harper* and *Sony* make unequivocally clear that the actions or absence of action by plaintiff copyright holders are appropriately to be considered as part of the fair use judgment. The Court in this case erroneously ruled the plaintiffs' actions out of consideration altogether.

**C. The Court's Exclusion from the Fair Use Balance of the Costs to All Those Other Than the Copyright Holders Was Error.**

In making its fair use balance, the Court put on the plaintiffs' side the adverse effects to copyright holders from recognizing a defense of fair use in this and all similar cases. Op. at 6-7. Yet the Court excluded from the balance the reciprocal consideration of the effects on everyone else of *not* recognizing a defense of fair use. Among the costs the Court declined to consider were those borne by parents and schools charged with policing the online activities of children and students; costs on universities compelled to disclose the names of their own students using computers connected to their university network; and the intrusions upon the privacy of individuals entailed by forced inspections of their computers undertaken in pursuit of copyright enforcement. The Court itself has been witness to such costs, and even, at times, the agent of protecting them. Op. at 33.

Yet, while recognizing that infringement has become so easy and the temptation for children so great that parents and universities are being all but conscripted as copyright police to regulate internet use, Op. at 33, the Court nonetheless dismissed these concerns, suggesting that proof of these costs is lacking, and in any event that such concerns are the responsibility of Congress, not the Court. But deferring considerations of public burdens imposed by copyright to Congress stands in anomalous contrast to Congressional and judicial recognition that the development of fair use doctrine is the province and responsibility of judges.[6]

In sum, the Court weights just the one side of the balance that favors the copyright holders, totally excluding anything adverse to them both in their own conduct and in the costs that decision in their favor imposes on others. The Court buys totally into Judge Pierre Leval's academic attempt to recast the doctrine of fair use as a purely economic inquiry focused on maximizing creative production, leaving fairness, morality and any broader concerns of public interest totally out of it. Op. at 11, 18*; See* Pierre N. Leval*, Toward A Fair Use Standard*, 103 Harv. L. Rev. 1105 (1990). In his cogent critique, Professor Weinreb points out that Judge Leval's economic analysis may make sense as an affirmative justification for finding fair use, but not as a limitation. Lloyd L. Weinreb,

---

[6] "The Copyright Act of 1976 for the first time accorded express statutory recognition of this judge-made rule of reason." However, this codification was "intended to restate the present [*i.e.,* pre-1978] judicial doctrine of fair use, not to change, narrow, or enlarge it in any way." 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 13.05.

*Fair's Fair: A Comment on the Fair Use Doctrine*, 103 Harv. L. Rev. 1137, 1138 (1990) ("At most, [Leval's] analysis supports *allowing* fair use when his criteria are met . . . . It does not support *restricting* fair use to his criteria.") Judge Leval's attempt to jettison all concerns of morality and fairness denies the language, history, development and application of fair use as an equitable rule of reason. As Professor Weinreb explains, "fair use has historically been and ought to remain what its name suggests: an exemption from copyright infringement for uses that are *fair.* What is fair is as fact-specific and resistant to generalization in this context as it is in others." *Id.* at 1141. Other scholars have pointed out that a conception of fair use that focuses only on transformation and economic value simply cannot account for a litany of uncontroversial personal fair uses and Court decisions recognizing them as such, from reading a book aloud to one's child to backing up a personal hard disk. *See generally* Jessica Litman, *Lawful Personal Use*, 85 Texas L. Rev. 1871 (2007). Instead, as Weinreb properly observes, "[t]he reference to fairness in the doctrine of fair use imparts to the copyright scheme a bounded normative element." 103 Harv. L. Rev. at 1161. As he concludes, "Fair is fair." *Ibid.*

## II. AT TRIAL THE COURT ERRED BY PREJUDICIALLY REDACTING DEFENDANT'S OFFER OF EVIDENCE SHOWING THAT HE WAS WILLING TO TAKE RESONSIBILITY FOR HIS ACTIONS, ALLOWING IT TO BE TWISTED INTO DEVASTATING IMPEACHMENT OF HIS CHARACTER.

The Court erroneously redacted Ex. 23, the defendant's offer of settlement of November 21, 2005, offered in evidence by the defendant. This in itself is reversible error requiring a new trial.

Plaintiffs did their best throughout the trial to make the defendant appear to the jury to be a liar, a perjurer, and a person dodging responsibility for his actions and blaming others under oath for his conduct. Tenenbaum's most powerful evidence to the contrary was his November 2005 letter to the plaintiffs with its offer of settlement and attached money order for $500.00 (Ex. 23). This letter showed that he took responsibility for his actions, that he was not looking for a fight but had had this fight imposed on him, and that he wanted to make amends to the best of his ability.

The letter in full:

*November 21, 2005*

*I am enclosing a money order for $500.00 as a final and complete settlement of any lawsuits that any company you represent may file against me.*

*I am a college student and on scholarship to attend my college. I use a bicycle around Baltimore. I was able to scrape together $500.00 to send to you from the money the college pays me to tutor. It would be a hardship to send you more money as the college only pays me $6 an hour. Of course, I am tutoring in addition to carrying a full-time schedule of classes.*

*It was very nice of my mom's childhood friend who became an attorney to contact you since I couldn't afford to hire an attorney.*

*While I do not have access to the computer at college, I will be home on November 22nd. If there are any files existing in violation of copyrights, I will destroy them at that time.*

*Very truly yours,*

To the defendant's great prejudice, the Court excluded by redaction all mention of settlement from the letter and excluded the $500.00 money order, admitting only the last paragraph of the letter in which the defendant stated that he would destroy the offending files. Ripped from its context as part of a settlement offer that Plaintiffs summarily rejected, this paragraph was thereby transformed from a conditional commitment contingent upon acceptance of the defendant's settlement offer by the plaintiffs into an apparently unconditional unilateral commitment by the defendant. This in turn gave the plaintiffs a basis for their devastating impeaching attack on the defendant for not destroying the offending files as he had apparently and unequivocally promised to do. This letter thus became damning evidence of perfidy. Its exclusion of the defendant's recognition of responsibility and substantial offer of settlement in November, 2005, stripped the defendant of any means to rebut the plaintiffs' claim that his willingness to take responsibility first arose only three weeks before trial.

The Court's exclusion of the defendant's settlement offer was based on a misunderstanding and erroneous application of Rule 408 of the Federal Rules of Evidence. The rule by its express terms applies only to exclude evidence of settlement negotiations offered to prove liability for, invalidity of, or amount of a claim. Here the erroneously excluded evidence was offered to show the defendant's acceptance of

responsibility, not to prove the invalidity or amount of a claim. "The principle of exclusion does not operate when compromise-related evidence is used to establish some other fact of consequence in the litigation." Glen Weissenberger, *Weissenberger's Federal Evidence* § 148 (2009 ed.).

Moreover, Rule 408 applies only to admissions. The rule seeks to avoid a party using a settlement offer *against* the party who made it. The Advisory Committee notes state:

> As a matter of general agreement, evidence of an offer to compromise a claim is not receivable in evidence *as an admission* of, as the case may be, the validity or invalidity of the claim. As with evidence of subsequent remedial measures, dealt with in Rule 407, exclusion may be based on two grounds. (1) The evidence is irrelevant, since the offer may be motivated by a desire for peace rather than from *any concession of weakness* of position. . . . While the rule is ordinarily phrased in terms of offers of compromise, it is apparent that a similar attitude must be taken with respect to completed compromises *when offered against a party* thereto. (Emphasis added.)

As McCormick explains in his section discussing "Admissions by Conduct," "The exclusionary rule [of FRE 408] is designed to exclude the offer of compromise only when it is tendered as an admission of the weakness of the offering party's claim or defense, not when the purpose is otherwise." Kenneth S. Broun et. al, *McCormick on Evidence* § 274 (6th ed. 2006). The underlying fear addressed by Rule 408 is that, without the rule, settlement negotiations would be inhibited if the parties knew that statements made in the course of settlement might later be used against them as admissions of liability. As stated in S. Salzberg & K. Redden, *Federal Rules of Evidence Manual* 191 (3d ed. 1982): "The philosophy of the Rule is to allow the parties to drop their guard and to talk freely and loosely without fear that a concession made to advance negotiations will be used [against them] at trial."

Ex. 23 is an offer of compromise offered as evidence of acceptance of responsibility by the party who made the offer. It was not offered as an admission of weakness made in settlement negotiations to prove liability or amount. It should not have been redacted. And, if redacted at all, it should not have been done in a way that distorted its meaning and allowed the plaintiffs to characterize the defendant as a liar. This was not harmless error.

### III. THE JURY'S DAMAGE AWARD, GROSSLY EXCESSIVE BY ANY MEASURE, VIOLATES DUE PROCESS.

Tenenbaum, individually, caused the plaintiffs no provable damage. His file-sharing was for personal use, not for profit, willful only in the sense of knowing but not malicious, not criminal, no different than the conduct of literally millions of others in his generation. Only if his conduct is combined with millions of others does the damage to the plaintiffs appear to be substantial. On these facts, the award against Tenenbaum of $675,000 for downloading and sharing thirty songs is so severe and oppressive as to be wholly disproportionate to his offense. The award punishes Tenenbaum not only for his own actions but also for the aggregate actions of others, and punishes him not only for damage to plaintiffs but to persons not parties who have been injured by the decline of revenues in the music business. *Cf. Philip Morris USA v. Williams*, 549 U.S. 346, 353-54 (2007) (holding that the Due Process Clause forbids a damages award that would "punish a defendant for injury that it inflicts upon nonparties"). The ratio of the penalty to the actual injury he caused is far beyond what any case has ever sustained.

### A. The Award Against Tenenbaum Violates the *Williams* Standard.

Statutory damages violate the constitutional guarantee of due process if they are "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 67-68 (1919). Legislatures often enact statutory damages primarily to protect consumers from the predatory actions of corporations. *See e.g.*, The Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.*; The Telephone Consumer Protection Act, 47 U.S.C. § 227; The Cable Communications Policy Act of 1984 ("Cable Act"), 47 U.S.C. § 521 *et seq.* The *Williams* case is a perfect example. *Williams* involved an Arkansas statute calling for statutory damages of "not less than fifty dollars, nor more than three hundred dollars" against railroads that over-charged passengers. *Id.* at 64. Two passengers who were each overcharged 66 cents for their tickets sued the railroad company and were each awarded statutory damages of seventy-five dollars. In response to a due process challenge to these awards by the railroad company, the *Williams* court found them "no more than reasonable and adequate to accomplish the purpose of the law and remedy the evil intended to be reached." *Id.* at 67. In making this judgment, the Supreme Court considered the public

interest in not being overcharged and the "numberless opportunities" for the railroad to overcharge. The Court concluded that "[the awards] properly cannot be said to be so severe and oppressive as to be wholly disproportioned to the offense or obviously unreasonable." *Ibid.*

This sensible approach and benchmark holding provides a solid basis for finding the statutory damage award in this case unconstitutional. This is so even if this Court agrees with the plaintiffs' assertion that statutory damages are in a separate constitutional category from punitive damages, and thus not to be strictly evaluated under the Supreme Court's recent precedents striking down excessive punitive damage awards as violations of due process, *BMW v. Gore,* 517 U.S. 559 (1996), and *State Farm v. Campbell*, 538 U.S. 408 (2003). Comparison of the award in this case with the award in *Williams* is sufficient in itself to demonstrate unconstitutionality.

(1) Whereas the *Williams* court sided with the consumer against the commercial corporation, here the situation is the reverse – commercial corporations suing an individual consumer, equivalent to the railroad suing its passengers. In contrast to the "numberless opportunities" a railroad has to overcharge its passengers, for all of which the railroad is responsible as the single wrongdoer, here the plaintiff corporations are responding to the conduct of millions of independent people, but are attempting to punish Tenenbaum for the actions of all of them. Punishing Tenenbaum for the offenses of other file-sharers who are neither his co-conspirators nor joint tort feasors with him makes the award against Tenenbaum wholly disproportionate to *his* offense. It is unconstitutional to impose a civil penalty on a defendant for either the conduct of others or her own conduct that harmed those who are not plaintiffs. *See Philip Morris USA v. Williams*, 549 U.S. 346, 353–54 (2007); *see also Verizon Cal. Inc. v. Onlinenic, Inc.*, No. C 08-2832 JF (RS), 2009 WL 2706393, at *8 (N.D. Cal. Aug 25, 2009) ("[A] court authorizing an award that reaches well into realm of punitive or deterrence-oriented damages must be careful not to punish the defendant for wrongful acts other than to those committed against the plaintiff.")

(2) The size of the damage award against the railroad in *Williams* was not out of proportion to the railroad's capacity to pay, while in this case the statutory penalty imposed on Tenenbaum is bankrupting. This makes the award in this case severe and

oppressive in the extreme. The wealth of the defendant has been widely recognized as relevant to the deterrent effect of a damages award. *See, e.g.*, *Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 485 (7th Cir. 2003) ("sizeable award . . .is both suitable and necessary to punish and deter a corporation of this size"); *Swinton v. Potomac Corp.*, 270 F.3d 794, 818-19 (9th Cir. 2001) (punitive damages award was not out-of-line with defendant's net worth); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1068 (8th Cir. 1997) (same). While courts have shown deference under *Williams* to large awards in recent statutory damage cases, the statutory damages awards that the plaintiffs have pointed to elsewhere were all upheld against for profit corporations. *See*, *e.g.*, *Verizon Cal. Inc. v. Onlinenic, Inc.,* No. C 08-2832 JF (RS), 2009 WL 2706393, at *8 (N.D. Cal. Aug 25, 2009); *Zomba Enters., Inc. v. Panorama Records*, 491 F.3d 584 (6th Cir. 2007), *cert. denied*, 128 S. Ct. 2429 (2008); *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 302 F. Supp. 2d 455 (D. Md. 2004); *Accounting Outsourcing, LLC v. Verizon Wireless Pers. Commc'ns, L.P.*, 329 F. Supp. 2d 789 (M.D. La. 2004); *Holtzman v. Caplice*, No. 07 C 7279, 2008 WL 2168762 (N.D. Ill. May 23, 2008) (defendant M.P. Caplice & Associates). Because the *Williams* standard deals with unreasonableness, severity, and oppressiveness, this fact is not only relevant but central to the inquiry here.

(3) The railroad's offense of overcharging consumers was reprehensible, a predatory commercial practice by a corporation overreaching its customers. Tenenbaum's offense was downloading songs freely available on the Internet for personal use. Even employing the plaintiffs' strained metaphor of theft (albeit without trespass or any physical dispossession), Tenenbaum's offense is at most comparable to shoplifting music from a record store, not so heinous as to justify a bankrupting fine. This makes the award against Tenenbaum disproportionate to his offense and obviously unreasonable.

(4) The ratio of penalty to actual damage in *Williams* was $75 dollars to 66 cents, or 113 to 1. Using a purchase price of 99 cents per song and, assuming contrary to fact, that each download represents a lost sale, the ratio of penalty to actual damage in this case is 22,500 to 1. If the ratio is calculated on lost profit instead of gross revenue

(generously estimated at 35 cents per song) the ratio becomes 65,000 to 1. This makes the award against Tenenbaum disproportionate and obviously unreasonable by any measure.[7]

Courts applying *Williams* have focused on whether statutory damages are reasonable in light of the harm the defendant caused. *Zomba Enters., Inc. v. Panorama Records*, 491 F.3d 588 (6th Cir. 2007) and *Lowry's Reports, Inc. v. Legg Mason*, 302 F. Supp. 2d 455 (D. Md. 2004), are good examples. Both *Zomba* and *Lowry* distinguish statutory damages from punitive damages and proceed only under the more general *Williams* standard. But both also sharply contrast with this case in a manner that confirms the sufficiency of the *Williams* standard by itself to justify finding the award here unconstitutional. Both dealt with statutory damages against corporate, commercial defendants. *Zomba* approved statutory damages in a penalty-to-actual-damage ratio of 44 to 1. As the court said, "If the Supreme Court countenanced a 113:1 ratio in *Williams*, we cannot conclude that a 44:1 ratio is unacceptable here." *Lowry* approved statutory damages against a commercial corporate defendant in a ratio of either 2.9 to 1 or 322 to 1, depending on whether one uses the plaintiff's or the defendant's figures for actual damage. 302 F. Supp. 2d at 458 & 458 n.1. On every comparative parameter the facts of this case are far more extreme.

The idea that the Constitution "places outer limits on the size of a civil damages award made pursuant to a statutory scheme" predates by over eighty years the modern line of cases extending this logic to common law jury awards. *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 276 (1989) (citing *Williams*, 251 U.S. at 66-67). This theory follows from the bedrock principle that "punishment should fit the crime." *Gore*, 517 U.S. at 574 n.24 (1996). Thus, the theory advanced by a few lower courts that the *Gore* and *Campbell* cases are simply "not implicated" by a case involving statutory damages, *Lowry's*, 302 F. Supp. 2d at 460, turns the Supreme Court's jurisprudence upside down. Indeed, *Gore* itself cites *Williams* and its antecedents for the proposition that "exemplary damages imposed on a defendant should reflect 'the enormity of his offense.'" *Gore*, 517 U.S. at 574 (quoting *Day v. Woodworth*, 54 U.S. (13

---

[7] Only the copyrights on the thirty songs were proven to be registered, which is necessary to recovery. Any damage caused by sharing the thirty songs is unproven and completely speculative. Each of the songs was immensely popular, with many copies available for free download on the peer-to-peer networks, thus Tenenbaum's sharing of the songs added only slightly to their availability.

How.) 363, 371 (1852); citing *Williams* at 251 U.S. at 66-67).

### B. The Unconstitutionality of the Award is Affirmed by the Standards of *Gore* and *State Farm.*

Whether or not the Supreme Court's punitive damage cases apply directly to statutory damages, the due process concerns they articulate surely provide additional guidance here. Both statutory and punitive damages, when imposed in civil cases not to compensate but to punish and deter, raise similar constitutional concern. "Although these awards serve the same purposes as criminal penalties, defendants subjected to punitive damages in civil cases have not been accorded the protections applicable in a criminal proceeding." *State Farm v. Campbell*, 538 U.S. at 417 (2003).

In determining whether a civil punishment is grossly excessive, the Supreme Court in *Gore* provided three guideposts, each of which can be seen as a particularization of the more general *Williams* standard: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm v. Campbell*, 538 U.S. at 418.

*(1) Reprehensibility:*

*State Farm* elaborates the Court's reprehensibility concern:

"[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." [*Gore*, 517 U.S. at 575]. We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. 517 U.S., at 576-577. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect.

538 U.S. at 419.

Here, Tenenbaum did no physical harm; any harm he caused was purely

economic.[8] His conduct evinced no indifference or reckless disregard for the health of safety of others. The targets of his conduct, the largest recording companies in the United States, were not the financially disadvantaged. There was no intentional malice. His conduct can be said to have been repeated, but can also be seen as one continuous course of conduct engaged in by his entire generation that even now many see as having been unauthorized but not morally wrong.[9]

### (2) Ratio:

The second *Gore* factor is the factor commonly expressed in ratios of punitive to actual damages: "the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award." *Campbell*, 538 U.S. at 418.  Although the Supreme Court has declined to state a bright-line rule about the maximum permissible ratio, it has repeatedly held that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at 425.  Even if, on occasion, awards with two-digit or even three-digit ratios are permissible, the damages award in this case is nowhere close to constitutionally permissible.  No case has ever approved either statutory or punitive damages with a ratio as high as the award here.

### (3) Comparability:

The third *Gore* factor is comparability. The two trials of Jammie Thomas-Rasset and resulting awards, both of which were subject to the same distortion that produced the verdict and award here, are comparable in the sense of being equally and even more shockingly excessive than the award here. In the first Thomas trial, the jury awarded $222,000 in statutory damages for downloading and sharing 24 songs.  In granting Thomas's request for a new trial, Chief Judge Michael Davis described that damage award as "wholly disproportionate." *Capitol Records, Inc. v. Thomas*, 579 F. Supp. 2d 1210, 1227 (D. Minn. 2008). According to Judge Davis:

---

[8] *See also Wechsberg v. United States*, 54 Fed. Cl. 158, 167 (Fed. Cl. 2002) (requiring plaintiffs to offer evidence of actual injuries if these are used to justify an award of statutory damages higher than the minimum).

[9] Defok, *Universities Come under Increasing Pressure from Music Recording Industry*, The Patriot-News, May 4, 2003.

> [Defendant's] status as a consumer who was not seeking to
> harm her competitors or make a profit does not excuse her
> behavior. But it does make the award of hundreds of
> thousands of dollars in damages unprecedented and
> oppressive.

The jury's award of $1.92 million dollars in the retrial is presently pending review before Judge Davis.

Far more pertinent as comparables are the cases brought by the plaintiffs on complaints identical to that against Tenenbaum in which the defendants have lost by summary judgment, *BMG v. Gonzalez*, 430 F.3d 888 (6th Cir. 2005), or by default. In all of these the damage award has been limited to the minimum. The arbitrariness of the grossly excessive awards in this case and the case of Jammie Thomas-Rasset is put further into high relief by the random method by which Plaintiffs selected those whom they chose to sue from among the millions of file-sharers, the fact that no cases for statutory damages other than those brought by the plaintiffs have ever been prosecuted against non-commercial individuals,[10] and the fact that Plaintiffs have now announced the discontinuation of their litigation campaign. Nate Anderson, *No More Lawsuits: ISPs To Work With RIAA, Cut Off P2P Users*, Ars Technica, Dec. 19, 2008, *available at* http://arstechnica.com/tech-policy/news/2008/12/no-more-lawsuits-isps-to-work-with-riaa-cut-off-p2p-users.ars.

In an analogous context,[11] the Supreme Court has held that the Excessive Fines Clause of the Eighth Amendment forces courts to take account of whether the "gravity of the defendant's offense" was proportional to the fine imposed even where the amount of the fine was technically authorized by the statute. *United States v. Bajakajian*, 524 US 321, 337 (1998). In that case, the defendant failed to report cash he was bringing into the

---

[10] Chief Judge Davis, in decrying the excessiveness of the initial damage award against Thomas, noted that no cases were cited to him in which large statutory damages were applied to a party who did not infringe in search of commercial gain. *Thomas*, 579 F. Supp. 2d at1227.

[11] While, the Supreme Court has rejected the application of the Excessive Fines Clause to non-statutory punitive damages paid to private parties, *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 264 (1989), the question has not been addressed in the context of statutory damages. *Id.* at 274 ("[E]ven if we were prepared to extend the scope of the Excessive Fines Clause beyond the context where the Framers clearly intended it to apply, we would not be persuaded to do so with respect to cases of *punitive damages awards*." (emphasis added)). And even in the nonstatutory context, at least one Justice has expressed a desire to revisit this conclusion. *Philip Morris v. Williams*, 127 S. Ct. 1057, 1066 n.1 (2007) (Stevens, J., dissenting). It is thus an open question whether the Constitution's explicit protection against "excessive fines," U.S. Const. amend. XIII, applies in this case.

United States. The Court reasoned that even though the statute technically authorized forfeiture of all $357,144 he imported, fining him the full amount would have been unconstitutional because the defendant "does not fit into the class of persons for whom the statute was principally designed: He is not a money launderer, a drug trafficker, or a tax evader." *Id.* at 338. Likewise, it is clear from the lack of any similar cases that the Copyright Act was principally designed to deter commercial copyright infringement and not individual, noncommercial activity such as that of the defendant. The Constitutional calculus must be applied accordingly.

## IV. IF THE COURT DOES NOT GRANT THE DEFENDANT A NEW TRIAL, IT SHOULD REDUCE THE STATUTORY DAMAGE AWARD TO THE MINIMUM.

*Zomba*, 491 F.3d at 587, asserts that the proper standard of review of a statutory damage award is "extraordinarily deferential – even more so than in cases applying abuse-of-discretion review." The logic is that a trial judge who applies the statutory damage range provided by Congress cannot be said to have abused discretion in the usual sense because the judge has followed Congressional direction. But that is not the issue Tenenbaum is raising here. He is not asserting that the jury abused its discretion. Rather, he asserts that the jury was given far too much discretion by instructions that invited it to make and unconstitutionally excessive award. *State Farm*, 538 U.S. at 417 ("We have admonished that 'punitive damages pose an acute danger of arbitrary deprivation of property. Jury instructions typically leave the jury with wide discretion in choosing amounts . . . .'" (citation omitted)).

*Douglas v. Cunningham*, 294 U.S. 209 (1935), on which *Zomba* relies illustrates the distinction. The Supreme Court in *Douglas* approved a trial judge's assessment of statutory damages of $5000 against a newspaper that had made 384,000 infringing copies of the plaintiff's copyrighted work. The Court noted that, in infringement suits against newspapers, Congress had authorized as a measure of statutory damages one dollar for each copy, but with a total award, no matter how many copies, of not more than $5000. The *Douglas* Court ruled that "the employment of the statutory yardstick, within set limits, is committed solely to the court which hears the case, and this fact takes the matter out of the ordinary rule with respect to abuse of discretion." The Court made no judgment whether the Congressional yardstick, as applied, violated due process. Had the Court

addressed this due process question, it would undoubtedly have concluded that there was no due process violation because Congress had considered the problem of infringements by newspapers and had adopted a specific yardstick for assessing statutory damages with limits reasonably tailored to that situation. Similarly, the statutory damage remedy approved in *Williams* was specifically tailored to meet the overcharging conduct of railroads.

### A. The Legislative History of the 1999 Act Makes Clear that Congress Had No Intention of Imposing Statutory Damages on Music Consumers.

Here, the case is entirely different. The statutory damage provision of Section 504(c) lumps together all forms of copyright infringement, criminal, civil, commercial, non-commercial, for profit, not for profit, actually damaging or not damaging – in short, the entire wide range of different kinds of copyright infringement. Its yardstick provides a range so wide that it cannot realistically be described as "tailored" at all. As applied in this case the statute authorized a total verdict anywhere between $22,500 and $4,500,000.

In fact, Congress never considered statutory damages applied to peer-to-peer file-sharing. The legislative history of the Digital Theft Deterrence and Copyright Damages Improvement Act of 1999 contains no reference to Napster, Kazaa, Gnutella or the like, much less concern over individual users who share mp3s on peer-to-peer networks. The context of the Digital Theft Deterrence and Copyright Damages Improvement Act of 1999, which the Congressmen themselves point to when discussing it, involved an MIT student, David LaMacchia, who for six-weeks between November 23, 1993 and January 5, 1994, created and operated a password-protected bulletin board on the university's servers where he first encouraged users to upload copyright-protected software programs (Excel, Word Perfect, Sim City), then transferred the software to a different password-protected location, and finally allowed users with access to the latter location to upload the copyrighted material free of charge. This was a centralized server operation maliciously designed and operated to do great damage to the software industry.

In announcing LaMacchia's indictment, U.S. Attorney David Stern stated, "The pirating of business and entertainment software through clandestine computer bulletin boards is tremendously costly to software companies, and by extension to their employees and to the economy. We need to respond to the culture that no one is hurt

by these thefts and that there is nothing wrong with pirating software." Stern continued, "[T]he government views large scale cases of software piracy, whether for profit or not, as serious crimes and will devote such resources as are necessary to protect those rights."[12] Consternation ensued when the United States District Court for the District of Massachusetts dismissed the charges against LaMacchia because the then applicable copyright statutes required infringers to profit financially. This became known as the "LaMacchia Loophole" in copyright law. Congress responded by passing the 1997 No Electronic Theft Act (the "NET Act")with the express purpose of allowing the government to prosecute such large-scale cases of software piracy even when there is no financial gain. *See*, *e.g.*, 143 Cong. Rec. H9884-01. (Mr. Coble: "H.R. 2265, Mr. Speaker, is a much needed legislative response to a 1994 court case that created a loophole which currently prevents the Department of Justice from prosecuting Internet copyright theft.") Congress was not targeting individual end-using consumers (those who downloaded from LaMacchia's server), but instead was focused on operators of centralized bulletin-board servers organizing large-scale clandestine software piracy.

The 1999 Act was prompted by Congressional concern that the level of enforcement of its 1997 act was unsatisfactory. Senator Leahy, a co-sponsor of the Act, made clear that the Act had two purposes: First, to "help provide additional deterrence" on top of the NET Act by "amending the Copyright Act, 17 U.S.C. 504 (c), to increase the amounts of statutory damages recoverable for copyright provisions," 145 Cong. Rec. S15228-01 (by providing an "inflation adjustment" according to a statement in the House Judiciary Committee, 145 Cong. Rec. H12884-01). Second, to instruct the Sentencing Commission to act on an emergency basis to enact guidelines in response to the NET Act (which the Commission had yet to do). The overriding theme of the 1999 Act was to make sure that the concerns for large-scale software piracy enunciated in the NET Act were being dealt with effectively by law enforcement and that additional monetary disincentives would contribute to the deterrence.

The Floor Statements of Mr. Rogan to the House precursor of the bill confirm that the intent of the 1999 Act was to add another layer of deterrence to the NET Act, rather

---

[12] *MIT Student Charged With Million Dollar Computer Software Piracy Scheme, U.S. Attorney's Office Announces*, PR Newswire, April 7, 1994.

than respond to individual users sharing music on peer-to-peer networks: "During the subcommittee's hearing on the 'Implementation of the NET Act and Enforcement Against Internet Privacy,' the concern raised was about the lack of prosecutions being brought by the Justice Department and the Sentencing Commission's failure to address Congress' desire to impose strict penalties for violators." 145 Cong. Rec. H6798-02. Mr. Coble's statement, quoted by the Court, that "Copyright piracy, Mr. Speaker, is flourishing in the world. With the advanced technologies available and the fact that many computer users are either ignorant of the copyright laws or simply believe that they will not be caught or punished, the piracy trend will continue," 145 Cong. Rec. H12884-01, was made and should be understood in this context. This statement was not meant to suggest that Congress was imposing strict statutory penalties on consumers (those who downloaded from LaMacchia's server). There is no hint of such suggestion anywhere in the legislative history. Had there been any such suggestion, it is unimaginable that the 1999 Act would have been passed in both houses of Congress, as it did, without controversy or debate.

Further confirmation that the increase in statutory damages was never meant to apply to music consumers sharing peer-to-peer comes from the timing of Congress's actions. The bill that first proposed the increase of the maximum statutory damage award was H.R. 1761, 106th Cong., introduced on May 11, 1999. *See* 145 Cong. Rec. E930-04 (proposing a precursor to the final bill that had a maximum penalty of $250,000 in order to deter the "worst of the worst offenders.") The bill's introduction thus predated widespread file sharing, since Napster was not released until June 1, 1999.[13] It follows that the kind of copyright infringement that Congress hoped to deter with these increased penalties *must* have been malicious large scale operations like LaMacchia's  – there was no other concern before Napster. *See* James Boyle, *The Public Domain* 50 (2008). (Before digital media, it was "relatively hard to violate an intellectual property right. . . . Like an antitank mine, [IP law] would not be triggered by the footsteps of individuals. It was reserved for bigger game.")

---

[13] *Napster's Highs and Lows*, Business Week, Aug. 14 2000, *available at* http://www.businessweek.com/2000/00_33/b3694003.htm.

The following portion of Senator Leahy's floor statement in support of the 1999

Act sums a lot of this up nicely:

> I have long been concerned about reducing the levels of software piracy
> in this country and around the world. The theft of digital copyrighted
> works and, in particular, of software, results in lost jobs to American
> workers, lost taxes to Federal and State governments, and lost revenue to
> American companies. A recent report released by the Business Software
> Alliance estimates that worldwide theft of copyrighted software in 1998
> amounted to nearly $11 billion. According to the report, if this "pirated
> software has instead been legally purchased, the industry would have
> been able to employ 32,700 more people. In 2008, if software piracy
> remains at its current rate, 52,700 jobs will be lost in the core software
> industry." This theft also reflects losses of $991 million in tax revenue in
> the United States.

> The Hatch-Leahy-Schumer "Digital Theft Deterrence and Copyright
> Damages Improvement Act" would help provide additional deterrence by
> amending the Copyright Act, 17 U.S.C. §504(c), to increase the amounts
> of statutory damages recoverable for copyright infringements. These
> amounts were last increased in 1988 when the United States acceded to
> the Berne Convention. Specifically, the bill would increase the cap on
> statutory damages by 50 percent, raising the minimum from $500 to $750
> and raising the maximum from $20,000 to $30,000. In addition, the bill
> would raise from $100,000 to $150,000 the amount of statutory damages
> for willful infringements.[14]

That Congress had no thought that its 1999 Act targeted end-using individual

music consumers sharing music peer-to-peer was further confirmed in the following year

by the Senate sponsors of the 1999 Act, Senators Hatch and Leahy. Under their

leadership, the Senate Judiciary Committee conducted a hearing in July, 2000, titled,

"Music On The Internet: Is There An Upside To Downloading?"[15] The purpose of this

hearing was to *initiate* Congressional consideration of the growing tension between peer-

to-peer file-sharing and copyright that Napster's introduction created. During this hearing

Senator Hatch not only praised but actually demonstrated downloading from Napster. He

repeatedly emphasized the importance music consumers were placing on having access to

freely transferable music. ("[Consumers] desire access to downloadable music which is

not unnecessarily restrictive or unduly burdensome. . . . [M]usic fans have expressed a

---

[14] 145 Cong. Rec. S15228-01.

[15] 106th Cong., S. Hrg. 106-1060, *available at*
http://www.access.gpo.gov/congress/senate/senate14ch106.html.

strong interest in getting popular, legitimate music in this format.") Senator Leahy proudly described how his children sent him music they had downloaded.[16] In October, 2000, Senator Hatch held a second Judiciary Committee hearing in his home state of Utah in which he introduced Shawn Fanning, the inventor of Napster, as his guest of honor, and literally invited young people in the audience to come on stage and sit at his feet. ("We're real proud of him and proud of the efforts he's made and proud of the things he's been able to accomplish.")[17] These hearings and the various statements made by these senators demonstrate the fiction of any assertion that Congress, in its 1999 Act, considered and targeted statutory damages to the problem of music consumers sharing songs peer-to-peer.

**B. Congress has Never Authorized the Procedure by Which the Jury Determined the Level of Statutory Damage.**

Not only has Congress never considered imposing statutory damages in the context of peer-to-peer file-sharing, Congress has never considered and never authorized the procedure by which the statutory damage award was assessed in this case. It is not surprising that a jury would return such ridiculously high verdicts as $1.92 million dollars in Thomas-Rasset and $675,000 in Tenenbaum. The Court instructed the jury:

> The Copyright Act entitles a plaintiff to a sum of not less than $750 and not more than $150,000 for an act of infringement that you find to be willful, as you consider just

with "willful" satisfied if the defendant merely "had knowledge that his actions constituted copyright infringement." The jury was then given a verdict form with thirty separate entries, each with a box to check for willfulness and a blank line on which to fill in a dollar amount. The judge's articulation of the plaintiffs' entitlement to awards up to $150,000 per infringement and the verdict form with its thirty check-boxes and blank

---

[16] "When I go on college campuses, as many of us do, to talk and everybody is talking about what they have downloaded, how they share, and so on, and when my kids pick up a 'Black Muddy River,' which happens to be one of my favorites of the Dead, and send it to me – they have heard a new version – and I log on in the morning while I am having my breakfast and there it is, I mean this is a whole different world, and I think we have to recognize that on where we go."

[17] "Utah's Digital Economy and the Future: Peer-to-Peer and Other Emerging Technologies." 106th Cong., S. Hrg. 106-1070, *available at* http://www.access.gpo.gov/congress/senate/senate14ch106.html.

lines became the jury's guide, in light of which the jurors undoubtedly considered their damage award moderate.

This procedure has never been authorized by Congress. Congress has never authorized juries to impose statutory damages at all. As the Supreme Court found in *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 345 (1998), "The language of § 504(c) does not grant a right to have a jury assess statutory damages." Nor can it be said that this was in any way what Congress intended, since we know that the current procedure is the result not of Congressional enactment but of the *force majeur* of the Supreme Court's Seventh Amendment ruling. Under the procedure actually enacted by the Congress, statutory damage was to be assessed by the judge. As Nimmer forcefully points out, judicial discretion was "the core of statutory damages under Section 504(c)." 4 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 14.04. Congress specified a procedure in which the knowledge and discretion of trial judges, using their awareness of precedent in other cases, could be counted on to tailor awards to the specific cases before them. By contrast, juries have no context beyond the one case before them. Nimmer rightly concludes, "[T]he shift from judge-determined to jury-granted statutory damages . . . alter[s] drastically the character of the statute." *Ibid.*

Constitutionally speaking, simply shifting the responsibility for assessment to the jury results in disaster, the equivalent of a jury instruction in *Gore* purporting to authorize a punitive damage award of $4 million dollars and in *State Farm* of $145 million dollars. Tenenbaum's right to trial by jury was irretrievably tainted by the Court's instruction authorizing unconstitutionally high maximum awards. The jury should have been instructed to return the award it "considers just" without its frame of reference being polluted with a statutory maximum so high that it could not be constitutionally applied.[18] If a jury must be given a maximum to frame its task of awarding statutory damage, it

---

[18] Congress has taken exactly this approach when it has set damage limits knowing that a jury, not the judge, will make the damage award. The Civil Rights Act of 1991 sets maximum damage limits for the rights it creates and specifies explicitly, "the court shall not inform the jury of the limitations." 42 USC § 1981a(c)(2) (2006). During congressional debate on this nondisclosure provision, one of the Act's chief proponents cogently explained, "the bill specifically provides that the jury shall not be informed of the existence or amount of the caps on damage awards. Thus, no pressure, upward or downward, will be exerted on the amount of jury awards by the existence of the statutory limitations." 137 Cong. Rec. S15484 (Oct 30, 1991) (Senator Danforth). *See Sasaki v Class*, 92 F.3d 232, 237-38 (4th Cir. 1996) (holding counsel's disclosure of the statutory limitation to the jury in closing argument to be reversible error).

should be the maximum that the trial judge in the specific case would consider to be just and constitutional.

### C. The Court is Obliged Both by The Constitution and by Statute to Assure that the Statutory Damage Imposed Is Just.

The Court is, in any event, constitutionally obliged to review the jury's award to assure that it is just and reasonable. By operation of the Seventh Amendment, the amount of statutory damages is committed in the first instance to the jury. Because of the Seventh Amendment, the jury's verdict cannot be increased, but the constitutionality of civil punishments depends on their being subject to judicial review. *Honda Motor Co. v. Oberg*, 512 U.S. 415, 420-21 (1994) ("'procedural due process' requires judicial review of punitive damages awards for reasonableness" in the form of "meaningful and adequate review by the trial court" (internal quotations omitted)). The Supreme Court in 2001 again affirmed that civil penalties are subject to *de novo* review and that judicial review of the amount of a civil penalty is a constitutional requirement. *Cooper Indus. v. Leatherman Tool Group Inc.*, 532 U.S. 424, 437 (2001). ("Unlike the measure of actual damages suffered, which presents a question of historical or predictive fact, the level of punitive damages is not really a 'fact' 'tried' by the jury. Because the jury's award of punitive damages does not constitute a finding of 'fact,' appellate review of the district court's determination that an award is consistent with due process does not implicate the Seventh Amendment.") A punitive sanction "cannot be justified on the ground that it was necessary to deter future misconduct without considering whether less drastic remedies could be expected to achieve that goal." *BMW v. Gore*, 517 U.S. 559, 584 (1996). Such review also far better satisfies the actual Congressional mandate at the core of Section 504(c). While the Seventh Amendment gives a defendant the right to trial by jury on all issues relating to an award of statutory damages, there is surely no Seventh Amendment requirement that the trial judge be divested of the task assigned by Congress of assuring that the penalty imposed is one the judge considers just.

For these same reasons, this Court should remit the statutory damages in this case to the minimum. Remittitur is appropriate where the result of an award is "'grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand.'" *Correa v. Hosp. San Francisco*, 69 F.3d 1184,

1197 (1st Cir. 1995); *Milone v. Moceri Family, Inc*., 847 F.2d 35, 37 (1st Cir. 1988). Such is the case here.

Respectfully submitted,


*/s/Charles R. Nesson*

Charles R. Nesson[*]

BBO #369320

1575 Massachusetts Avenue

Cambridge,  Massachusetts 02138

617 495-4609

nesson@gmail.com


Matthew H. Feinberg

BBO #161380

Matthew A. Kamholtz

BBO #257290

FEINBERG & KAMHOLTZ

125 Summer St.

Boston, Massachusetts 02110

January 4, 2010

---

[*] With assistance from Harvard Law student Jason Harrow.

CERTIFICATE OF SERVICE


I, Charles R. Nesson, hereby affirm that the within document was this day filed through the ECF system and will be sent electronically to the registered participants as identified in the Notice of Electronic filing.


Date: January 4, 2010                    */s/ Charles R. Nesson*

                                         Charles R. Nesson