UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SONY BMG MUSIC ENTERTAINMENT, et al., | ) ) ) | Civ. Act. No. 07-cv-11446-NG |
| Plaintiffs, | ) ) | |
| v. | ) ) | Leave to File Excess Pages |
| JOEL TENENBAUM, | ) ) | Granted January 20, 2009 |
| Defendant. | ) ) ) | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT JOEL TENENBAUM'S MOTION FOR NEW TRIAL OR REMITTITUR**

# TABLE OF CONTENTS

**Page**

SUMMARY ................................................................................................................. 1

STATEMENT OF FACTS ......................................................................................... 4

ARGUMENT .............................................................................................................. 7

I.      Standard Of Review .......................................................................................... 7

II.     The Court Properly Granted Plaintiffs' Motion For Summary
        Judgment Regarding Fair Use, And Tenenbaum's Efforts To
        Overturn That Ruling Post Trial Fail. ............................................................. 8

        A.      Tenenbaum is barred from asserting his new fair use
                arguments in a post-trial motion ......................................................... 8

        B.      The Court did not create a fair use right for some
                undefined "interregnum," nor does such right exist under the law ......... 8

        C.      Tenenbaum's attractive nuisance argument fares
                no better the second time ..................................................................... 12

III.    The Court Properly Redacted The Portion Of Tenenbaum's
        November 21, 2005 Letter Concerning Settlement Discussions ...................... 13

IV.     The Jury's Damage Award Is Consistent With The Law
        And With The Facts Of Tenenbaum's Massive, Willful Infringement ............ 17

        A.      The Court should reject Tenenbaum's constitutional challenge ........... 17

                1.      Tenenbaum's constitutional argument is devoid
                        of factual support ..................................................................... 18

                2.      Tenenbaum's reliance on the Supreme Court's punitive
                        damages jurisprudence is misplaced as statutory damages
                        are reviewed under a much more deferential standard ............ 19

                3.      The jury's award of statutory damages to Plaintiffs
                        satisfies *Williams* .................................................................... 23

                4.      Tenenbaum's arguments challenging the jury's verdict
                        under *Williams* all fail ............................................................. 26

B.     There is no basis for reducing the jury's award to the
statutory minimum ................................................................................ 29

    1.    Congress acted specifically to address the very type
of online infringement that Tenenbaum engaged in ................................. 30

    2.    The Court properly charged the jury with the task
of awarding statutory damages ................................................................ 32

V.    The Court Should Reject Tenenbaum's Request For A Remittitur .................................. 33

A.     The Court lacks authority to remit the jury's damage award................................ 33

B.     The overwhelming evidence of Tenenbaum's misconduct
and the substantial harm that he caused supports the jury's award ...................... 36

CONCLUSION ......................................................................................................... 38

#1455747 v1 den

# TABLE OF AUTHORITIES

## FEDERAL CASES

*A&M Records, Inc. v. Internet Site Known As Fresh Kutz,*
   Case No. 97-cv-1099 (S.D. Cal. 1997) ............................................................31

*A & M Records, Inc. v. Napster,*
   239 F.3d 1004 (9th 2001)...........................................................................12

*Accounting Outsourcing, LLC v. Verizon Wireless Personal Commc'ns, L.P.,*
   329 F. Supp. 2d 789 (M.D. La. 2004)..............................................17, 22, 24

*Acevedo-Garcia v. Monroig,*
   351 F.3d 547 (1st Cir. 2003).......................................................................7

*In re Aimster Copyright Litigation,*
   334 F.3d 643 (7th Cir. 2003) ....................................................................36

*Algie v. RCA Global Commun., Inc.,*
   891 F. Supp. 875 (S.D.N.Y. 1994)...............................................................8

*Atlantic Recording Corp. v. Anderson,*
   2008 U.S. Dist. LEXIS 53654 (S.D. Tex. Mar. 12, 2008).........................11, 12

*BMW of North America, Inc. v. Gore,*
   517 U.S. 559 (1996).................................................................17, 22, 23

*Beneficial National Bank v. Anderson,*
   539 U.S. 1 (2003)......................................................................................9

*Bogosian v. Woloohojian Realty Corp.,*
   323 F.3d 55 (1st Cir. 2003)..............................................................4, 5, 6, 7, 8

*Browning-Ferris Industrial of Vt., Inc. v. Kelco Disposal, Inc.,*
   492 U.S. 257 (1989)................................................................................22

*Campbell v. Acuff-Rose Music,*
   510 U.S. 569 (1994)................................................................................10

*Capitol Records Inc. v. Thomas-Rasset,*
   Case No. 06-cv-1497 (MJD/RLE) ..............................................................34

*Castle Rock Entertainment v. Carol Publ'g Group,*
   150 F.3d 132 (2d Cir. 1998).......................................................................10

iii

*Centerline Equip. Corp. v. Banner Personal Serv.*,
    545 F. Supp. 2d 768 (N.D. Ill. 2008) ...........................................................28

*Coastal Fuels Inc. v. Caribbean Petroleum Corp.*,
    79 F.3d 182 (1st Cir. 1996) .......................................................................7

*Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*,
    259 F.3d 1186 (9th Cir. 2001) ..................................................................24

*Correa v. Hospital San Francisco*,
    69 F.3d 1184 (1st Cir. 1995) ....................................................................33

*Davet v. Maccarone*,
    973 F.2d 22 (1st Cir. 1992) ......................................................................33

*Douglas v. Cunningham*,
    294 U.S. 207 (1935) ...........................................................................23, 25

*Eastern Mt. Platform Tennis v. Sherwin-Williams Co.*,
    40 F.3d 492 (1st Cir. 1994) ......................................................................36

*Eldred v. Ashcroft*,
    537 U.S. 186 (2002) ................................................................................34

*Encyclopedia Britannica Education Corp. v. Crooks*,
    542 F. Supp. 1156 (W.D.N.Y. 1982) ........................................................10

*F.W. Woolworth Co. v. Contemporary Arts, Inc.*,
    344 U.S. 228 (1952) ....................................................................19, 20, 26

*Feist Publ'ns, Inc. v. Rural Telegraph Serv. Co.*,
    499 U.S. 340 (1991) ................................................................................11

*Feltner v. Columbia Pictures Television, Inc.*,
    523 U.S. 340 (1998) ....................................................................20, 32, 33

*Fitzgerald Public Co., Inc. v. Baylor Public Co., Inc.*,
    807 F.2d 1110 (2d Cir. 1986) ...................................................................11

*Frank Music Corp. v. CompuServe, Inc.*,
    Case No. 93-cv-8153 (S.D.N.Y.) ..............................................................31

*Galarneau v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    504 F.3d 189 (1st Cir. 2007) ....................................................................14

iv

*Harper & Row, Publishers, Inc. v. Nation Enterprises,*
  471 U.S. 539 (1995)............................................................................................10, 13

*Holtzman v. Caplice,*
  2008 U.S. Dist. LEXIS 41188 ................................................................................17, 25

*Hypertherm, Inc. v. America Torch Tip Co.,*
  2009 U.S. Dist. LEXIS 17821 (D.N.H. Feb. 19, 2009) ....................................................14

*Keisling v. SER-Jobs for Progress,*
  19 F.3d 755 (1st Cir. 1994).........................................................................................8

*Kenro, Inc. v. Fax Daily, Inc.,*
  962 F. Supp. 1162 (S.D. Ind. 1997) ...........................................................................25

*Kolb v. Goldring, Inc.,*
  694 F.2d 869 (1st Cir. 1982).....................................................................................36

*L.A. Westermann Co. v. Dispatch Printing Co.,*
  249 U.S. 100 (1919)..................................................................................................21

*London-Sire Records, Inc. v. Doe 1,*
  542 F. Supp. 2d 153 (D. Mass. 2008) ........................................................................11

*Los Angeles News Serv. v. Reuters Tele., Ltd.,*
  149 F.3d 987 (9th Cir. 1998) .....................................................................................19

*Lowry's Reports, Inc. v. Legg Mason, Inc.,*
  302 F. Supp. 2d 455 (D. Md. 2004) ...........................................................17, 18, 22, 25

*McInnis v. A.M.F., Inc.,*
  765 F.2d 240 (1st Cir. 1985).....................................................................................14

*MCA Records Inc. v. Internet Site Known As Fresh Kutz,*
  Case No. 97-cv-1360 (N.D. Tex. 1997)........................................................................31

*Peter Letterese & Associates v. World Institute of Scientology Enterprises,*
  533 F.3d 1287 (11th Cir. 2008) .................................................................................10

*Philip Morris USA v. Williams,*
  549 U.S. 346 (2007)..................................................................................................27

*Pierce v. F.R. Tripler & Co.,*
  955 F.2d 820 (2d Cir. 1992).......................................................................................14

v

*SESAC, Inc. v. WPNT, Inc.*,
    327 F. Supp. 2d 531 (W.D. Pa. 2003) ............................................................................34

*Salinger v. Random House, Inc.*,
    811 F.2d 90 (2d Cir. 1987) ............................................................................10

*Sony Corporation of America v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984) ............................................................................13

*Sony Music Entertainment Inc. v. Internet Site Known As Fresh Kutz*,
    Case No. 97-cv-4245 (S.D.N.Y. 1997) ............................................................................31

*St. Louis, I. M. & S. Railway Co. v. Williams*,
    251 U.S. 63 (1919) ............................................................................17, 26, 27, 28

*Stacey v. Bangor Punta Corp.*,
    620 F. Supp. 636 (D. Me. 1985) ............................................................................15

*Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co.*,
    74 F.3d 488 (4th Cir. 1996) ............................................................................23

*TXO Prod. Corp. v. Alliance Resources Corp.*,
    509 U.S. 443 (1993) ............................................................................20

*Texas v. American Blastfax, Inc.*,
    121 F. Supp. 2d 1085 (W.D. Tex. 2000) ............................................................................24

*Tiller v. Baghdady*,
    244 F.3d 9 (1st Cir. 2001) ............................................................................14

*UMG Recordings, Inc. v. MP3.com, Inc.*,
    92 F. Supp. 2d 349 (S.D.N.Y. 2000) ............................................................................10, 11

*United States v. Garcia-Pastrana*,
    584 F.3d 351 (1st Cir. 2009) ............................................................................32

*United States v. Kakley*,
    741 F.2d 1 (1st Cir. 1984) ............................................................................29

*United States v. LaMacchia*,
    871 F. Supp. 535 (D. Mass. 1994) ............................................................................31

*Velazquez v. Figueroa-Gomez*,
    996 F.2d 425 (1st Cir. 1993) ............................................................................7

#1455747 v1 den

*Venegas-Hernandez v. Sonolux Records,*
    370 F.3d 183 (1st Cir. 2004)............................................................................19

*Verizon California Inc., et al. v. OnlineNIC,*
    2009 U.S. Dist. LEXIS 84235 (N.D. Cal. Aug. 25, 2009)................................22

*Zomba Enterprises, Inc. v. Panorama Records,*
    491 F.3d 584 (6th Cir. 2007) ..............................................................17, 22, 23

## FEDERAL STATUTES

17 U.S.C. § 106(3) ...............................................................................................9

17 U.S.C. § 107....................................................................................................13

17 U.S.C. § 504(c)(1).........................................................................18, 20, 21, 30, 33

42 U.S.C. § 1981a(c)(2).......................................................................................33

47 U.S.C. § 227(b)(3)(B)......................................................................................24

Fed. R. Civ. P. 61 ...........................................................................................15 ,16

Fed. R. Evid. 403 .................................................................................................15

Fed. R. Evid. 408 .................................................................................................14

H.R. Rep. 105-339 ..........................................................................................32, 35

H.R. Rep. No. 106-216 (1999)..........................................................21, 26, 30, 31, 32, 34

## MISCELLANEOUS

3B O'Malley, Grenig, and Lee, *Federal Jury Practice & Instructions*
    § 160.93 (2005)................................................................................................33

Colleen P. Murphy, *Judicial Assessment of Legal Remedies,*
    94 Nw. U. L. Rev. 153, 202 (1999) ................................................................25

Holbrook and Harris, *Model Jury Instructions: Copyright, Trademark,*
    *and Trade Dress Litigation* § 1.7.7 (2008) ....................................................33

*Ninth Circuit Model Civil Jury Instructions* § 17.25 ..................................................33

Plaintiffs submit this response in opposition to Defendant Joel Tenenbaum's Motion for New Trial or Remittitur and state as follows:

## SUMMARY

Tenenbaum is a long-term, hardcore, and willful copyright infringer whose misconduct caused Plaintiffs to suffer incalculable harm. Plaintiffs asserted claims on only thirty sound recordings, but the evidence at trial demonstrated that Tenenbaum intentionally infringed literally thousands of sound recordings over a period of nearly ten years by using multiple peer-to-peer ("P2P") networks to download and distribute these recordings without authorization. He even acted as an original seeder to the networks by putting new copies of works online for the first time for other people to take. Tenenbaum knew of the illegality of his conduct, yet he deliberately broke the law, including, quite remarkably, during the course of the case.

Having engaged in the conduct that he did, it is not surprising that Tenenbaum would have no trouble lying about it. Time after time, Tenenbaum falsely denied responsibility for the infringement, blamed his friends and family for his own illicit activities, and lied under oath. At trial, the evidence of Tenenbaum's wrongdoing was so overwhelming that, after years of lies and deceit, he finally admitted to uploading and downloading the recordings at issue. As a result, the Court granted a directed verdict in Plaintiffs' favor. Thereafter, the jury found Tenenbaum's infringement to be willful and awarded Plaintiffs $22,500 in statutory damages per work infringed – well within the statutory range set forth in the Copyright Act.

Continuing his pattern of avoiding responsibility, Tenenbaum now seeks a new trial. Specifically, he asks this Court to substitute its judgment for that of Congress and the jury. In support of his motion, Tenenbaum contends: (1) that his activity should be considered a fair use under the Copyright Act; (2) that the Court should have allowed him to introduce evidence that he made a $500 settlement offer to Plaintiffs; and (3) that the jury's award violates the Due

1

Process Clause of the Constitution.  Alternatively, Tenenbaum seeks reduction of the jury's award to the statutory minimum.  Tenenbaum's motion fails in every respect.

First, Tenenbaum claims, for the first time in this case, that this Court recognized a so-called "fair use interregnum" that excuses his serial copyright infringement, *i.e.*, a time during which infringement should be excused and deemed fair use because a work is not available in the infringer's chosen format.  Tenenbaum contends that this fair use interregnum, which is obviously antithetical to fundamental tenets of copyright law, should extend until the moment when Plaintiffs began offering their recordings in unencrypted/unprotected .mp3 format. Tenenbaum is wrong.  The Court properly rejected Tenenbaum's fair use defense before trial and, in so doing, did not establish the existence of any fair use interregnum.  Indeed, any such ruling would constitute reversible error.  Furthermore, even if such a supposed fair use interregnum did exist (which it does not), it would have no application here because the evidence at trial showed the availability of the works at issue in both physical and digital format long before Tenenbaum's infringement.  Finally, Tenenbaum's latest grab for fair use fails procedurally.  Tenenbaum cannot request reconsideration of a summary judgment ruling under the guise of a motion for a new trial, especially when Tenenbaum failed to make any "interregnum" argument before now.

Second, Tenenbaum argues that a new trial is warranted because the Court redacted a portion of his November 21, 2005, letter concerning settlement discussions.  This challenge has no merit.  The Court has wide discretion on evidentiary rulings and properly exercised it in excluding settlement discussions from the case under Federal Rules of Evidence 408 and 403. Tenenbaum's argument also rests upon a false factual predicate.  Namely, Tenenbaum incorrectly claims that the redacted portion of the letter demonstrates that he took responsibility

2

for his actions. However, his repeated lies under oath denying responsibility for the infringements for years after he sent the letter make clear that nothing could be further from the truth. And, in any event, the Court's instruction to the jury that the parties had, in fact, engaged in "settlement negotiations and that they failed," obviated any possible prejudice to Tenenbaum.

Third, Tenenbaum challenges the constitutionality of the jury's award, claiming that it violates the Due Process Clause. As is typical of Tenenbaum's approach to this case, his due process argument ignores the facts and the law. Tenenbaum casts aside the evidence at trial and pays no regard to the substantial deference that courts must give to Congress to set the appropriate range of statutory damages, and to juries to award those damages. Instead, Tenenbaum asks this Court to do what no Court has ever done — find that a verdict that falls within the statutory range set by Congress nevertheless fails to comply with due process and is therefore unconstitutional. Tenenbaum's reliance on due process concerns in the punitive damages context is also misplaced. Those concerns simply do not apply in the context of statutory damages, and the amount awarded by the jury here is just and constitutional.

Finally, as an alternative, Tenenbaum asks the Court to remit the award down to minimum statutory damages. This too is ridiculous. The Court lacks the authority to interfere with a jury award that falls within the statutory range established by Congress. Furthermore, even if the Court were able to remit a statutory damages award in certain circumstances (a proposition Plaintiffs strongly dispute), this case represents a textbook example of where it would be entirely inappropriate to do so. The jury's verdict represents only 15% of what the jury could have awarded, and the facts distinct to this case justify the jury's award, including: (1) Tenenbaum's willful infringement of all thirty works; (2) his downloading and distribution of thousands of additional works to millions of other P2P users over a period of many years; (3) his

3

intentional seeding of P2P networks with new copies of thousands of works; (4) clear evidence of concealing evidence and perjury; and (5) a demonstrated need for significant deterrence.

Tenenbaum complains that "Plaintiffs did their best throughout the trial to make him appear to the jury to be a liar, a perjurer, and a person dodging responsibility for his actions and blaming others under oath for his conduct." (Motion at 8.) Of course, Tenenbaum ignores the fact that he is all of those things — and he has no one to blame but himself. Tenenbaum has shown nothing but disdain for the copyright laws, the rules of this Court, and Plaintiffs. Tenenbaum is the poster child for willful copyright infringement, and now he asks the Court to autograph that poster. The Court should do no such thing.

### STATEMENT OF FACTS[1]

On July 31, 2009, the jury found that Tenenbaum had willfully infringed all thirty of Plaintiffs' sound recordings at issue and awarded Plaintiffs statutory damages in the amount of $22,500 for each infringed work. The Court entered judgment on the jury's verdict on December 7, 2009, and Tenenbaum filed his motion thereafter.

Tenenbaum's motion omits any discussion of the overwhelming evidence of his massive, willful, and unrepentant infringing conduct that provided the basis for the jury's verdict. In particular, for years, Tenenbaum provided false denials and failed to take responsibility for his

---

[1] Tenenbaum's motion relies on a great many purported "facts." Many simply have no basis and are inaccurate. In any event, the vast majority were not established at trial, are not part of the record, and Tenenbaum may not present them in a Rule 59 motion. As explained by the First Circuit:

> Rule 59(e) motions are aimed at *re*consideration, not initial consideration. Thus, parties should not use them to raise arguments which could, and should, have been made before judgment issued. Motions under Rule 59(e) must either clearly establish a manifest error of law or must present newly discovered evidence.

*Bogosian v. Woloohojian Realty Corp.*, 323 F.3d 55, 72 (1st Cir. 2003) (quotations omitted).

4

own deliberate violations of the law.  At trial, Tenenbaum finally admitted that he had downloaded and distributed "all [thirty] sound recordings." (Tr. Day 4 at 102:6-10, attached as Exhibit A; Trial Exhibits 55 and 56, attached as Exhibit B and Exhibit C, respectively.)[2] Plaintiffs proved that Tenenbaum downloaded and distributed to millions of other P2P users the thirty works in suit, along with thousands of other digital audio files (many of them Plaintiffs' copyrighted sound recordings).

Tenenbaum's infringement occurred over a period of many years and across multiple P2P networks.  The list of networks that Tenenbaum used reads like an encyclopedia entry for "P2P": Napster, AudioGalaxy, iMesh, Morpheus, KaZaA, LimeWire, and others.  (Tr. Day 4 at 41:13 to 47:9.)  Tenenbaum started using Napster in 1999.  (*Id.* at 41:13 to 42:3.)  After Napster was shut down, Tenenbaum switched to KaZaA because he "continued to want a source of music without paying for it." (*Id.* at 43:15-17.)  Tenenbaum moved through multiple networks and ultimately installed and used LimeWire on his Gateway computer so that he could continue to "download music without paying for it." (*Id.* at 46:1-3.)  Tenenbaum downloaded more than 800 sound recordings to his KaZaA shared folder and several thousand more sound recordings to his LimeWire shared folder, many of them Plaintiffs' copyrighted sound recordings.  (*Id.* at 7:11 to 9:13, 45:3-25, 91:7-15, 54:1-18; Trial Exhibits 13, 35, and 43, attached as Exhibit D, Exhibit E, and Exhibit F, respectively.)

In addition to his downloading, Tenenbaum intentionally distributed these thousands of sound recordings to other P2P users.  Tenenbaum knew that he repeatedly distributed music from his KaZaA and LimeWire shared folders to other KaZaA and LimeWire users.  (Tr. Day 4 at 9:14 to 10:17, 44:19-23.)  Indeed, Tenenbaum testified multiple times that his very intent was

---

[2] Plaintiffs do not have full transcripts of the trial.  As a result, some of the statements in this opposition have no citation to the record, although Plaintiffs believe they are fully accurate.

to take the music he downloaded (music that was not his to take in the first place) and share it with the millions of other users on the P2P networks. (*Id.* at 64:9-13, 82:20-24, 96:25 to 97:11.) Tenenbaum also intentionally seeded some of these P2P networks with thousands of additional sound recordings, deliberately putting new copies of these works online for the first time "for other people to take." (*Id.* at 30:13 to 33:11.)

Tenenbaum used these multiple P2P networks over many years "so that [he] could achieve *the maximum amount of music downloading and uploading* with the least amount of effort." (*Id.* at 47:5-9, emphasis added.) He did so knowing that his conduct was unlawful. Before he started using KaZaA, Tenenbaum knew that Napster had been shut down for copyright infringement. (*Id.* at 42:13 to 43:11.) Tenenbaum received repeated warnings not to infringe on P2P networks, both from Goucher College in the fall of 2003 and from his own father. (*Id.* at 34:2 to 36:22; Trial Exhibit 26 at 11-12, attached as Exhibit G.) Despite all this, Tenenbaum continued to infringe unabated even during the course of this lawsuit. (*Id.* at 45:3 to 46:3, 54:1-18, 91:16-20; Trial Exhibit 43.)

Tenenbaum also refused to accept responsibility for his conduct and lied repeatedly about what he knew and what he had done. He lied in his Answer to the Complaint and lied repeatedly in his sworn discovery responses.[3] Only when called to the witness stand by Plaintiffs at trial, over his counsel's objection and after years of litigation, did Tenenbaum finally admit responsibility for the uploading and downloading. On the stand, he even admitted that he

---

[3] Tenenbaum falsely claimed, for example, that he "didn't have any idea who had used sublimeguy14@KaZaA," and that he had "no knowledge" of any P2P system on his computer. (*Id.* at 14:2-9, 15:12-19, 16:11 to 17:17.) Tenenbaum blamed his family members and friends for his own misconduct (*id.* at 19:5 to 21:19), sending Plaintiffs on a wild goose chase around the country to determine the veracity of Tenenbaum's assertions. Tenenbaum also gave sworn testimony that the computer he used to distribute over 800 music files on KaZaA was destroyed before November 2005 (*id.* at 99:16 to 101:9) when, in fact, the computer had not been destroyed and should have been disclosed to Plaintiffs (*id.* at 48:2 to 49:4, 73:12-24).

#1455747 v1 den

previously lied under oath in making these and other statements.  (*Id.* at 89:7-13, 89:25 to 90:5, 98:12 to 99:2.)

Tenenbaum's infringement caused significant damage to Plaintiffs.  The Copyright Act does not require Plaintiffs to prove actual damages.  However, Plaintiffs presented significant fact and expert testimony at trial regarding the massive harm caused by P2P infringement like Tenenbaum's.  Plaintiffs' witnesses, including Wade Leak and JoAn Cho, testified to the substantial harm caused by the massive distribution of their copyrighted sound recordings over P2P networks such as KaZaA, including lost revenues, layoffs, and a diminished capability to identify and promote new talent.  Further, Mr. Leak and Plaintiffs' expert, Dr. Stanley Liebowitz, each testified that conduct like that Tenenbaum engaged in has significantly damaged Plaintiffs' ability to earn revenue from the legitimate digital market for the songs at issue.  Legitimate markets simply cannot compete with free.  Tenenbaum's actions amounted to the exercise of a blanket worldwide license to reproduce and distribute Plaintiffs' valuable copyrighted sound recordings, and the cost of such a license on the open market would involve buying the company.

## ARGUMENT

### I.    Standard Of Review

The Court's "discretion is quite limited concerning motions for new trials.  A trial judge may not upset the jury's verdict merely because he or she would have decided the case differently."  *See Coastal Fuels Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 201 (1st Cir. 1996) (citing *Velazquez v. Figueroa-Gomez*, 996 F.2d 425, 427 (1st Cir. 1993)).  "[A] district court may set aside a jury's verdict and order a new trial only if the verdict is against the demonstrable weight of the credible evidence or results in a blatant miscarriage of justice."  *Acevedo-Garcia v. Monroig*, 351 F.3d 547, 565 (1st Cir. 2003).

#1455747 v1 den

## II.    The Court Properly Granted Plaintiffs' Motion For Summary Judgment Regarding Fair Use, And Tenenbaum's Efforts To Overturn That Ruling Post Trial Fail.

### A.    Tenenbaum is barred from asserting his new fair use arguments in a post-trial motion.

At no point prior to filing the instant motion did Tenenbaum argue fair use on the basis of some undefined "interregnum."  Therefore, the Court need not even reach this argument since Tenenbaum is precluded from raising it for the first time in a post-trial motion.  *See Bogosian*, 323 F.3d at 72.  This is especially so following a trial where Tenenbaum could have moved for judgment as a matter of law under Rule 50(a) but did not.  *See Keisling v. SER-Jobs for Progress*, 19 F.3d 755, 759 (1st Cir. 1994) ("If a defendant wishes to renew a motion for judgment as a matter of law at the post-trial stage . . . , the defendant is required to have moved for judgment as a matter of law at the close of all the evidence.").

In essence, Tenenbaum's motion asks the Court to revisit its earlier decision granting Plaintiffs' motion for partial summary judgment and striking Tenenbaum's fair use defense.  Tenenbaum, however, may not seek reconsideration of the Court's decision in a post-trial motion.  A grant of partial summary judgment serves to narrow the case and focus the issues for trial.  *See Algie v. RCA Global Commun., Inc.*, 891 F. Supp. 875, 883 (S.D.N.Y. 1994).  If parties were allowed to ignore partial summary judgment rulings and, after trial, seek to introduce new evidence or raise new arguments that could have been presented before or during trial — which is what Tenenbaum seeks to do here — then the purpose of the rule would be defeated.  *See id.* (rejecting post-trial motion for reconsideration of pre-trial summary judgment ruling).

### B.    The Court did not create a fair use right for some undefined "interregnum," nor does such right exist under the law.

The premise of Tenenbaum's fair use argument is that the Court in its summary judgment order established a fair use right to excuse infringement during some "interregnum" when the

law was unclear and the works he stole were purportedly not available in the exact format he wanted.  (Motion at 1-4.)  Tenenbaum further argues that this purported interregnum should extend until Plaintiffs began to offer their works in unencrypted/unprotected .mp3 format rather than when Apple introduced its iTunes service in the spring of 2003.  These arguments run counter to copyright law and to the facts of this case and must be rejected.

First, the language Tenenbaum references from the Court's order granting Plaintiffs' motion for partial summary judgment was unsupported dictum.  The Court's order merely suggested that the Court could "envision a fair use defense for a defendant who shared files during a period of time before the law concerning file-sharing was clear and paid outlets were readily available."  *See* minute order of 7/27/09 in Case No. 1:03-cv-11661-NG; *see also* Memo. and Order Re Summary Judgment, Doc. 22 at 35.  Plaintiffs take great exception to the statement, notwithstanding that it is mere dictum, as it finds no basis in the law.  The Court made the statement without the benefit of any opportunity for briefing on the issue (indeed, without any briefing).  When Plaintiffs sought leave to brief the issue after the Court issued its minute order, the Court indicated that briefing was not necessary because the Court was only "speculating" as to the boundaries of the fair use defense and its statements concerning the so-called interregnum were "obviously dicta."  (*See* Tr. Day 1 at 11:4-14, attached as Exhibit H.) *See also Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 17 (2003) ("Dicta of course have no precedential value . . . .").

Second, the establishment of an "interregnum," as Tenenbaum suggests, would undermine fundamental notions of copyright law.  The Copyright Act provides that a copyright holder has the exclusive right of distribution.  17 U.S.C. § 106(3).  Encompassed in the right of distribution is the right for a copyright owner to decide when and how to publish and distribute

9

its works.  In *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1995), the

Supreme Court recognized that a copyright holder's "right of first publication implicates a

threshold decision by the author whether and in what form to release his work."  *Id.* at 553.

Accordingly, "'[t]he applicability of the fair use doctrine to unpublished works is narrowly

limited since, although the work is unavailable, this is the result of a deliberate choice on the part

of the copyright owner.'"  *Id.* (quoting S. Rep. No. 94-473 at 64 (1975)).  The same is true where

a copyright holder intentionally withdraws a work from publication, which act may serve as "a

valuable marketing tool — taking advantage of timing and pent-up market demand."  *Peter

Letterese & Assocs. v. World Inst. of Scientology Enters.*, 533 F.3d 1287, 1314 (11th Cir. 2008).

There is no rule or policy that would justify using "availability" as a factor in the fair use context

to excuse a defendant's unauthorized use simply because the defendant did not deem the work

"available" in his chosen format.  *See Harper & Row*, 471 U.S. at 569 (finding "no warrant for

judicially imposing a 'compulsory license' permitting unfettered access" to unpublished

copyrighted expression).

     Indeed, copyright holders have no obligation to offer their works at all, let alone "in

exactly the format [infringers] want."  *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d

349, 352 (S.D.N.Y. 2000); *see also Encyclopedia Britannica Educ. Corp. v. Crooks*, 542 F.

Supp. 1156, 1180 (W.D.N.Y. 1982) (Plaintiffs' choice of media "does not abrogate their rights as

copyright holders.").  The Copyright Act gives copyright holders the right, within broad limits, to

choose which markets they will enter and when, and such "creative and economic choice" must

be respected.  *Castle Rock Entm't v. Carol Publ'g Group*, 150 F.3d 132, 145-46 (2d Cir. 1998);

*see also Campbell v. Acuff-Rose Music*, 510 U.S. 569, 591 n.21 (1994) (the plaintiff copyright

owner is entitled to control its protected material); *Salinger v. Random House, Inc.*, 811 F.2d 90,

10

99 (2d Cir. 1987) (author has no obligation to publish his writings); *MP3.com*, 92 F. Supp. 2d

at 352 ("A copyright holder's 'exclusive' rights, derived from the Constitution and the Copyright

Act, include the right, within broad limits, to curb the development of [derivative markets] by

refusing to license a copyrighted work or by doing so only on terms the copyright owner finds

acceptable."). Under Tenenbaum's limitlessly overbroad notion of fair use, a plaintiff would

have to distribute its works at all times and in all formats in order to maintain its exclusive right

of distribution. Only in Tenenbaum's world of theft does such a rationale make sense.[4]

Third, to prove infringement, a copyright plaintiff need only demonstrate (1) ownership

of the works at issue, and (2) unauthorized copying or distribution by the defendant. *Feist*

*Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). A plaintiff need not demonstrate

the defendant's intent to infringe, or even knowledge of infringement, in order to prove copyright

infringement. *Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co., Inc.,* 807 F.2d 1110, 1113 (2d Cir.

1986) ("Under §501(a) intent or knowledge is not an element of infringement"); *London-Sire*

*Records, Inc. v. Doe 1*, 542 F. Supp. 2d 153, 176 (D. Mass. 2008) ("Plaintiffs need not prove

knowledge or intent in order to make out a prima facie case of infringement."). Thus, any

"confusion" as to the law is not a defense to copyright infringement, and there can be no

interregnum during which a purported lack of clarity regarding the law would excuse infringing

conduct. *See Atlantic Recording Corp. v. Anderson*, 2008 U.S. Dist LEXIS 53654, at *25 (S.D.

Tex. Mar. 12, 2008) (awarding statutory damages despite the defendant's claim that he "did not

appreciate the gravity of his actions in the context of copyright law").

---

[4] The Court commented in footnote 17 of its summary judgment order that the period of
fair use could conceivably encompass the period before the threat to the market for these works
became apparent. That standard is not grounded in law and would be unworkable in practice.

Fourth, the most recent articulation of Tenenbaum's fair use defense rests upon a false factual foundation. To begin with, Tenenbaum was not confused as to the law. He knew that downloading and distributing copyrighted works was illegal and yet chose to do it anyway. Tenenbaum kept on infringing "far beyond the infancy of this new technology or any legal uncertainty" and cannot claim fair use. (*See* Minute Order of Sept. 27, 2009.) Tenenbaum continued to download and distribute copyrighted songs long after Plaintiffs filed this lawsuit, including "as late as May, 2008." (*See* Tr. Day 4 at 54:7-18, 91:16-20.) In addition, notwithstanding Tenenbaum's recent assertions in his motion, there is also no factual basis for Tenenbaum's new "DRM made me do it" defense. Tenenbaum's primary purpose in using P2P networks was to get music for free and to support the networks he used. (*Id.* at 33:9-11, 43:12-22, 46:1-5, 47:5-9, 82:20 to 83:1, 96:25 to 97:11.) Tenenbaum specifically testified that he used and liked iTunes for years, making no distinction between its pre and post 2007 offerings or any burden imposed by DRM. (*Id.* at 92:5-12, 97:23 to 98:11.) Nowhere in his testimony did Tenenbaum complain that DRM caused him to infringe.

Finally, even if this Court were to accept Tenenbaum's erroneous "interregnum" theory, which it should not, there is no need for a new trial. There is no question that Tenenbaum intentionally distributed Plaintiffs' copyrighted sound recordings without Plaintiffs' consent, and there is no fair use for such distribution. *See A & M Records, Inc. v. Napster*, 239 F.3d 1004, 1026 (9th 2001). Thus, even if fair use could excuse some portion of Tenenbaum's downloading, which it does not, Tenenbaum's new fair use theory fails as a matter of law as to distribution.

### C.    Tenenbaum's attractive nuisance argument fares no better the second time.

Tenenbaum argues that Plaintiffs' purported complicity in the attractiveness of P2P should be considered as a factor in the fair use balance, claiming a "situation akin to 'attractive

12

nuisance.'" (Motion at 5.) However, the Court already rejected Tenenbaum's attractive nuisance argument, appropriately recognizing that "this principle has no foothold in copyright law" and that "the idea that a copyright holder could lose the rights to his work precisely because of its popularity runs counter to the purposes of copyright." (Doc. 22 at 29.)

Not satisfied, Tenenbaum now claims that the holdings in *Harper & Row* and in *Sony Corporation of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), somehow suggest that the Court should focus its attention on the alleged conduct of Plaintiffs to determine the fair use question. Tenenbaum misreads both cases. Neither *Sony* nor *Harper & Row* focus on the plaintiffs' actions in determining fair use. In *Sony*, the Court looked to the conduct of Betamax owners and held that, because their copying was for the purpose of "time shifting," it could be entitled to fair use protection. *Sony*, 464 U.S. at 454-55. Likewise, *Harper & Row* focused on the defendants' "use" of the work, rather than on the plaintiff's conduct. *Harper & Row*, 471 U.S. at 560-568. As this Court held in its summary judgment order, Tenenbaum's arguments seeking to shift the blame to Plaintiffs fail because "[t]hey are not arguments about the productive purpose of [Tenenbaum's] use or the absence of injury to the copyright holder — that is, the rationales that generally inform fair use." (Doc. 22 at 26, citing 17 U.S.C. § 107.)

### III. The Court Properly Redacted The Portion Of Tenenbaum's November 21, 2005 Letter Concerning Settlement Discussions.

Tenenbaum seeks a new trial on the basis that the Court refused to admit Trial Exhibit 23 without redaction. Tenenbaum claims he would have used the entire letter to "show[] that he took responsibility for his action. . . . and that he wanted to make amends to the best of his ability," presumably so that the jury might not have found his conduct to be willful, and might have awarded a lower amount of statutory damages. (Motion at 8.) Tenenbaum is wrong and

not entitled to a new trial.  The evidentiary ruling was a matter within the Court's discretion and

Tenenbaum suffered no prejudice from the redaction.

A trial court's evidentiary rulings should "not be upset unless they involve an abuse of

discretion."  *McInnis v. A.M.F., Inc*., 765 F.2d 240, 242 n.1 (1st Cir. 1985); *Galarneau v. Merrill*

*Lynch, Pierce, Fenner & Smith Inc.,* 504 F.3d 189, 205 (1st Cir. 2007).  A court abuses its

discretion on evidentiary rulings only when "a relevant factor that should have been given

significant weight is not considered."  *Tiller v. Baghdady*, 244 F.3d 9, 14 (1st Cir. 2001)

(quotation omitted).

Here, the Court properly excluded the settlement portion of Tenenbaum's letter under

Federal Rule of Evidence 408.  That rule explicitly prohibits the use of settlement offers by "any

party" to prove the "amount of a claim that was disputed as to the validity or amount."  Fed. R.

Evid. 408.  Tenenbaum's effort to introduce his letter for the purpose of negating a finding of

willfulness and reducing a damage award, therefore, is directly contrary to Rule 408.  In fact, this

is the exact reason for the existence of the rule.

> Rule 408(a) bars evidence about settlement discussions that is offered to
> invalidate a claim in the case.  ATTC argues that its discussions with Hypertherm
> about designing around the patents would negate evidence that it willfully
> infringed the patents, providing a defense to that claim.  As described, the
> discussion evidence appears to run directly afoul of Rule 408(a).  In addition,
> even in the absence of Rule 408, ATTC has not shown that its current
> negotiations with Hypertherm would be relevant to the question of whether it
> willfully infringed Hypertherm's patents in the past.

*Hypertherm, Inc. v. Am. Torch Tip Co*., 2009 U.S. Dist. LEXIS 17821, **16-17 (D.N.H. Feb. 19,

2009) (citation omitted); *see also Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 826 (2d Cir. 1992)

(rejecting, as precluded by Rule 408, a defendant's attempt to introduce its own settlement offer

in order to reduce damages).

In addition, the Court also properly excluded the settlement portion of the letter under Federal Rule of Evidence 403. That rule permits exclusion of evidence where its probative value "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay [and] waste of time." Fed. R. Evid. 403. "It is well recognized, and rightly so, that the risks of prejudice and confusion entailed in receiving settlement evidence are such that often Rule 403 and the underlying policy of Rule 408 [to encourage settlement] require exclusion even when a permissible purpose can be discerned." *Stacey v. Bangor Punta Corp.,* 620 F. Supp. 636, 637 (D. Me. 1985). Here, not only does Tenenbaum's $500 offer have no probative value, introduction of the letter without redaction would have caused an unnecessary and confusing mini-trial on the issue of the parties' settlement negotiations. As discussed at side bar during trial, the parties had multiple settlement discussions throughout the litigation, generally with Plaintiffs making what they believed to be a very reasonable settlement demand and Tenenbaum rejecting it out of hand or countering with offers such as "we will settle if you pay us $15,000." Allowing this letter to go the jury unredacted would inevitably have led to endless testimony from each side concerning the back and forth of the parties' settlement discussions, which would have served only to confuse the issues and waste the jury's time. Accordingly, it was proper for the Court to exclude the settlement portion of this letter under Rule 403. *See Stacey*, 620 F. Supp. at 637.

Finally, redaction of the settlement portion of the letter was entirely harmless and, therefore, not grounds for granting a new trial under Federal Rule of Civil Procedure 61. Rule 61 provides that

> [u]nless justice requires otherwise, no error in admitting or excluding evidence . . . is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying or otherwise disturbing a judgment or order. At

15

> every stage of the proceeding, the court must disregard all errors and
> defects that do not affect any party's substantial rights.

Fed. R. Civ. P. 61.  Here, Tenenbaum provides no support for his contention that the redaction "was not harmless error."  (*See* Motion, at 10.)  He argues that the promise to destroy the infringing files in the bottom portion of the letter was contingent on Plaintiffs' acceptance of the settlement offer in the top portion, and that the letter must, therefore, be read as a whole. (Motion at 9.)  But Tenenbaum indicated no such contingency in his letter, stating only that he "will destroy" the infringing files.  (Trial Exhibit 23, attached as Exhibit I.)  Nor does the letter show that Tenenbaum was in any way taking "responsibility for his actions" or that he "wanted to make amends."

The import of Tenenbaum's November 21, 2005 letter, and specifically the last paragraph, is that it highlights Tenenbaum's repeated lies about the facts and evidence in this case.  When shown this last paragraph at his deposition, Tenenbaum claimed that the computer on which he used KaZaA had been destroyed before he wrote the letter.  (Tr. Day 4 at 52:1-21.) At trial, however, Tenenbaum revealed for the first time that, in fact, the computer still existed at the time he wrote the letter and that the Plaintiffs' copyrighted sound recordings were still in the KaZaA shared folder.  (Tr. Day 4 at 73:12-24.)  Tenenbaum, thus, lied about the existence of material evidence, failed to provide material evidence during the course of discovery (the computer as well as the sound recordings), and then apparently destroyed the computer after the litigation was well underway.  On questioning from his own counsel, Tenenbaum admitted to the jury that he lied about all of this.  (Tr. Day 4 at 89:3 to 90:5.)  Under these circumstances, admitting the top portion of Tenenbaum's letter, with Tenenbaum's $500 "nuisance offer," would have made Tenenbaum look even worse, not better.

16

Tenenbaum's motion also ignores the parties' stipulation, submitted to the jury as Trial Exhibit 58, attached as Exhibit J, which states that "[f]or all purposes in this matter, the parties stipulate that there were settlement negotiations and that they failed."  This stipulation negates any possible prejudice Tenenbaum might claim.  The jury knew that Tenenbaum had engaged in settlement discussions, and the specific amount of Tenenbaum's $500 nuisance offer would not have changed the outcome of the case.  Indeed, no reasonable jury would have altered its damage award based on the notion that Tenenbaum half-heartedly sent Plaintiffs a $500 offer before engaging in a four-year campaign of lies and deceit in an effort to escape responsibility.

## IV.  The Jury's Damage Award Is Consistent With The Law And With The Facts Of Tenenbaum's Massive, Willful Infringement.

### A.    The Court should reject Tenenbaum's constitutional challenge.

Tenenbaum's constitutional attack on the damage award is baseless.  His motion ignores the overwhelming evidence of his willful infringement and relies on facts not in evidence. Tenenbaum's reliance on the Supreme Court's punitive damages jurisprudence — including the three guideposts established in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996) — is also misplaced, both legally and factually.  As Tenenbaum acknowledges, the Court must analyze the constitutionality of the jury's award under the highly deferential standard articulated in *St. Louis, I. M. & S. Railway Co. v. Williams*, 251 U.S. 63 (1919).[5]  The jury's award in this case easily passes muster under that standard.

---

[5] *See also Zomba Enters., Inc. v. Panorama Records*, 491 F.3d 584, 587 (6th Cir. 2007); *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 302 F. Supp. 2d 455, 460 (D. Md. 2004); *Accounting Outsourcing, LLC v. Verizon Wireless Pers. Commc'ns, L.P.*, 329 F. Supp. 2d 789, 808-09 (M.D. La. 2004); *Holtzman v. Caplice*, No. 07 C 7279, 2008 U.S. Dist. LEXIS 41188, at *17-18 (N.D. Ill. May 23, 2008).

17

### 1.    Tenenbaum's constitutional argument is devoid of factual support.

Tenenbaum premises his challenge to the jury's award on a factual argument that is both without support in the record and inaccurate.  According to Tenenbaum, the actual harm caused by his infringement should be calculated at either $0.99 or $0.35 per song.  (Motion at 13-14.) Tenenbaum has absolutely no support in the record for this assertion, nor could he.

Under 17 U.S.C. § 504(c)(1), Plaintiffs chose to seek statutory damages rather than actual damages.  Plaintiffs were, therefore, not required to present proof of actual damages resulting from Tenenbaum's infringement.  *See Lowry's Reports*, 302 F. Supp. 2d at 459 (explaining that "[b]ecause statutory damages are an alternative to actual damages, there has never been a requirement that statutory damages must be strictly related to actual injury.").  Nonetheless, Plaintiffs provided evidence of actual harm through the testimony of Wade Leak, Dr. Stanley Liebowitz, and others.

The testimony from Plaintiffs' witnesses explained that the harm caused by Tenenbaum was substantially more than simply the amount it would cost to download legally a song or album.  The evidence showed that Tenenbaum willfully infringed all thirty of Plaintiffs' copyrighted works, and that Tenenbaum had these and thousands more digital audio files — including many of Plaintiffs' works — in several shared folders on his computers that he intentionally distributed to other P2P users.  Tenenbaum kept the thirty song files in his KaZaA shared folder for a long period of time during which he distributed them to other users in an unlimited, unprotected, and viral fashion.  Any of the millions of other users on the KaZaA network, all of whom were looking to download for free, could easily access these files from Tenenbaum's computer, download them, and subsequently distribute them to untold numbers of other users.  The evidence permitted the jury to conclude that Tenenbaum disseminated actual copies of Plaintiffs' copyrighted works to other users on the network many, many times.

18

Witnesses for the Plaintiffs, such as Mr. Leak, testified that the cost of obtaining a license that would allow someone to engage in Tenenbaum's actions would be unheard of and prohibitive.

Tenenbaum's motion also ignores completely the other relevant evidence that Plaintiffs presented to the jury and that the Court properly instructed the jury to consider in its assessment of damages.[6]  For instance, the jury heard testimony that Tenenbaum knowingly infringed, that he did so because he wanted to get music for free and distribute it to others, that he continued infringing for years in the face of multiple warnings to stop, and that he concealed material evidence, lied, and blamed others.  The jury was entitled to and properly did consider not only the substantial harm that Tenenbaum caused through both reproduction and distribution of the infringed works, but also Tenenbaum's litigation misconduct and the need for deterrence.

> **2.    Tenenbaum's reliance on the Supreme Court's punitive damages jurisprudence is misplaced as statutory damages are reviewed under a much more deferential standard.**

Tenenbaum premises his constitutional attack on the notion that a statutory damage award should be reviewed much like a punitive damage award.  (Motion at 15-18.)  But that premise is simply wrong.  Statutory damages are not the functional equivalent of punitive damages because they serve a broader range of purposes, including providing compensation and achieving an appropriate level of deterrence of copyright infringement.  *See F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 233 (1952) (copyright actions should serve to compel "reparation for injury" and "to discourage wrongful conduct"); *Venegas-Hernandez v. Sonolux Records*, 370 F.3d 183, 195 (1st Cir. 2004); *Los Angeles News Serv. v. Reuters Tele., Ltd.*, 149

---

[6]    *See* Doc. 909 at 3, instructing the jury that it could consider "the nature" of Tenenbaum's infringement, Tenenbaum's "purpose and intent," the expenses that Tenenbaum saved, the revenue Plaintiffs lost, the duration of Tenenbaum's infringement, Tenenbaum's "continuation of infringement after notice or knowledge of copyright claims," the "need to deter this Tenenbaum and other potential infringers," and "the willfulness" of Tenenbaum's conduct.

F.3d 987, 996 (9th Cir. 1998).  More importantly, statutory damages must be awarded within a

defined range established, and periodically adjusted, by Congress.  A statutory range enacted

before the wrongful conduct occurs gives ample notice and does not present any of the same due

process issues as punitive damages, which may be unlimited and unconstrained.  That means

courts consider a constitutional challenge to a statutory damages award under a standard that is

much more deferential than that applicable to a jury's punitive damage award.  *See TXO Prod.*

*Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 456-57 (1993) (finding a "significant[] differen[ce]"

— a constitutional difference — between "review of a jury's award for arbitrariness and the

review of legislation").  In particular, there is no constitutional requirement that the level of a

statutory damage award bear some close relation to the actual harm caused by an intentional tort.

    American copyright law has authorized awards of statutory damages since the Copyright

Act of 1790, and English copyright law did the same long before that.  *See Feltner v. Columbia*

*Pictures Television, Inc.*, 523 U.S. 340, 349 (1998) (tracing the history of statutory copyright

damages).  One reason for allowing statutory damages is that it is difficult to prove actual

damages caused by copyright infringement.[7]  Because of the difficulty of proving actual harm,

among other reasons, the Copyright Act gives copyright owners the explicit right to "elect, at any

time before final judgment is rendered, to recover, instead of actual damages and profits, an

award of statutory damages for all infringements involved in the action."  17 U.S.C. § 504(c)(1).

Allowing a copyright owner to elect to receive statutory damages does not mean that there has

not been actual harm, it simply means that Congress properly recognized the difficulty of

---

[7] *See F.W. Woolworth*, 344 U.S. at 231 (statutory damages "give the owner of a copyright some recompense for injury done him, in a case where the rules of law render difficult or impossible proof of damages or discovery of profits" (quotation omitted)); Staff of House Comm. on the Judiciary, 87th Cong., Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law 103 (Comm. Print 1961) at 3, attached hereto as Exhibit K (explaining why actual damages are inadequate in many cases).

proving that harm, or that the actual damages were not adequate to incent creators to create and protect copyrighted works.  As the Supreme Court has recognized, providing a choice between actual damages and statutory damages "shows that something other than actual damages is intended — that another measure is to be applied in making the assessment" of the appropriate amount of statutory damages.  *L.A. Westermann Co. v. Dispatch Printing Co.*, 249 U.S. 100, 106 (1919).

Thus, statutory damages serve as an alternative means of providing compensation to victims of copyright infringement, while also serving to deter future infringements, impose appropriate financial damages on intentional wrongdoers, and promote the creation of intellectual property.  That by itself means that statutory damages should not be viewed as equivalent, functionally or constitutionally, to punitive damages.

Even more important is the fact that statutory damages must be set within a range that Congress has established.  The Copyright Act has long provided an explicit range of possible statutory damage awards for copyright infringement, with a different maximum award permitted in the context of willful infringement.  17 U.S.C § 504(c).  Congress has carefully adjusted this legislatively enacted range in response to external developments on a number of occasions, the most recent adjustment taking place in 1999 in response to increased copyright infringement via the Internet.  H.R. Rep. No. 106-216 (1999), attached as Exhibit L.

This feature of statutory damages is critical because the central concern animating the Supreme Court's *Gore* line of cases setting constitutional limits on punitive damages is a lack of fair notice.  As the *Gore* Court put it, "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose."

517 U.S. at 574.  Here, where Congress has established a statutory range of damages with a mandatory upper limit, those constitutional concerns fall away.  *See Lowry's Reports*, 302 F. Supp. 2d at 460 (refusing to review statutory damages for copyright infringement under the *Gore* punitive damages analysis because "[t]he unregulated and arbitrary use of judicial power that the *Gore* guideposts remedy is not implicated in Congress' carefully crafted and reasonably constrained statute"); *Accounting Outsourcing*, 329 F. Supp. 2d at 809 (refusing to apply *Gore* to statutory damage award and noting that, in the context of such congressionally mandated schemes, "Defendants can hardly complain that they had no fair notice regarding the severity of the potential punishment"); *Zomba Enters.*, 491 F.3d at 588 (holding that the Supreme Court's punitive damages analysis does not apply to an award of statutory damages); *Verizon California Inc., et al. v. OnlineNIC*, 2009 U.S. Dist. LEXIS 84235, at *22-26 (N.D. Cal. Aug. 25, 2009) (same).

The existence of a statutory range also precludes application of the punitive damages case law for a second reason.  The Court's *Gore* line of cases emphasized that "substantial deference [should be given] to legislative judgments concerning appropriate sanctions for the conduct at issue," 517 U.S. at 583 (quoting *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 301 (1989) (O'Connor, J. concurring in part and dissenting in part)).  This recognition of the heightened deference given to statutory damage awards, and the correspondingly lower deference owed a jury's unbounded punitive damage award, is included within the third guidepost established by the *Gore* Court, which judges the propriety of punitive damages by examining the disparity between a punitive damage award and the "civil penalties authorized or imposed in comparable cases."  517 U.S. at 575.  The damages awarded here fall within a clearly defined statutory range — they are by definition the "civil penalties authorized" for

22

Tenenbaum's conduct.  Comparing an award of statutory damages to the authorized range of civil penalties would be an odd exercise because they are the same thing.  This not only demonstrates the inapplicability of the *Gore* punitive damages framework to a review of statutory damages, it also demonstrates the correctness of the jury's award, which is at the low end of the "civil penalties authorized" by Congress.

> **3.**     **The jury's award of statutory damages to Plaintiffs satisfies *Williams*.**

This *Williams* standard rarely, if ever, justifies a court in second-guessing a legislature's choice of penalty for an intentional tort like willful copyright infringement.  As noted in *Williams*, "the states . . . possess a wide latitude of discretion in the matter" and statutory remedies for "public wrongs" are not required to be "be confined or proportioned to [the plaintiff's] loss or damages." *Id.* at 66.  Under this standard, it is not sufficient for a defendant to claim that there is a large differential between their estimate of the actual harm caused and the magnitude of the penalty.  *Williams* recognizes that legislators have the constitutional authority to make that choice, and a court should be loathe to disturb it.

Courts reviewing awards of statutory damages under the Copyright Act have recognized this duty of extreme deference.  As the Sixth Circuit explained, constitutional review in this context "is extraordinarily deferential — even more so than in cases applying abuse-of-discretion review." *See Zomba Enters.*, 491 F.3d at 587 (affirming statutory damage award in a ratio of 44:1 compared to the licensing fee the plaintiff lost as a result of the infringement); *see also Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co.*, 74 F.3d 488, 496 (4th Cir. 1996) (applying a standard of review that "is even more deferential than abuse of discretion" and upholding a jury award of $400,000 for four infringements, even though the plaintiff proved no actual damage and the defendant's gross revenue was $10,200); *Douglas v. Cunningham*, 294 U.S. 207, 210 (1935) (analyzing the range of statutory damages in the 1909 Act and explaining

23

that "the employment of the statutory yardstick, within set limits, is committed solely to the court which hears the case, and this fact takes the matter out of the ordinary rule with respect to abuse of discretion"); *Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1194 (9th Cir. 2001) ("If statutory damages are elected, [t]he court has wide discretion in determining the amount of statutory damages to be award, constrained only by the specified maxima and minima.") (internal quotation and citation omitted).

Courts have accorded the same level of deference in cases addressing other statutory damage provisions. For example, the federal Telephone Consumer Protection Act ("TCPA") provides that any person who receives an unsolicited advertisement sent by fax is entitled to receive "actual monetary loss from such a violation, or . . . $500 in damages for each such violation, whichever is greater." 47 U.S.C. § 227(b)(3)(B). Courts that have addressed this provision have applied *Williams* and noted that "Congress identified two public harms addressed by the TCPA:  (1) unsolicited fax advertisements impose difficult-to-quantify interruption costs on businesses and residences because fax machines typically can only handle one fax at a time; and (2) unsolicited commercial facsimiles shift the advertisers' printing costs to unwitting recipients." *Accounting Outsourcing*, 329 F. Supp. 2d at 809; *see also Texas v. American Blastfax, Inc.*, 121 F. Supp. 2d 1085, 1090 (W.D. Tex. 2000) (explaining that "the TCPA damages provision was not designed solely to compensate each private injury caused by unsolicited fax advertisements, but also to address and deter the overall public harm caused by such conduct").

TCPA defendants often assert that the actual damages suffered by the recipient of unsolicited fax advertisements are incredibly low, as little as "a few pennies per alleged violation," making the statutory damages of $500 per fax disproportionately high. *See, e.g.,*

*Kenro, Inc. v. Fax Daily, Inc.*, 962 F. Supp. 1162, 1165-66 (S.D. Ind. 1997).  But courts have found no constitutional violation under *Williams*, recognizing that Congress designed the TCPA remedy to "take into account the difficult to quantify business interruption costs imposed upon recipients of unsolicited fax advertisements, effectively deter the unscrupulous practice of shifting these costs to unwitting recipients of junk faxes, and provide adequate incentive for an individual plaintiff to bring suit on his own behalf."  *Id.* (internal quotation omitted); *see Holtzman*, 2008 U.S. Dist. LEXIS 41188, at *17-18.

In fact, Plaintiffs have not located a single case, in the nine decades since *Williams* was decided, in which a court relied on *Williams* to reduce or eliminate an award of statutory damages because of a due process violation.  *See, e.g.*, Colleen P. Murphy, *Judicial Assessment of Legal Remedies*, 94 Nw. U. L. Rev. 153, 202 (1999) (noting that in the context of the Copyright Act, "[n]o reported decision has reduced a litigated award that was within the appropriate statutory range").  Nor has Tenenbaum cited to one.

Here, under the applicable standards, there is no doubt that the jury's award passes constitutional muster.  The jury determined that Tenenbaum willfully infringed thirty of Plaintiffs' copyrighted works.  While Tenenbaum argues that these thirty intentional torts were trivial in their economic impact (Motion at 13-14), that argument ignores facts established at trial (Tenenbaum's massive distribution of the works), and also misses the mark as a matter of law.  As discussed above, the Constitution does not require some fixed ratio between actual injury caused by an intentional tort and the damages a legislature may choose to impose.  To the contrary, legislators may freely determine that a given tort merits a damage award vastly exceeding the actual injury inflicted.  *See Lowry's Reports*, 302 F. Supp. 2d at 459; *Douglas*, 294 U.S. at 210.  In so doing, they can assess what level of damage award is needed to deter

violations, taking into account the difficulty of detecting violations and the cost of enforcement litigation. *See* H.R. Rep. No. 106-216, at 2 (explaining that the 1999 increase in the statutory damages range was necessary to provide "more stringent deterrents to copyright infringement and stronger enforcement of the laws").

Thus, whether or not an infringer acts with the express purpose of profiting from his or her infringement, statutory damages are available within the range set by Congress. As the Supreme Court recognized in *F.W. Woolworth*, "[e]ven for uninjurious and unprofitable invasions of copyright the court may, if it deems it just, impose a liability within statutory limits to sanction and vindicate the statutory policy." 344 U.S. at 233.

As already noted, Tenenbaum's constitutional argument is also factually erroneous. Tenenbaum did not limit his tortious conduct to thirty reproductions made for personal use. He participated in a massive way in multiple P2P file-sharing networks over a period of many years; he seeded these networks with thousands of new copies of digital music files; he attempted to hide his conduct and blame others; and he concealed material evidence. In light of all of this evidence, Tenenbaum's due process concerns are meritless, particularly when measured against the "due regard for the interests of the public, the numberless opportunities for committing the offense, and the need for securing uniform adherence to" the Copyright Act. *See Williams*, 251 U.S. at 67.

### 4. Tenenbaum's arguments challenging the jury's verdict under *Williams* all fail.

Tenenbaum proffers several arguments seeking to challenge the jury's verdict under *Williams*, all of which fail. Tenenbaum, for example, argues that the ratio of penalty to actual damages in *Williams* was about 113 to 1, whereas here, based on Tenenbaum's theory, it is much higher. (Motion at 13-14.) Tenenbaum's "ratio" argument ignores both the law and the facts.

*Williams* does not focus on the ratio of penalty to actual harm but, rather, on how the statutory penalty compares to "the interests of the public, the numberless opportunities for committing the offense, and the need for securing uniform adherence" to the law. *Williams*, 251 U.S. at 67. The actual harm to Plaintiffs is, thus, not a factor under *Williams*. Tenenbaum's ratio argument also ignores the facts of this case because it focuses only on Tenenbaum's illegal downloading. Tenenbaum also distributed Plaintiffs' works to millions of other P2P users over a period of many years causing severe damage to Plaintiffs.

Tenenbaum also relies on *Philip Morris USA v. Williams*, 549 U.S. 346 (2007), claiming it is "unconstitutional to impose a civil penalty on a defendant for either the conduct of others or [his] own conduct that harmed those who are not Plaintiffs." (Motion at 12.) Setting aside the fact that *Philip Morris* does not apply because it did not concern an award of statutory damages, Tenenbaum misreads the case. The Court did state that a jury cannot be told to punish a defendant directly for tortious conduct affecting third parties not before the court. But it went on to say that, in calculating the appropriate punitive damage award, a jury must weigh the reprehensibility of the defendant's conduct, and that assessment can constitutionally take account of the actual and potential harm inflicted by the defendant on third parties. *Philip Morris*, 549 U.S. at 355. Here, Plaintiffs testified about harm primarily to themselves but also to artists and producers who directly share in the royalties from the sale of sound recordings. They are directly "downstream" from the Plaintiffs and cannot prosecute their own rights as they do not necessarily own the copyrights at issue. It is certainly permissible for the jury to consider the impact of Tenenbaum's conduct on this very important segment of the music community.

Moreover, there is no factual support for Tenenbaum's argument that Plaintiffs seek to punish Tenenbaum for the actions of other infringers. (Motion at 12.) To the contrary, Plaintiffs

sought statutory damages only for the thirty works at issue, and there can be no question that Tenenbaum himself infringed Plaintiffs' copyrights in these and other works over a period of many years. The jury instructions, and the jury verdict form, made clear that the jury was to decide damages based on Tenenbaum's conduct alone, and not on the conduct of any other individual. (*See* Doc. 909 at 3-4.) Tenenbaum's counsel made this point repeatedly to the jury in closing. (*See e.g.*, Tr. Day 5 at 38:10-13, 53:13-18, 54:8-15, 62:1-12, attached hereto as Exhibit M.) Indeed, based on the testimony of Dr. Liebowitz and others concerning the billions of dollars of lost revenues and the mass layoffs in the record industry as a result of file-sharing, had the jury had been awarding damages for the infringement of other P2P users, its verdict would have been exponentially larger.

Tenenbaum also contends that courts should vary their application of *Williams* depending on a defendant's ability to pay the judgment. (Motion at 12-13.) *Williams*, however, does not focus on a particular defendant's financial status but, rather, on the defendant's "offense" and on the "interests of the public" in ensuring compliance with the law. *Williams*, 251 U.S. at 67; *see also Centerline Equip. Corp. v. Banner Pers. Serv.*, 545 F. Supp. 2d 768, 778 (N.D. Ill. 2008) ("The Due Process Clause does not require Congress to make illegal behavior affordable, particularly for multiple violations.") (internal quotation omitted). The jury's award here, which is at the lower end of the range set by Congress, easily satisfies *Williams* given the overwhelming evidence of Tenenbaum's long-term, willful infringement, the harm caused by Tenenbaum's infringement, and the significant need for deterrence.

Finally, Tenenbaum argues that *Williams* involved a "reprehensible . . . predatory commercial practice by a corporation overreaching its customers" [sic], and that his conduct should be deemed less culpable because it only involved "shoplifting" thirty songs for "personal

28

use." (Motion at 13.)  Here again, Tenenbaum simply ignores the substantial evidence of his long-term, massive, and willful infringement, including his intentional distribution of Plaintiffs' works, which has nothing to do with his "personal use."  The jury found Tenenbaum's conduct to be willful, and the notion that overcharging a customer is morally more culpable than Tenenbaum's repeated, outright, and knowing theft and distribution of copyrighted music is bizarre.  Tenenbaum's motion chooses to ignore that a corporation that owns copyrights is entitled to the same rights and privileges as an individual who owns copyrights.  The testimony at trial showed that long-term, rampant infringement like that Tenenbaum engaged in has significant impacts across the industry.  Those impacts are felt by real people, including the engineers, producers, and musicians who Tenenbaum claims to support.

**B.**     **There is no basis for reducing the jury's award to the statutory minimum.**

In lieu of a new trial, Tenenbaum asks the Court to reduce the jury's award to the statutory minimum.  (Motion at 18.)  Tenenbaum offers two grounds for this request.  He contends that Congress did not intend to impose statutory damages on "music consumers," and that Congress did not authorize the procedure by which the jury determined damages in this case. Neither of these arguments has any support, and neither warrants reducing the jury's award.[8]

---

[8] Tenenbaum also argues that "the jury was given far too much discretion." (Motion at 18.)  Tenenbaum, however, offered no objection to the Court's instruction that the jury should consider "any other considerations you believe relevant to a just and appropriate determination of damages."  (Doc. 909 at 3.)  In fact, Tenenbaum requested similar language.  (*See* Doc. 893-4 at 13, asking the Court to instruct the jury "only that its task is to assess damages that are 'just.'").  Tenenbaum cannot complain that the jury had "too much discretion" when Tenenbaum himself asked the Court to instruct the jury to weigh anything it considered "just."  *See United States v. Kakley*, 741 F.2d 1, 3 (1st Cir. 1984) (a party cannot complain of "invited" error).

#1455747 v1 den

1.    **Congress acted specifically to address the very type of online infringement that Tenenbaum engaged in.**

Tenenbaum's contention that Congress did not intend to impose statutory damages on infringers like Tenenbaum is without merit. Tenenbaum's entire argument focuses on the 1999 amendments to the Copyright Act which, among other things, increased the minimum and maximum permissible amounts of statutory damages in civil cases. *See* Digital Theft Deterrence and Copyright Damages Improvement Act of 1999, Pub. L. No. 106-160, 113 Stat. 1774. As an initial matter, this issue is a red herring. The jury awarded damages of $22,500 per work infringed, an amount well below the statutory maximum of $50,000 that existed under the Copyright Act prior to the 1999 amendments. 17 U.S.C. § 504(c) (1976); Pub. L. No. 94-533, §22 (1976). As such, even if Congress had not increased statutory damages in 1999, the jury's award would have been substantially less than the maximum possible award. For this reason, the argument that the amendment was not intended for infringers like Tenenbaum misses the mark.

Notwithstanding, the legislative history of the 1999 amendments demonstrates that Congress increased statutory damages for civil copyright cases in order to address misconduct such as Tenenbaum's. Specifically, Congress described the need for the legislation as follows:

> By the turn of the century *the Internet is projected to have more than 200 million users*, and the development of new technology will create additional incentive for copyright thieves to steal protected works. . . . *Many computer users* are either ignorant that copyright laws apply to Internet activity, or they *simply believe that they will not be caught or prosecuted for their conduct*. Also, many infringers do not consider the current copyright infringement penalties a real threat and continue infringing, even after a copyright owner puts them on notice that their actions constitute infringement and that they should stop the activity or face legal action.

H.R. Rep. No. 106-216 at 3 (emphasis added). Based on these concerns, Congress increased the range of damages to provide "more stringent deterrents" and "stronger enforcement of the laws." *See id.* at 2; *see also id.* at 6 ("It is important that the costs of infringement substantially exceed

30

the costs of compliance, so that persons who use or distribute intellectual property have a strong incentive to abide by the copyright laws.").  This case provides a textbook example of the very problem Congress sought to address — an Internet user taking advantage of new technology to infringe copyright who knew that what he was doing was wrong but, believing that he would not be caught or prosecuted for his conduct, continued infringing anyway.

The idea that Congress "never considered" online infringement like Tenenbaum's (Motion at 19) ignores the plain language of the law, the circumstances under which Congress acted, and the legislative history.  By 1999, online piracy of copyrighted music had been a growing problem for years.  As early as 1993 music publishers had sued an internet service provider over musical works that were being uploading to, stored on, and downloading from the service provider's computer system.  *See Frank Music Corp. v. CompuServe, Inc.*, Case No. 93-cv-8153 (S.D.N.Y.).  In 1997, several American record companies filed lawsuits against three music archive web sites and obtained restraining orders barring the operators from reproducing copyrighted sound recordings on their web sites.  *See MCA Records Inc. v. Internet Site Known As Fresh Kutz*, Case No. 97-cv-1360 (N.D. Tex. 1997); *A&M Records, Inc. v. Internet Site Known As Fresh Kutz*, Case No. 97-cv-1099 (S.D. Cal. 1997); *Sony Music Entertainment Inc. v. Internet Site Known As Fresh Kutz,* Case No. 97-cv-4245 (S.D.N.Y. 1997).  The legislative history itself demonstrates that Congress sought to address the growing problem of online infringement globally, focusing its attention specifically on the "Internet" and on the millions of "computer users" connected to the Internet.  H.R. Rep. No. 106-216 at 3.  That the Committee offered examples of pirated "software" and "video discs," *id.*, in no way suggests that Congress intended to exclude all other copyrighted works from the new range of statutory damages.

#1455747 v1 den

Tenenbaum's arguments regarding *United States v. LaMacchia*, 871 F. Supp. 535 (D. Mass. 1994) and the No Electronic Theft (NET) Act (Motion at 20), suffer from two flaws. First, Tenenbaum improperly and confusingly conflates changes to criminal provisions of the Copyright Act with civil provisions. The 1999 amendments clearly delineate between the "Statutory Damages Enhancement" for civil cases and the "Sentencing Commission Guidelines" for criminal cases. H.R. Rep. No. 106-216 at 2. Second, the NET Act addressed infringement of all works on the Internet, not just "software" as Tenenbaum contends. In passing the NET Act, Congress sought to address the scope of "electronic piracy" globally, and made specific findings regarding the problem of online infringement of sound recordings — "The extension of an audio-compression technique, commonly referred to as MP-3, now permits infringers to transmit large volumes of CD-quality music over the Internet." H.R. Rep. 105-339 at 4, attached as Exhibit N.

### 2. The Court properly charged the jury with the task of awarding statutory damages.

After the Court entered a directed verdict in Plaintiffs' favor, a ruling that Tenenbaum does not challenge in his post-trial motion, the only issues left for the jury's consideration were whether Tenenbaum's conduct was willful and what amount of statutory damages to award. Tenenbaum's argument (Motion at 24) that Congress never "authorized" juries to determine statutory damages is wrong. Leaving aside the fact that Tenenbaum never asserted this argument during trial and, thus, waived it, Congress has specifically acknowledged the role of juries in determining statutory damages under the Copyright Act. *See* H.R. Rep. No. 106-216 at 6 (Courts and *juries* must be able to render awards that deter others from infringing") (emphasis added). More importantly, the Supreme Court — fully aware of the range of statutory damages — has made it clear that the jury has the sole authority to determine "all issues pertinent to an award of statutory damages," including the amount itself. *Feltner*, 523 U.S. at 355.

32

Tenenbaum's argument that the jury should not have been instructed on the range of statutory damages is also with merit. This Court exercises discretion in "the form and wording" of jury instructions. *See United States v. Garcia-Pastrana*, 584 F.3d 351, 381 (1st Cir. 2009). To warrant a new trial, any alleged error in jury instructions must "have been prejudicial, based on a review of the record as a whole." *Davet v. Maccarone*, 973 F.2d 22, 26 (1st Cir. 1992). Here, Tenenbaum has not cited a single authority to suggest any error in the Court's instruction or that the Court abused of discretion. There can be no question that the jury was, in fact, properly instructed as to the range of available damages in this case. *See* 17 U.S.C. § 504(c). And, courts routinely instruct juries on the range they are to consider under the Copyright Act. *See, e.g.*, 3B O'Malley, Grenig, and Lee, *Federal Jury Practice & Instructions* § 160.93 (2005) (instructing the jury on the available range); *Ninth Circuit Model Civil Jury Instructions* § 17.25 – Copyright Damages – Statutory Damages (17 U.S.C. § 504(c)) (same); Holbrook and Harris, *Model Jury Instructions: Copyright, Trademark, and Trade Dress Litigation* § 1.7.7 (2008) (same). Moreover, while Congress has specifically directed courts not to instruct juries as to the limits of statutory damages in other contexts, *see, e.g.*, The Civil Rights Act of 1991, 42 U.S.C. § 1981a(c)(2), Congress enacted no such provision in regards to statutory damages under the Copyright Act. Because the jury instructions did not mislead or confuse the jury in any way as to the applicable law, Tenenbaum's argument for a new trial on this ground must be rejected.

**V.    The Court Should Reject Tenenbaum's Request For A Remittitur.**

    **A.    The Court lacks authority to remit the jury's damage award.**

In a final effort to reduce the jury's verdict or obtain a new trial, Tenenbaum seeks a remittitur under *Correa v. Hospital San Francisco*, 69 F.3d 1184, 1197 (1st Cir. 1995), arguing that the jury's verdict is grossly excessive, inordinate, and shocks the conscience. (Motion at 25.) The Court, however, does not have the power to remit the jury's award of statutory

damages in this case.  As discussed above, *Feltner* holds that the jury has the sole authority to determine "all issues pertinent to an award of statutory damages," including the amount itself. *Feltner*, 523 U.S. at 355.  *Feltner* neither holds nor contemplates that a judge has the right to alter a jury's statutory damage award if that award falls squarely within the statutory damage range prescribed by Congress.  *See also SESAC, Inc. v. WPNT, Inc.*, 327 F. Supp. 2d 531, 532 (W.D. Pa. 2003) (rejecting request for remittitur of statutory damages for copyright infringement because "[t]he court should not interfere lightly with a carefully crafted statutory scheme by substituting its judgment for that of the legislature").

Tenenbaum cannot cite a single authority permitting a district court to remit a jury's damage award that falls within the range of available damages established by Congress.  The line of punitive damages cases that Tenenbaum relies on (Motion at 25) has no application here for the same reasons discussed in section IV.A.2. above.  In particular, statutory damages are not the functional equivalent of punitive damages.  Rather, statutory damages serve a broader range of purposes.  They serve to deter infringement, to encourage civil enforcement of the copyright laws, and to provide redress from harm, which was significant in this case.  Congress has determined the appropriate range of statutory damages with these very goals in mind, and it did so with particular attention to online infringers just like Tenenbaum.  *See* H.R. Rep. No. 106-216 at 3.  "The wisdom of Congress' action [in setting copyright policy] is not within [the courts'] province to second-guess."  *Eldred v. Ashcroft*, 537 U.S. 186,  222 (2002) ("[T]he Copyright Clause empowers Congress to determine the intellectual property regimes that, overall, in that body's judgment, will serve the ends of the Clause.").[9]

---

[9] In *Capitol Records Inc. v. Thomas-Rasset*, Case No. 06-cv-1497 (MJD/RLE) (D. Minn.), the court recently ordered a remittitur of statutory damages awarded by a jury for willful

For the same reason, a district court judge cannot superimpose arbitrary limitations on statutory damages for specific types of infringement or specific types of infringers.  *See, e.g.*, *Thomas-Rasset* Order at 25 (seeking to fashion a "limit on statutory damages awards against noncommercial individuals").  Tenenbaum has claimed repeatedly throughout this case that he should be given special treatment because, according to Tenenbaum, he is a noncommercial infringer who downloaded only for "personal use."  (Motion at 13.)  The Copyright Act, however, makes no distinction between so-called commercial and noncommercial infringers. Infringers can cause the same harm regardless of their motivation.  And, in passing the NET Act, Congress specifically rejected the idea that individual infringers should be excused simply because they may not "realize a commercial advantage or private financial gain."  H.R. Rep. 105-339 at 2, reversing *LaMacchia*.  Moreover, as a practical matter, given the allure of free content, one who illegally distributes music for free on the Internet may do substantially more harm to the market for a copyright holder's works than one who charges for illegal copies. While Tenenbaum may not have sold the music he stole, he likely caused more harm to Plaintiffs by intentionally giving it away for free to millions of other P2P users than he would have by offering it for sale.  He certainly caused no less harm.

For all of these reasons, a district judge that superimposes his or her own subjective view of the "right" amount of statutory damages usurps the role of the jury in direct violation of the Seventh Amendment and the Supreme Court's decision in *Feltner*, and also improperly invades Congress' authority in setting copyright policy.

---

copyright infringement.  *See* Memo. of Law & Order ("*Thomas-Rasset* Order"), attached as Exhibit O.  The court, however, cited no authority for such action.  *See id.* at 7-8.

#1455747 v1 den

**B.      The overwhelming evidence of Tenenbaum's misconduct and the substantial harm that he caused supports the jury's award.**

If, notwithstanding the foregoing, the Court is inclined to consider Tenenbaum's remittitur request, there is no factual basis for a remittitur in this case.  In reviewing an award of damages for remittitur, "the district court is obliged to review the evidence in the light most favorable to the prevailing party and to grant remittitur or a new trial on damages only when the award 'exceeds any rational appraisal or estimate of the damages that could be based upon the evidence before it.'"  *Eastern Mt. Platform Tennis v. Sherwin-Williams Co.*, 40 F.3d 492, 502 (1st Cir. 1994) (quoting *Kolb v. Goldring, Inc.*, 694 F.2d 869, 872 (1st Cir. 1982)).

The jury in this case heard evidence demonstrating that Tenenbaum willfully infringed Plaintiffs' copyrights in thirty sound recordings by downloading them and distributing them to millions of other users on KaZaA, that he downloaded and distributed thousands of additional sound recordings — many of them belonging to Plaintiffs — on multiple P2P networks, that he intentionally seeded these networks with new copies of works, that he engaged in this conduct for nearly ten years with full knowledge that it was illegal and despite repeated warnings to stop, that he continued to infringe even during the course of the lawsuit, and that he perjured himself and concealed material evidence of his infringement.  These facts more than justify the jury's verdict of $22,500 per infringed work.

Copyright infringement is a serious offense, and the jury properly found that Tenenbaum's massive, long-term, and willful infringement caused significant harm to Plaintiffs. That the full scope of that harm may be incalculable does not make it any less real or significant. Indeed, the full extent of the harm Tenenbaum caused in this case is incalculable for the sole reason that the P2P networks Tenenbaum chose to use make it impossible for Plaintiffs to identify anything more than a fraction of Tenenbaum's illegal activity.  *See In re Aimster*

36

*Copyright Litig.*, 334 F.3d 643, 646 (7th Cir. 2003) (discussing the viral nature of P2P

infringement and the fact that a single copy "could be levered into the distribution within days or

even hours of millions of identical, near-perfect . . . copies); *Anderson*, 2008 U.S. Dist LEXIS

53654, at *19-20 ("[T]here is no way to ascertain the precise amount of damages caused by

Defendant's actions in not only improperly downloading Plaintiffs' Copyrighted Recordings

himself but also subsequently distributing some or all of Plaintiffs' Copyrighted Recordings to a

vast community of other persons on KaZaA.").

 As Plaintiffs' witnesses Dr. Doug Jacobson and Chris Connolly testified, the P2P

networks that Tenenbaum chose to use are specifically designed to facilitate massive copyright

infringement.  These networks are also configured in a way that prevents copyright holders like

Plaintiffs from detecting an infringer's distributions to the millions of other peers on the network.

Having deliberately chosen to use P2P networks that make it impossible to know the full extent

of the harm he caused, Tenenbaum cannot fairly complain of a lack of evidence of actual harm.

In any event, the jury's award reflects its view that the harm here was significant, and that view

is more than supported by Plaintiffs' evidence of Tenenbaum's downloading and massive

distribution of Plaintiffs' works to millions of other KaZaA users.

 They jury also clearly found that the need for deterrence here is great.  Tenenbaum's

willful, repeated infringements, his refusal to accept responsibility, his attempts to blame others,

his perjury and intentional concealment of material evidence cannot be ignored.  From a

culpability perspective, it is hard to imagine a defendant more culpable than Tenenbaum.  Joel

Tenenbaum is a highly educated physicist who knew and understood the law but chose to break

it anyway.  He continued to infringe even after Plaintiffs detected his infringement and initiated

this lawsuit.  While Plaintiffs are aware of the Court's predisposition regarding these cases, that

predisposition must defer to the actual facts in a case, including the highly egregious set of facts

in this case. Tenenbaum snubbed his nose to copyright law, to Plaintiffs, and to the judicial

process with repeated lies, concealment of evidence, and a legal strategy that needlessly drained

the resources of all involved. Tenenbaum's conduct underscores the compelling need for the

deterrent effect Congress incorporated into the Copyright Act's statutory damages scheme,

which the jury properly recognized.

Given Plaintiffs' overwhelming showing of Tenenbaum's misconduct, there can be no

question that the jury's verdict is well supported by the evidence in this case. To conclude

otherwise would subvert long-settled and still entirely relevant understandings of the appropriate

measure of damages for copyright infringement.

## CONCLUSION

Wherefore, Plaintiffs ask that Tenenbaum's motion for a new trial or remittitur be denied.

Respectfully submitted this 8th day of February 2009.

SONY BMG MUSIC ENTERTAINMENT;
WARNER BROS. RECORDS INC.;
ATLANTIC RECORDING CORPORATION;
ARISTA RECORDS LLC; and UMG
RECORDINGS, INC.

By their attorneys,

By:  s/Eve G. Burton
Timothy M. Reynolds (*pro hac vice*)
Eve G. Burton (*pro hac vice*)
Laurie J. Rust (*pro hac vice*)
HOLME ROBERTS & OWEN LLP
1700 Lincoln, Suite 4100
Denver, Colorado 80203
Telephone: (303) 861-7000
Facsimile: (303) 866-0200
Email:  timothy.reynolds@hro.com
         eve.burton@hro.com
         laurie.rust@hro.com

Matthew J. Oppenheim (*pro hac vice*)
THE OPPENHEIM GROUP, LLP
7304 River Falls Drive
Potomac, MD 20854
Telephone (301) 299-4986
Facsimile:  (866) 766-1678
Email:  matt@oppenheimgroup.net

Daniel J. Cloherty
DWYER & COLLORA, LLP
600 Atlantic Avenue - 12th Floor
Boston, MA 02210-2211
Telephone:  (617) 371-1000
Facsimile:  (617) 371-1037
dcloherty@dwyercollora.com

ATTORNEYS FOR PLAINTIFFS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 8, 2010.

s/Eve G. Burton

#1455747 v1 den