# EXHIBIT H

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - )

CAPITAL RECORDS, INC., ET AL.,   )   CV. NO. 03-11661-NG

PLAINTIFFS            )

VS.                   )   COURTROOM NO. 2

NOOR ALAUJAN, ET AL.,            )   1 COURTHOUSE WAY

DEFENDANTS       )   BOSTON, MA  02210

- - - - - - - - - - - - - - - -

EXCERPT

JURY TRIAL DAY 1

JULY 27, 2009


9:12 A.M.










BEFORE THE HONORABLE NANCY GERTNER

UNITED STATES DISTRICT COURT JUDGE


VALERIE A. O'HARA

OFFICIAL COURT REPORTER

1          THE COURT:  But what difference does it make if

2     there are no facts that are relevant here, why isn't that

3     just dicta in my decision?

4          MR. OPPENHEIM:  Well, your Honor, our concern

5     quite frankly, for the very reason that the Court is

6     expressing it, it will be cited back in later cases as

7     though it has the authority of the Court.

8          THE COURT:  You can file whatever you like, but

9     it's obviously dicta.  What I was trying to do was to

10    understand what the sort of metes and bounds of this defense

11    comprised so I was obviously speculating, and it is

12    obviously dicta, you can file whatever you like.  Whatever

13    those boxes consist of, there was no effort to put this case

14    in them.

15         MR. OPPENHEIM:  I appreciate that, your Honor.

16    You will hopefully during the course of the trial, for

17    instance, hear testimony that this music has been available

18    online since 1999 and digitally on CDs since the mid-'80s,

19    and I hope that all of that testimony that you'll hear may

20    help you when you write your fuller decision.

21         THE COURT:  Okay.  Yes, counsel.

22         MR. REYNOLDS:  Yes, I have a few issues.  One,

23    with respect to the access to the Internet, we still do not

24    have any indication from the defendant as to what is

25    proposed, what is going to be shown.  We would ask that a

# EXHIBIT I

EXHIBIT

#4 Tenenbaum

9/24/08

NOV 2 1 2005

1021 Dulaney Valley Rd
Baltimore, MD 21204

Attorneys at Law
2555 Grand Blvd.
Kansas City, MO 64108-2613

Re: Proposed Litigation

Dear Sir or Ma'am:



While I do not have access to the computer at college, I will be home on November 22nd.
If there are any files existing in violation of copyrights, I will destroy them at that time.

Very truly yours,

Joel Tenenbaum

EXHIBIT 23

07-CV-11446-NG

# EXHIBIT J

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| CAPITOL RECORDS, INC., et al., )<br>　　　　　Plaintiffs, )<br>　　　　　　　　　　　)<br>　　　　　　v.　　　　　)<br>NOOR ALAUJAN, )<br>　　　　　Defendant. )<br>　　　　　　　　　　　) | Civ. Act. No. 03-cv-11661-NG<br>(LEAD DOCKET NUMBER) |

|  |  |
|---|---|
| SONY BMG MUSIC ENTERTAINMENT, )<br>et al.,　　　　　Plaintiffs, )<br>　　　　　　　　　　　)<br>　　v.　　　　　　　　)<br>JOEL TENENBAUM, )<br>　　　　　Defendant. )<br>　　　　　　　　　　　) | Civ. Act. No. 07-cv-11446-NG<br>(ORIGINAL DOCKET NUMBER) |

## JOINT STIPULATION RE SETTLEMENT NEGOTIATIONS

For all purposes in this matter, the parties stipulate that there were settlement negotiations

and that they failed.

DATED:  July 31, 2009.



AGREED AND STIPULATED TO BY:

SONY BMG MUSIC
ENTERTAINMENT; WARNER BROS.          JOEL TENENBAUM
RECORDS INC.; ATLANTIC
RECORDING CORPORATION;
ARISTA RECORDS LLC; and UMG
RECORDINGS, INC.

By their attorneys,                          By his attorneys,

_____      _____
Timothy M. Reynolds (pro hac vice)          Charles Nesson
Eve G. Burton (pro hac vice)                Harvard Law School
Laurie J. Rust (pro have vice)              1575 Massachusetts Ave.
HOLME ROBERTS & OWEN LLP                    Cambridge, MA 02138
1700 Lincoln, Suite 4100                    Telephone: (617) 495-4609
Denver, CO 80203
Telephone: (303) 861-7000
Facsimile: (303) 866-0200                   Matthew H. Feinberg
Email: eve.burton@hro.com                   Matthew Kamholtz
                                            FEINBERG & KAMHOLTZ
                                            125 Summer Street
Matthew J. Oppenheim (pro hac vice)         Boston, MA 02110-1621
THE OPPENHEIM GROUP                         Telephone: (617) 526-0700
7304 River Falls Drive
Potomac, MD 20854
Telephone: (301) 299-4986                   ATTORNEYS FOR DEFENDANT
Facsimile: (866) 766-1678
Email: matt@oppenheimgroup.net

Daniel J. Cloherty
DWYER & COLLORA, LLP
600 Atlantic Avenue - 12th Floor
Boston, MA 02210-2211
Telephone: (617) 371-1000
Facsimile: (617) 371-1037
dcloherty@dwyercollora.com

ATTORNEYS FOR PLAINTIFFS

# EXHIBIT K

8-14 Nimmer on Copyright B

Nimmer on Copyright

Copyright 2009, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

**APPENDIX 14** Register's Report on the General Revision of the U.S. Copyright Law (1961)
[99] Chapter IX
[101] CHAPTER IX REMEDIES FOR INFRINGEMENT

8-14 Nimmer on Copyright B

## § B   Damages and Profits  n1

### 1. actual damages and profits

#### a.   In general

Liability of a wrongdoer for the actual damages suffered by the injured person is a traditional remedy for civil wrongs generally. Actual damages have been one of the remedies for copyright infringement since the first U.S. copyright statute of 1790.

Liability for the profits derived from a wrongful act has also been recognized as a remedy for civil wrongs. The wrongdoer's profits may sometimes be a measure of the damages suffered by the injured person, or they may be awarded to prevent unjust enrichment. Liability for the profits from a copyright infringement was first specified in the act of 1909, but had been imposed by the courts in some earlier cases.

#### b.   Damages and profits as cumulative or alternative remedies

Under the present law there is some question as to whether the copyright owner is entitled to recover both his damages and the in **[102]** fringer's profits cumulatively, in cases where the profits are more than a measure of the damages. The language of section 101(b) would seem to indicate so. However, the 1909 congressional committee reports (H. Rept. No. 2222, S. Rept. No. 1108, 60th Cong., 2d sess.) show that the intention was to allow the plaintiff to recover either his damages or the infringer's profits, whichever is greater. The few court decisions on this question do not seem to have settled the issue.

We believe the more equitable rule is that under which damages and profits are not cumulative. The statute should be clarified to provide for recovery of either damages or profits, whichever of the two is larger.

#### c.   Problems in awarding profits

In regard to the infringer's profits, the statute now provides that the plaintiff must prove "sales" only, and that the defendant must prove all the elements of cost to be deducted. This provision seems sound in principle. However, since many infringements do not involve "sales," a broader term such as "gross revenue" should be used.

The courts have sometimes had difficulty in determining the elements that are properly deductible as costs. This seems essentially a problem of accounting inherent in the situation and not peculiar to copyright cases. We believe it would be impracticable to attempt any statutory specification of deductible costs.

Another question has arisen as to whether profits are to be apportioned where the infringer has used copyrighted and other materials together. The statute now refers to "all the profits * * * made from such infringement." In some of the earlier decisions the courts said that the infringer is liable to pay over all his profits without apportionment. But more recently the courts have construed the statutory language as meaning only the profits attributable to the infringing use of the copyrighted work, and have apportioned profits accordingly. We believe the statute should be clarified in accordance with these recent decisions, to permit the courts to apportion profits when they find it appropriate to do so.

## 2. statutory damages

### a.  The principle of statutory damages

Statutory damages--stated amounts for which an infringer may be held liable as an alternative to actual damages--have been a feature of the U.S. copyright statutes since 1790. The need for this special remedy arises from the acknowledged inadequacy of actual damages and profits in many cases:

● The value of a copyright is, but its nature, difficult to establish, and the loss caused by an infringement is equally hard to determine. As a result, actual damages are often conjectural, and may be impossible or prohibitively expensive to prove.

● In many cases, especially those involving public performances, the only direct loss that could be proven is the amount of a license fee. An award of such an amount would be an invitation to infringe with no risk of loss to the infringer.

● The actual damages capable of proof are often less than the cost to the copyright owner of detecting and investigating infringements.

**[103]**

● An award of the infringer's profits would often be equally inadequate. There may have been little or no profit, or it may be impossible to compute the amount of profits attributable to the infringement. Frequently the infringer's profits will not be an adequate measure of the injury caused to the copyright owner.

In sum, statutory damages are intended (1) to assure adequate compensation to the copyright owner for his injury, and (2) to deter infringement. A stated minimum amount is to be awarded in any case, and the court may award more, up to a stated maximum, where it considers that the actual damages or profits capable of proof would be inadequate for those purposes. In principle, statutory damages are similar to the liquidated damages frequently provided in contracts, or to statutory amounts specified as damages in various statutes dealing with civil wrongs, such as wrongful death, workmen's compensation, and antidiscrimination laws.

The principle of statutory damages for copyright infringement appears to be acceptable generally to the interested groups. There is considerable sentiment, however, for changing some of the features of the present provisions. The points in issue will be considered below.


*b.   When statutory damages are awarded*

With certain exceptions to be noted later, the amount of statutory damages that may be awarded ranges from $250 to $5,000. Within that range the court has discretion to award the sum it considers just, whenever that sum exceeds the actual damages and profits. Thus:


  • If actual damages and profits are both less than $250, the court must award at least $250 and may in its discretion award a higher sum up to $5,000.


  • If actual damages or profits are proven in some amount between $250 and $5,000, the court in its discretion may award either the proven amount or any higher sum up to $5,000.


  • If actual damages or profits are proven in excess of $5,000, the court will award the proven amount. Statutory damages are not applicable in this case.


*c.   Mandatory minimum; innocent infringers*

In any case the court must award at least $250. The representatives of various groups of copyright owners--authors, book and music publishers, motion picture producers, etc.-- have stressed the vital importance to the copyright owner of a mandatory minimum. They argue that a minimum amount is essential to assure the recovery of enough to warrant the expense of detecting infringements, to compensate the owner for his loss, and to deter infringement.

On behalf of certain users of copyright materials--broadcasters, periodical publishers, motion picture exhibitors, etc.--it has been argued that the minimum of $250 can bear too heavily on innocent infringers. In a few cases where the defendant infringed unwittingly, the courts have expressed regret at being compelled to award the statutory minimum. It has been suggested that as against innocent infringers, the mandatory minimum should be eliminated or reduced.n2

[104] The present statute reflects a concern for the impact of statutory damages on innocent infringers, in providing three exceptions to the ordinary minimum and maximum amounts:

- Section 101(b) specifies statutory damages of from $50 to $200 for newspaper reproductions of copyrighted photographs.

- Section 101(b) also provides maximum statutory damages of $100 for innocent infringement of nondramatic works in motion pictures.

- Section 1(c) provides for damages of not more than $100 for innocent infringement of nondramatic literary works in broadcasts.

These three exceptions do not absolve innocent infringers from liability for damages, but merely reduce the amount recoverable. If special treatment is justified in these three cases, however, it would seem equally justified in a variety of other situations involving innocent infringement.

The basic principle that an innocent infringer is liable, except where he has been misled through some act or omission of the copyright owner, is firmly established in the copyright law. As between an innocent copyright owner and an innocent infringer, it has generally been agreed that the loss caused by the infringement should be borne by the latter. The question is not whether innocent infringers should be liable; it is whether they should be subject to some minimum amount of damages and, if so, what the minimum should be.

The only purpose of awarding damages for an innocent infringement is to compensate the copyright owner. The other purpose of statutory damages--to deter infringement--is not present as to infringements committed innocently. Statutory damages may still be appropriate in many cases to compensate the copyright owner adequately, but a mandatory minimum of $250 might be excessive in some instances.

We would not attempt to fix special amounts of statutory damages recoverable against innocent infringers, either generally or in specified situations. Rather, we would provide that where an infringer establishes his innocence, the statutory minimum is not mandatory but the court, in its discretion, may award statutory damages in any amount it deems just. Since a plea of innocence may be used as a cloak for negligence and may be difficult to disprove, the infringer should have the burden of proving his innocence.

With the removal of the mandatory minimum as to innocent infringements generally, the three special exceptions in the present statute could be eliminated.

d.  *Multiple infringements*

Another question involves the sum that might be awarded as statutory damages if a single series of events is held to constitute a number of infringements. For example, the production of an infringing motion picture and each of its many exhibitions might be deemed separate infringements. The same is true of an infringing network broadcast and its relay by each of many local stations. The motion picture and broadcasting industries have expressed some concern that statutory damages might be pyramided to an exorbitant total if a court should multiply the statutory minimum by the number of infringements.

[105] We believe that the danger of exorbitant awards in multiple infringement cases is more theoretical than real. In a few cases involving multiple infringements--e.g., where various items in a copyrighted merchandise catalog were reproduced in a series of infringing catalogs--the courts have used this formula of multiplying the number of infringements by $250, but they did so to reach a result they thought just. We know of no case in which the court has felt constrained to use this formula where the resulting total was considered excessive. The present statute, however, is not clear on this point. It is conceivable that a court might construe the statute as requiring the use of this formula in multiple-infringement cases.

We believe that the courts should, as they do not, have discretion to assess statutory damages in any sum within the range between the minimum and maximum. In exercising this discretion the courts may take into account the number of works infringed, the number of infringing acts, the size of the audience reached by the infringements, etc. But in no case should the courts be compelled, because multiple infringements are involved, to award more than they consider reasonable.

We propose that the statute be clarified and made more flexible. It should provide that statutory damages within the minimum and maximum range are to be assessed as the total award for all infringements for which the defendant is liable. The maximum should be sufficiently high to enable the court to award an adequate sum for multiple infringements.

Section 101(b) now provides specially for one case of multiple infringements. It specifies that the total sum of statutory damages recoverable when a motion picture innocently infringes a dramatic work shall be within the range of $250 to $5,000. Our proposal would extend the same principle to all multiple infringements. The special provision could then be dropped.

### e. Infringements after actual notice

Section 101(b) now permits the court to exceed the $5,000 maximum, with no limit specified, in the case of "infringements occurring after the actual notice to a defendant, either by service of process in a suit or other written notice served upon him." Some fear has been expressed that this might result in exorbitant awards.

This provision was apparently based on the supposition that any infringement occurring after actual notice would necessarily be willful. But this supposition is questionable. For example, a television network may receive a notice alleging infringement on the eve of a scheduled broadcast when it is too late to defer the program pending an investigation of the claim. Likewise a periodical publisher may receive a notice when an issue is about to be distributed.

The possibility that a court, in its discretion, might award statutory damages greatly exceeding the usual maximum, merely because a notice had been sent, seems remote. In the very few cases where statutory damages of more than $5,000 were awarded, other factors such as willful infringement on a large scale were involved. Nevertheless, we believe the statute is faulty in making the service of notice the basis for exceeding the maximum. A better basis which was proposed in some of the revision bills of 1924-40, would be a showing that the infringement was willful.

[106] We believe, however, that a still better solution was proposed in some of the other revision bills. They would have made the maximum--raised to $10,000 or $20,000--an absolute ceiling, with no special provision for infringements committed after notice or willfully. This would

allow the court to take willfulness into account in awarding statutory damages up to the maximum. We favor this approach.

The absolute maximum for statutory damages would not, of course, preclude the recovery of a larger sum of actual damages or profits if proven.

### f.  Minimum and maximum amounts

The present minimum of $250 and maximum of $5,000 were adopted in 1909. With the depreciation in the value of the currency, those amounts now represent much less than they did then. Some commentators have suggested that these amounts should therefore be raised. Others have suggested, apparently with innocent infringers in mind, that the minimum should be reduced.

In view of our proposal that the minimum not be mandatory against innocent infringers, we see no reason to reduce the present minimum of $250. An award of that amount does not seem unduly severe; anything less would often be inadequate to enable the copyright owner to enforce his rights, and to foster due care by others not to infringe. On the other hand, despite the decreased value of the dollar, the present minimum seems to be enough for these purposes. The court may award more when it considers the minimum inadequate. We would retain the present minimum of $250.

In regard to the maximum, the depreciated value of the dollar seems more significant. In any case where an award of $5,000 would have been appropriate some years ago, an award of $10,000 would be justified now. Any award of more than the minimum is within the court's discretion. And in the light of our proposals to make the maximum an absolute ceiling, even for multiple and willful infringements, we would allow the courts to make awards up to $10,000 as they deem just in the circumstances.

### g.  Schedule of amounts per copy or performance

Section 101(b) now contains a schedule of amounts for each infringing copy or performance, the amounts varying for different kinds of works. It is understood that this schedule is a mere guide that the courts might use, in their discretion, in fixing the sum to be awarded as statutory damages within the present range between $250 and $5,000.

The schedule has not proved to be a very useful guide, because the amounts are arbitrary and the number of copies or performances is only one of many factors to be considered in assessing damages. In most cases the courts have not applied the mathematical formula of the schedule, and in a few cases where this has been done the results are questionable. To some extent the fear of excessive awards under the present statute is founded on the possibility of a merely mathematical application of the schedule.

The schedule adds a needless complication to the scheme of statutory damages. We would omit it.

[107] 3. recommendations

(*a.*) The present provisions of section 101(b) regarding actual damages and profits should be clarified to provide that--

(1) An infringer is liable for the actual damages suffered by the copyright owner, or the profits of the infringer attributable to the infringement, whichever is greater.

(2) In establishing profits, the plaintiff is required to prove only "gross revenue," rather than "sales." The defendant should continue to have the burden of proving deductions.

*b.* The present provisions of section 101(b) regarding statutory damages should be modified to provide that--

(1) Where an award of actual damages or profits would be less than $250, the court shall award instead, as statutory damages for all infringements for which the defendant is liable, a sum of not less than $250 nor more than $10,000, as it deems just. However, if the defendant proves that he did not know and had no reason to suspect that he was infringing, the court may, in its discretion, withhold statutory damages or award less than $250.

(2) Where an award of actual damages or profits would exceed $250 but would be less than the court deems just, the court in its discretion may award instead, as statutory damages for all infringements for which the defendant is liable, any higher sum not exceeding $10,000.

*c.* The following provisions of the present statute should be omitted:

(1) The provisions in sections 101(b) and 1(c) fixing special amounts of damages in certain cases.

(2) The provision in section 101(b) for statutory damages in excess of the maximum where notice has been served on the infringer.

(3) The schedule of amounts per copy or performance in section 101(b).

**FOOTNOTES:**
(n380)Footnote 1.  See "Copyright Law Revision Studies Nos. 22 and 23" (Senate committee print).

(n381)Footnote 2.  As to the liability of innocent infringers, see "Copyright Law Revision Study No. 25" (Senate committee print).

EXHIBIT L



2 of 2 DOCUMENTS

Copyright 1999 Congressional Information Service, Inc.
COMMITTEE REPORTS

106th Congress, 1st Session

House Report **106-216**

106 H. Rpt. 216

COPYRIGHT DAMAGES IMPROVEMENT ACT OF 1999 R E P O R T

**DATE:** July 1, 1999. Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

**NOTICE:** [A> UPPERCASE TEXT WITHIN THESE SYMBOLS IS ADDED <A]
[D> Text within these symbols is deleted <D]

**SPONSOR:** Mr. Coble submitted the following together with G7XXX VIEWS

**COMMITTEE:** From the Committee on the Judiciary

REPORT
(To accompany H.R. 1761) Retrieve bill tracking report  Retrieve full text version

**TEXT:**

The Committee on the Judiciary, to whom was referred the bill (H.R. 1761) to amend provisions of title 17, United States Code, having considered the same, reports favorably thereon with an amendment and recommends that the bill as amended do pass.

TABLE OF CONTENTS

Page The Amendment

Purpose and Summary Background and Need for the Legislation

Hearings Committee Consideration

Committee on Government Reform Findings New Budget Authority and Tax Expenditures

Congressional Budget Office Cost Estimate Constitutional Authority Statement

Section-by-Section Analysis Changes in Existing Law Made by the Bill, as Reported

Additional/Minority/Dissenting Views

The amendment is as follows:

SECTION 1. SHORT TITLE.

This Act may be cited as the "Copyright Damages Improvement Act of 1999".

SEC. 2. STATUTORY DAMAGES ENHANCEMENT.

Section 504(c) of title 17, United States Code, is amended

(1) in paragraph (1)

(A) by striking "$500" and inserting "$750"; and

(B) by striking "$20,000" and inserting "$30,000"; and

(2) in paragraph (2)

(A) by inserting "(A)" after "(2)";

(B) by striking "$100,000" and inserting "$300,000";

(C) by inserting after the second sentence the following:

"(B) In a case where the copyright owner demonstrates that the infringement was part of a repeated pattern or practice of infringement, the court may increase the award of statutory damages to a sum of not more than $250,000 per work."; and

(D) by striking "The court shall remit statutory damages" and inserting the following:

"(C) The court shall remit statutory damages".

SEC. 3. SENTENCING COMMISSION GUIDELINES.

Section 2(g) of the No Electronic Theft (NET) Act (28 U.S.C. 994 note) is amended by striking paragraph (2) and inserting the following:

"(2) In implementing paragraph (1), the Sentencing Commission shall amend the guideline applicable to criminal infringement of a copyright or trademark to provide an enhancement based upon the retail price of the legitimate items that are infringed upon and the quantity of the infringing items. To the extent the conduct involves a violation of section 2319A of title 18, United States Code, the enhancement shall be based upon the retail price of the infringing items and the quantity of the infringing items.

"(A) the first day occurring after May 20, 1999, or

"(B) the first day after the date of the enactment of this paragraph, on which sufficient members of the Sentencing Commission have been confirmed to constitute a quorum.

Purpose and Summary

The purpose of H.R. 1761 is to provide more stringent deterrents to copyright infringement and stronger enforcement of the laws enacted to protect intellectual property rights. H.R. 1761 accomplishes this by increasing the statutory penalties in the Copyright Act for copyright infringement, creating a new statutory penalty for situations where infringement is part of a "repeated pattern or practice" of infringement, and clarifying Congress' intent that the United States Sentencing Commission ensure that the sentencing guideline for intellectual property offenses provide for consideration of the retail price of the legitimate infringed-upon item and the quantity of infringing items in order to make the guideline sufficiently stringent to deter such crime.

Background and Need for the Legislation

Section 106 of the Copyright Act (Title 17 of the U.S. Code) gives the owner of a copyright the " . . . exclusive rights . . . to reproduce . . . (and) distribute copies of . . . the copyrighted work. . . . " An individual who violates any of these exclusive rights is an infringer, and may be subject to civil and criminal penalties set forth in Chapter 5 of the Act and section 2319 of Title 18.

Notwithstanding these penalties, copyright piracy of intellectual property flourishes, assisted in large part by today's world of advanced technologies. For example, industry groups estimate that counterfeiting and piracy of computer software cost the affected copyright holders more than $11 billion last year (others believe the figure is closer to $20 billion). In some countries, software piracy rates are as high as 97% of all sales. The U.S. rate is far lower (25%), but the dollar losses ($2.9 billion) are the highest worldwide. The effect of this volume of theft is substantial: lost U.S. jobs, lost wages, lower tax revenue, and higher prices for honest purchasers of copyrighted software.

1999 Committee Reports, July 1, 1999

Unfortunately, the potential for this problem to worsen is great. By the turn of the century the Internet is projected to have more than 200 million users, and the development of new technology will create additional incentive for copyright thieves to steal protected works. The advent of digital video discs, for example, will enable individuals to store far more material than on conventional discs and, at the same time, produce perfect secondhand copies. As long as the relevant technology evolves in this way, more piracy will ensue. Many computer users are either ignorant that copyright laws apply to Internet activity, or they simply believe that they will not be caught or prosecuted for their conduct. Also, many infringers do not consider the current copyright infringement penalties a real threat and continue infringing, even after a copyright owner puts them on notice that their actions constitute infringement and that they should stop the activity or face legal action. In light of this disturbing trend, it is manifest that Congress respond appropriately with updated penalties to dissuade such conduct. H.R. 1761 increases copyright penalties to have a significant deterrent effect on copyright infringement.

Notwithstanding the statutory penalties for copyright infringement, enforcement of those penalties has been minimal. During the first session of the 105th Congress, H.R. 2265, the "No Electronic Theft Act" (NET Act) was enacted into law. (n1) The NET Act reversed the practical consequences of United States v. LaMacchia, 871 F. Supp. 535 (D. Mass. 1994), by criminalizing computer theft of copyrighted works, whether or not the defendant derives a direct financial benefit from the act(s) of misappropriation. However, since the enactment of the NET Act in December 1997, there have been no prosecutions brought by the Department of Justice under the Act. This is important because in order to be successful in the battle against Internet piracy not only must Congress enact legislation giving legal recourse to copyright owners but those laws must be implemented by the appropriate law enforcement agencies.

(n1)Pub. L. No. 105-47 (December 16, 1997.)

In May 1999, during hearings on enforcement of the NET Act, representatives of the Department of Justice and the copyright industries testified that the current sentencing guideline because it is based solely on the value of the infringing items significantly underrepresents the degree of economic harm inflicted by copyright and trademark crimes.

Sentences for the offenses of criminal copyright infringement and trademark counterfeiting are governed by a sentencing guideline designated as Section(s) 2B5.3 of the United States Sentencing Commission Guidelines Manual. This guideline sets a Base Offense Level of 6, the same as for fraud or theft offenses involving a loss between $1,000 and $2,000. The guideline also establishes, as the sole aggravating "Specific Offense Characteristic," that if "the retail value of the infringing items exceeded $2,000," then the base level is to be increased by the corresponding number of levels from the monetary loss table in the sentencing guideline for fraud offenses.

The witnesses from the Department of Justice and the copyright industries testified that the sentences imposed under this guideline are too low to deter individuals from trademark counterfeiting and copyright piracy; indeed, according to the Sentencing Commission, approximately 45 percent of intellectual property offenders receive a sentence of probation without any requirement of confinement. Department of Justice officials reported that these low sentences operate as a disincentive for the federal government to commit resources to investigating and prosecuting intellectual property cases, and that few prosecutions and low sentences for those cases that are prosecuted have contributed to the perception of intellectual property crime as a high profit, low risk venture.

In a further attempt to resolve this problem, H.R. 1761 clarifies how Congress intends for the Sentencing Commission to implement the NET Act to provide sufficiently stringent sentencing guidelines to deter intellectual property crime. It is vital that the United States recognizes intellectual property rights and provides strong protection and enforcement against violations of those rights. Federal law enforcement must be armed with effective tools with which to combat this problem. By doing that, the United States will protect its valuable intellectual property and encourage other countries to enact and enforce strong copyright protection laws.

Hearings

The Committee's Subcommittee on Courts and Intellectual Property held a hearing on H.R. 1761 on May 12, 1999. Testimony was received from Kevin V. DiGregory, Deputy Assistant Attorney General, Computer Crimes Division, U.S. Department of Justice; Timothy B. McGrath, Interim Staff Director, U.S. Sentencing Commission; Batur Oktay, Corporate Counsel, Adobe Systems, Inc., on behalf of the Business Software Alliance (BSA); Tim Starback, Emigre, Inc., on behalf of the Software and Information Industry Association (SIIA); and Tod Cohen, Vice President and Counsel, New Technology, Motion Picture Association of America (MPAA).

Committee Consideration

On May 20, 1999, the Subcommittee on Courts and Intellectual Property met in open session and ordered favorably reported the bill H.R. 1761, as amended, by a voice vote, a quorum being present. On May 26, 1999, the Committee met in open session and ordered favorably reported the bill H.R. 1761 with an amendment in the nature of a substitute by voice vote, a quorum being present.

Committee on Government Reform Findings

No findings or recommendations of the Committee on Government Reform were received as referred to in clause 3(c)(4) of Rule XIII of the Rules of the House of Representatives.

New Budget Authority and Tax Expenditures

Clause 3(c)(2) of House Rule XIII is inapplicable because this legislation does not provide new budget authority or increased tax expenditures.

Congressional Budget Office Cost Estimate

In compliance with clause 3(c)(3) of Rule XIII of the Rules of the House of Representatives, the Committee sets forth, with respect to the bill, H.R. 1761, the following estimate and comparison prepared by the Director of the Congressional Budget Office under section 403 of the Congressional Budget Act of 1974:

U.S. Congress, Congressional Budget Office,

Washington, DC, June 7, 1999.

Hon. Henry J. Hyde, Chairman, Committee on the Judiciary,

House of Representatives, Washington, DC.

Dear Mr. Chairman: The Congressional Budget Office has prepared the enclosed cost estimate for H.R. 1761, the Copyright Damages Improvement Act of 1999.

If you wish further details on this estimate, we will be pleased to provide them. The CBO staff contact is Mark Hadley, who can be reached at 226-2860.

Sincerely, Dan L. Crippen, Director.

H.R. 1761 Copyright Damages Improvement Act of 1999.

CBO estimates that enacting this bill would have no significant impact on the federal budget. H.R. 1761 would not affect direct spending or receipts; therefore, pay-as-you-go procedures would not apply. The bill contains no intergovernmental or private-sector mandates as defined in the Unfunded Mandates Reform Act and would not affect the budgets of state, local, or tribal governments.

Under current law, a copyright owner may choose to recover statutory damages for infringement rather than actual damages and lost profits. H.R. 1761 would increase statutory damages and establish new damages for cases in which the copyright owner demonstrates that the infringement was part of a repeated pattern or practice of infringement. Damages for copyright infringement are paid by one private party to another and thus do not affect the federal budget.

Under the No Electronic Theft Act (Public Law 105-147), when the United States Sentencing Commission establishes sentencing guidelines for cases of copyright infringement, the commission must consider the retail value and the quantity of the items. H.R. 1761 would clarify that in most cases the commission must consider the retail value of the legitimate items rather than the value of the infringing items. If the commission elects to enhance prison sentences for copyright infringement, federal costs would rise, subject to the availability of appropriations, to accommodate more prisoners. CBO expects that any increase in discretionary spending over the next five years is likely to be very small.

The CBO staff contact is Mark Hadley, who can be reached at 226-2860. This estimate was approved by Paul N. Van de Water, Assistant Director for Budget Analysis.

Constitutional Authority Statement

Pursuant to clause 3(d)(1) of the Rule XIII of the Rules of the House of Representatives, the Committee finds the authority for this legislation in Article I, section 8, clause 8 of the Constitution.

Section-by-Section Analysis

Sec. 1. Short Title.

This section states that H.R. 1761 may be cited as the "Copyright Damages Improvement Act of 1999".

Sec. 2. Statutory Damages Enhancement.

Section 2 makes a number of changes to existing statutory damage awards in section 504 of title 17, United States Code. The general purpose of the amendments is to strengthen the deterrent effect of statutory damages on copyright infringement. Copyrighted works are some of the United States' most valuable products. In a world of increasing global utilization and distribution of intellectual property, the United States must take the lead in establishing a legal regime that provides sufficient protection for copyrighted works and encourages other countries to follow suit. Current statutory damage levels were last adjusted in 1988 and do not take into account inflation in the intervening years, increased utilization of certain types of intellectual property, or current trends in global distribution and electronic commerce. Courts and juries must be able to render awards that deter others from infringing intellectual property rights. It is important that the cost of infringement substantially exceed the costs of compliance, so that persons who use or distribute intellectual property have a strong incentive to abide by the copyright laws.

The section makes a number of changes to section 504 of title 17, United States Code. First, section 504(c)(1) is amended to adjust the minimum statutory damage amount for "non-willful" infringement from $500 to $750. This change adjusts the minimum amount upward to reflect inflation over the past eleven years and to otherwise preserve the deterrent effect of the statutory damage penalties.

Second, section 504(c)(1) is amended to adjust the maximum statutory damage amount for "non-willful" infringement from $20,000 to $30,000. This change as well adjusts the maximum amount upward to reflect inflation over the past eleven years and to otherwise preserve the deterrent effect of the statutory damage penalties.

Third, section 504(c)(2) is amended by redesignating the first two sentences as subparagraph "(A)" and by increasing the maximum damage amount for willful infringement from $100,000 to $300,000. This substantial increase reflects not only intervening inflation but also the determination that increased global utilization and distribution of intellectual property and electronic commerce warrant enhanced deterrence in order to prevent copyright infringement. This higher damage amount is fully consistent with other intellectual property precedents. For example, maximum copyright statutory damages for certain violations of the "satellite compulsory license" are $250,000, (n2) and the maximum penalty for willful infringement of a trademark is $1 million. (n3) It should be noted that the minimum damage amount for a person or entity that shows that it was an "innocent infringer" has not been changed. Thus, in a case where the infringer sustains the burden of proving, and the court finds that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may continue to reduce the award of statutory damages to a sum of not less than $200.

(n2)17 U.S.C. Section(s) 119(a)(5)(B).


(n3)15 U.S.C. Section(s) 1117(c)(2).


Fourth, a new subparagraph (B) is added to section 504(c)(2) establishing a maximum statutory damage amount of $250,000 for situations where the infringement was part of a "repeated pattern or practice" of infringement. This provision conforms the statutory damage categories available for infringement of all rights protected by the Copyright Act to the "pattern or practice" infringement damages of up to $250,000 for violations of the public performance right in the context of the section 119 "satellite compulsory license."

In creating a new category of statutory damages for "repeated pattern or practice" infringement, the Committee is acting to address situations in which the infringing activity constitutes a course of conduct, not an isolated occurrence. A repeated pattern or practice of infringement is inherently more harmful to the rights of copyright holders and to the interests the copyright laws are designed to protect. Such a pattern or practice should therefore subject the infringer to a higher range of statutory damages than in the case of a single act of infringement. In some instances, persons who are determined to infringe are insufficiently deterred by a first brush with the copyright laws to cease their infringing activity. In other cases, persons engage in infringing activity over a period of time without being detected by the copyright owner. It is intended that these higher damage awards be made available in these and other circumstances where an in-

fringer's activities arise to a "pattern or practice," in order to bring greater deterrence to bear and to promote respect for the law and for the rights of creators and copyright owners.

Finally, a technical and conforming amendment is made to section 504(c)(2) by establishing a new subparagraph (C).

Sec. 3. Sentencing Commission Guidelines.

Section 3 amends section 2(g)(2) of the "No Electronic Theft Act" (NET Act), Pub. L. No. 105-147 (December 16, 1997). Section 2(g)(1) is a Directive to the Sentencing Commission. The Directive instructs the Commission to ensure that the applicable guideline range for intellectual property crimes be sufficiently stringent to deter such crimes. Section (2)(g)(2) instructs the Commission that in implementing paragraph (g)(1), the Commission must ensure that the guidelines provide for consideration of the retail value and quantity of the items with respect to which the crime against intellectual property was committed. Section 3 of H.R. 1761 amends paragraph (g)(2) to state: "In implementing paragraph (1), the Sentencing Commission shall amend the guideline applicable to criminal infringement of a copyright or trademark to provide an enhancement based upon the retail price of the legitimate items that are infringed upon and the quantity of the infringing items. To the extent the conduct involves a violation of section 2319A of title 18, United States Code, the enhancement shall be based upon the retail price of the infringing items."

H.R. 1761 makes no changes in paragraph (g)(1) of the NET Act Directive. The Committee's clear intent is that sentences for intellectual property crimes should be increased significantly from their present level. The amendment to paragraph (g)(2) reinforces the Committee's intent that the current guideline, with its reliance only on the value of the infringing item, should be replaced with a guideline based on the retail price of the infringed upon (legitimate) items and the quantity of the infringing items in cases arising under 18 U.S.C. 2318, 2319, and 2320. (n4) The Committee believes that the retail price of the legitimate items that are infringed upon (multiplied by the quantity of the infringing items) is a more accurate measure of the economic harm caused by these offenses than the measure used by the current guideline.

(n4)In Section(s) 2319A cases, the enhancement must be based on the retail value of the infringing item because there is no commercially-available, genuine counterpart for the types of unauthorized recordings of live musical performances which this section prohibits. If the criminal conduct did not occur for commercial purpose or private financial gain, the "retail price" should be determined from the price of comparable items.

There may be cases in which multiplying the retail price of the legitimate item by the quantity of infringing items may overstate the economic harm. For example, a defendant selling a counterfeit watch on a street corner for a small fraction of its normal selling price may not warrant a sentence based purely on multiplying the number of sales by the retail price of the legitimate watch. This Directive is not intended to preclude the Commission from developing a guideline that permits reasonable adjustments to the monetary calculation in this type of case, or that provides other appropriate adjustments, aggravating or mitigating, to sufficiently deter copyright and trademark offenses and to meet the other purposes of sentencing as set forth in section 3553(a) of title 18, United States Code. (n5) This does not change the fact that the Commission must abide by the Directive, and adopt a guideline that, overall, has the effect of increasing the sentences for violations of intellectual property crimes, whether involving copyrights or trademarks.

(n5)The Committee amended H.R. 1761 to take a broader approach than the version of the bill reported by the Subcommittee on Courts and Intellectual Property, which directed the Commission to use "the retail price of the infringed-upon goods and quantity of the items as the exclusive basis for determining the total retail value of those items." (Emphasis added).

Section 3 of H.R. 1761 also grants the Commission emergency amendment authority necessary to amend guideline Section(s) 2B5.3, regardless of established amendment cycles. Section 3 also imposes a deadline on the Commission to implement paragraph (2)(g) of "not later than 3 months after the later of (A) the first day occurring after May 20, 1999, or (B) the first day after the date of the enactment of this paragraph, on which sufficient members of the Sentencing Commission have been confirmed to constitute a quorum." The Committee believes that expeditious action is necessary given the magnitude of the growing problem of crimes against intellectual property.

Changes in Existing Law Made by the Bill, as Reported

In compliance with clause 3(e) of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italics, existing law in which no change is proposed is shown in roman):

SECTION 504 OF TITLE 17, UNITED STATES CODE

Section(s) 504. Remedies for infringement: Damages and profits

(a) * * *

* * * * * * *

(c) Statutory Damages.

(1) Except as provided by clause (2) of this subsection, the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than [D>$500<D] [A>$750<A] or more than [D>$20,000<D] [A>$30,000<A] as the court considers just. For the purposes of this subsection, all the parts of a compilation or derivative work constitute one work.

(2)[A>(A)<A] In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than [D>$100,000<D] [A>$300,000<A]. In a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200. [A>(B) IN A CASE WHERE THE COPYRIGHT OWNER DEMONSTRATES THAT THE INFRINGEMENT WAS PART OF A REPEATED PATTERN OR PRACTICE OF INFRINGEMENT, THE COURT MAY INCREASE THE AWARD OF STATUTORY DAMAGES TO A SUM OF NOT MORE THAN $250,000 PER WORK.<A] [D>The court shall remit statutory damages<D] [A>(C) THE COURT SHALL REMIT STATUTORY DAMAGES<A] in any case where an infringer believed and had reasonable grounds for believing that his or her use of the copyrighted work was a fair use under section 107, if the infringer was: (i) an employee or agent of a nonprofit educational institution, library, or archives acting within the scope of his or her employment who, or such institution, library, or archives itself, which infringed by reproducing the work in copies or phonorecords; or (ii) a public broadcasting entity which or a person who, as a regular part of the nonprofit activities of a public broadcasting entity (as defined in subsection (g) of section 118) infringed by performing a published nondramatic literary work or by reproducing a transmission program embodying a performance of such a work.

SECTION 2 OF THE NO ELECTRONIC THEFT ACT

SEC. 2. CRIMINAL INFRINGEMENT OF COPYRIGHTS.

(a) * * *

* * * * * * *

(g) Directive to Sentencing Commission. (1) * * *

[D>(2) In implementing paragraph (1), the Sentencing Commission shall ensure that the guidelines provide for consideration of the retail value and quantity of the items with respect to which the crime against intellectual property was committed.<D]

(2) In implementing paragraph (1), the Sentencing Commission shall amend the guideline applicable to criminal infringement of a copyright or trademark to provide an enhancement based upon the retail price of the legitimate items that are infringed upon and the quantity of the infringing items. To the extent the conduct involves a violation of section 2319A of title 18, United States Code, the enhancement shall be based upon the retail price of the infringing items and the quantity of the infringing items.

(A) the first day occurring after May 20, 1999, or

(B) the first day after the date of the enactment of this paragraph, on which sufficient members of the Sentencing Commission have been confirmed to constitute a quorum.

1999 Committee Reports, July 1, 1999

**SUBJECT:** COPYRIGHT (92%); COPYRIGHT LAW (91%); INTELLECTUAL PROPERTY LAW (91%); LEGIS-LATION (89%); SENTENCING (79%); NONPROFIT ORGANIZATIONS (59%); INTERNET & WWW (59%); LAW ENFORCEMENT (59%); LITIGATION (59%); BUDGET (59%); TESTIMONY (59%); DAMAGES (59%); SETTLEMENTS & DECISIONS (59%); US FEDERAL GOVERNMENT (59%); DECISIONS & RULINGS (59%); GOVERNMENT BUDGETS (59%); PUBLIC BROADCASTING (59%); TRADEMARK LAW (59%);

**LOAD-DATE:** July 8, 1999

# EXHIBIT M

1           UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MASSACHUSETTS

3   - - - - - - - - - - - - - - - - )

4   CAPITAL RECORDS, INC., ET AL.,   )   CV. NO. 03-11661-NG

5           PLAINTIFFS        )

6   VS.                       )   COURTROOM NO. 2

7   NOOR ALAUJAN, ET AL.,            )   1 COURTHOUSE WAY

8           DEFENDANTS        )   BOSTON, MA  02210

9   - - - - - - - - - - - - - - - -

10

11              JURY TRIAL DAY 5

12              JULY 31, 2009

13

14

15              9:10 A.M.

16    BEFORE THE HONORABLE NANCY GERTNER

17    UNITED STATES DISTRICT COURT JUDGE

18

19           VALERIE A. O'HARA

20         OFFICIAL COURT REPORTER

21

22

23

24

25

1          MR. NESSON:  And second, the point he makes about

2     this industry being hurt by the advent of an open connected

3     global network of peers makes sense.  Invention of the

4     peer-to-peer networks that blossomed with Napster radically

5     changed the business environment of recorded music.  It

6     required the recording industry to adjust and evolve.  It

7     was a new environment, but progress happens.  Progress

8     happens.  It is not the open peer-to-peer network that is

9     here on trial, it is Joel Tenenbaum.

10          The issue is not the damage that peer-to-peer

11     technology caused to this industry, it's what Joel did that

12     is here in issue and what's appropriate in response to what

13     Joel did.

14          Mr. Liebowitz spoke of property rights, property

15     rights in bits floating free in the open network of

16     cyberspace are weak because nothing prevents the bits from

17     being consumed except the law, law that has no fences to

18     help it, no safes, no locks, just the law.

19          Moreover, this is law that is to be taught to

20     children, children coming, growing up in a digital

21     environment.  They have to be taught this law.  Imagine the

22     parents' job in teaching a child this law.  Think of how

23     parents teach children.  You start with a young child.  The

24     first you try and teach a child is how to share.  Sharing is

25     one of the first principles we teach to our children, how to

1    doesn't want, the other 17 songs on the track, on the CD,

2    and it's then in a physical form which is not actually the

3    form he wants it in.  To be completely compatible, he wants

4    it in digital form.

5          The profit that the defendant reaped, if any,

6    and/or the expense that the defendant saved.  Well, you see

7    that factor, you have it.  The revenue lost by the plaintiff

8    as a result of the infringement.  Well, that we've heard has

9    two components.  One is just the same component we've just

10   reviewed, the money he would have spent had he been forced

11   to do it by the absence of the free alternative.  It results

12   in some money lost.

13         The other component is this imagined component of

14   Joel putting up a song, what in fact you understand now he

15   downloads the song, it automatically is shared by the KazaA

16   program, and the thought is that it's shared to millions of

17   people as if that act of sharing is what causes all the

18   damage.

19         But you recall the testimony very clear that these

20   were very popular songs, so that when someone went to KazaA

21   in 2004, there were many, many copies of these songs

22   available.  It's like those bits that I spread on the floor,

23   and when some new person goes to KazaA, it turns out that

24   there are loads of copies available.  The fact that one more

25   becomes available doesn't change anything.

1          The operative question before and after Joel

2     downloaded his song is can other people find the song

3     easily?  Yes, they could before, yes, they can after.  The

4     one additional copy that Joel adds to the sea of copies that

5     are available to be searched and downloaded doesn't really

6     add anything to the ease with which a user coming anew to

7     that environment will get a song.

8          So what I'm saying is that if you focus on the

9     revenue lost by the plaintiff by reason of the infringement

10    and you're focusing on what Joel did with these songs, I say

11    they lost no revenue.  I don't mean to -- I mean to separate

12    from that first category of the alternate going to the store

13    and paying for it, but the idea that Joel putting this in

14    his shared folder cost these companies money, when you look

15    at it closely, you can see it's just not true.

16         If it were a new song, brand new song that came

17    out so if you went to KazaA after it came out and searched

18    for it, you wouldn't find it, and Joel put that song up, if

19    he was the initial ripper, the seeder, the one who is at the

20    bottom of this cone, puts the first one up, then, yes, they

21    could say the millions that come after are all attributable

22    to that first seed.

23         That's what it grew from because the way it works

24    is once that seed is up and somebody comes and looks and

25    finds it and puts it in their shared folder, then there are

1          If you come to the last page of this down to 30

2     where the foreperson signs it and dates it, I would say to

3     you that justice is in the bottom line.  The question of

4     whether what you do in relationship to Joel is just depends

5     on the bottom line, the total number when you get down to

6     the bottom.

7          If that number is so large that it's

8     disproportionate to what Joel did, I'd say you haven't done

9     your job.  If that number is appropriate to what Joel did,

10    if you feel that that bottom line that you come to is just

11    and appropriate for what Joel did, then you are doing your

12    job as far as I'm concerned.

13         Now, you have the power to fill in these boxes.

14    You actually have the power not to fill in the boxes.  If

15    you don't --

16         MR. OPPENHEIM:  Objection, your Honor.

17         THE COURT:  I'll adjust with instructions.  Go on,

18    counsel.

19         MR. NESSON:  If you as an American jury charged

20    with the responsibility of being wise and just should decide

21    that you don't need to fill in any of these boxes, that's

22    within your power.

23         MR. OPPENHEIM:  Your Honor, it's totally

24    inappropriate.

25         THE COURT:  It is.  I'll address that shortly.

# EXHIBIT N



2 of 2 DOCUMENTS

Copyright 1997 Congressional Information Service, Inc.
Committee Reports

105th Congress; 1st Session

House Report **105-339**

105 H. Rpt. 339

NO ELECTRONIC THEFT (NET) ACT

**DATE:** October 23, 1997. Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

**SPONSOR:** Mr. Coble submitted the following

**COMMITTEE:** from the Committee on the Judiciary

(To accompany H.R. 2265)
(Including cost estimate of the Congressional Budget Office)

**TEXT:**

The Committee on the Judiciary, to whom was referred the bill (H.R. 2265) to amend the provisions of titles 17 and 18, United States Code, to provide greater copyright protection by amending criminal copyright infringement provisions, and for other purposes, having considered the same, reports favorably thereon with an amendment and recommends that the bill as amended do pass.

The amendment is as follows:

Strike out all after the enacting clause and insert in lieu thereof the following:

SECTION 1. SHORT TITLE.

This Act may be cited as the "No Electronic Theft (NET) Act".

SEC. 2. CRIMINAL INFRINGEMENT OF COPYRIGHTS.

(a) Definition of Financial Gain. Section 101 of title 17, United States Code, is amended by inserting after the undesignated paragraph relating to the term "display", the following new paragraph:

"The term inancial gain includes receipt, or expectation of receipt, of anything of value, including the receipt of other copyrighted works.".

(b) Criminal Offenses. Section 506(a) of title 17, United States Code, is amended to read as follows:

"(a) Criminal Infringement. Any person who infringes a copyright willfully either

"(1) for purposes of commercial advantage or private financial gain, or

"(2) by the reproduction or distribution, including by electronic means, during any 180-day period, of 1 or more copies or phonorecords of 1 or more copyrighted works, which have a total retail value of more than $1,000,

shall be punished as provided under section 2319 of title 18.".

(c) Limitation on Criminal Proceedings. Section 507(a) of title 17, United States Code, is amended by striking "three" and inserting "5".

(d) Criminal Infringement of a Copyright. Section 2319 of title 18, United States Code, is amended

(1) in subsection (a), by striking "subsection (b)" and inserting "subsections (b) and (c)";

(2) in subsection (b)

(A) in the matter preceding paragraph (1), by striking "subsection (a) of this section" and inserting "section 506(a)(1) of title 17"; and

(B) in paragraph (1)

(i) by inserting "including by electronic means," after "if the offense consists of the reproduction or distribution,"; and

(ii) by striking "with a retail value of more than $2,500" and inserting "which have a total retail value of more than $2,500"; and

(3) by redesignating subsection (c) as subsection (e) and inserting after subsection (b) the following:

"(c) Any person who commits an offense under section 506(a)(2) of title 17

"(1) shall be imprisoned not more than 3 years, or fined in the amount set forth in this title, or both, if the offense consists of the reproduction or distribution of 10 or more copies or phonorecords of 1 or more copyrighted works, which have a total retail value of $2,500 or more;

"(2) shall be imprisoned not more than 6 years, or fined in the amount set forth in this title, or both, if the offense is a second or subsequent offense under paragraph (1); and

"(3) shall be imprisoned not more than 1 year, or fined in the amount set forth in this title, or both, if the offense consists of the reproduction or distribution of 1 or more copies or phonorecords of 1 or more copyrighted works, which have a total retail value of more than $1,000.

"(d)(1) During preparation of the presentence report pursuant to Rule 32(c) of the Federal Rules of Criminal Procedure, victims of the offense shall be permitted to submit, and the probation officer shall receive, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim, including the estimated economic impact of the offense on that victim.

"(2) Persons permitted to submit victim impact statements shall include

"(A) producers and sellers of legitimate works affected by conduct involved in the offense;

"(B) holders of intellectual property rights in such works; and

"(C) the legal representatives of such producers, sellers, and holders.".

(e) Unauthorized Fixation and Trafficking of Live Musical Performances. Section 2319A of title 18, United States Code, is amended

(1) by redesignating subsections (d) and (e) as subsections (e) and (f), respectively; and

(2) by inserting after subsection (c) the following:

"(d) Victim Impact Statement. (1) During preparation of the presentence report pursuant to Rule 32(c) of the Federal Rules of Criminal Procedure, victims of the offense shall be permitted to submit, and the probation officer shall receive, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim, including the estimated economic impact of the offense on that victim.

"(2) Persons permitted to submit victim impact statements shall include

"(A) producers and sellers of legitimate works affected by conduct involved in the offense;

"(B) holders of intellectual property rights in such works; and

"(C) the legal representatives of such producers, sellers, and holders.".

(f) Trafficking in Counterfeit Goods or Services. Section 2320 of title 18, United States Code, is amended

(1) by redesignating subsections (d) and (e) as subsections (e) and (f), respectively; and

(2) by inserting after subsection (c) the following:

"(d)(1) During preparation of the presentence report pursuant to Rule 32(c) of the Federal Rules of Criminal Procedure, victims of the offense shall be permitted to submit, and the probation officer shall receive, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim, including the estimated economic impact of the offense on that victim.

"(2) Persons permitted to submit victim impact statements shall include

"(A) producers and sellers of legitimate goods or services affected by conduct involved in the offense;

"(B) holders of intellectual property rights in such goods or services; and

"(C) the legal representatives of such producers, sellers, and holders.".

(g) Directive to Sentencing Commission. (1) Under the authority of the Sentencing Reform Act of 1984 (Public Law 98-473; 98 Stat. 1987) and section 21 of the Sentencing Act of 1987 (Public Law 100-182; 101 Stat. 1271; 18 U.S.C. 994 note) (including the authority to amend the sentencing guidelines and policy statements), the United States Sentencing Commission shall ensure that the applicable guideline range for a defendant convicted of a crime against intellectual property (including offenses set forth at section 506(a) of title 17, United States Code, and sections 2319, 2319A, and 2320 of title 18, United States Code) is sufficiently stringent to deter such a crime and to adequately reflect the additional considerations set forth in paragraph (2) of this subsection.

(2) In implementing paragraph (1), the Sentencing Commission shall ensure that the guidelines provide for consideration of the retail value and quantity of the items with respect to which the crime against intellectual property was committed.

SEC. 3. INFRINGEMENT BY UNITED STATES.

Section 1498(b) of title 28, United States Code, is amended by striking "remedy of the owner of such copyright shall be by action" and inserting "action which may be brought for such infringement shall be an action by the copyright owner".

SEC. 4. CLARIFICATION OF LIABILITY FOR COPYRIGHT INFRINGEMENT.

Except as expressly provided in this Act, nothing in this Act or the amendments made by this Act modifies liability for copyright infringement, including the standard of willfulness for criminal infringement.

Purpose and Summary

The purpose of H.R. 2265, as amended, is to reverse the practical consequences of United States v. LaMacchia, 871 F. Supp. 535 (D. Mass. 1994) (hereinafter LaMacchia), which held, inter alia, that electronic piracy of copyrighted works may not be prosecuted under the federal wire fraud statute; and that criminal sanctions available under Titles 17 and 18 of the U.S. Code for copyright infringement do not apply in instances in which a defendant does not realize a commercial advantage or private financial gain.

Background and Need for Legislation

The Extent of Electronic Piracy

Section 106 of the Copyright Act (Title 17 of the U.S. Code) gives the owner of a copyright the . . . exclusive rights . . . to reproduce ". . . (and) distribute copies of . . . the copyrighted work. . . ." An individual who otherwise violates any of these exclusive rights is an infringer, and may be subject to criminal penalties set forth in Section 506 of the Act and section 2319 of Title 18. Current penalties include fines of $250,000 per individual ($500,000 per organization) and imprisonment of up to five years (10 years for second or subsequent offenses).

Notwithstanding these penalties, copyright piracy flourishes in the software world. Industry groups estimate that counterfeiting and piracy of intellectual property especially computer software, compact discs, and movies cost the affected copyright holders more than $11 billion last year (others believe the figure is closer to $20 billion). In some coun-

tries, software piracy rates are as high as 90% of all sales. The U.S. rate is far lower (27%), but the dollar losses ($2.3 billion) are the highest worldwide. The effect of this volume of theft is substantial: 130,000 lost U.S. jobs, $5.6 billion in corresponding lost wages, $1 billion in lower tax revenue, and higher prices for honest purchasers of copyrighted software.

Unfortunately, the potential for this problem to worsen is great. By the turn of the century the Internet is projected to have more than 200 million users, and the development of new technology will create additional incentive for copyright thieves to steal protected works. The advent of digital video discs, for example, will enable individuals to store far more material on conventional discs and, at the same time, produce perfect secondhand copies. The extension of an audio-compression technique, commonly referred to as MP-3, now permits infringers to transmit large volumes of CD-quality music over the Internet. As long as the relevant technology evolves in this way, more piracy will ensue. Many computer users are either ignorant that copyright laws apply to Internet activity, or they simply believe that they will not be caught or prosecuted for their conduct.

In light of this disturbing trend, it is manifest that Congress must respond appropriately with additional penalties to dissuade such conduct.

The La Macchia Case

Representative Goodlatte introduced H.R. 2265 on July 25, 1997. Chairman Coble, Ranking Member Frank, and Representative Cannon of the Subcommittee on Courts and Intellectual Property are cosponsors of the bill.

H.R. 2265 constitutes a legislative response to the LaMacchia case, in which the defendant, a graduate student attending MIT, encouraged lawful purchasers of copyrighted computer games and other software to upload these works via a special password to an electronic bulletin board on the Internet. The defendant then transferred the works to another electronic address and urged other persons with access to a second password to download the materials for personal use without authorization by or compensation to the copyright owners. The defendant never benefitted financially from any of these transactions.

A federal grand jury returned a one-count indictment against the defendant, charging him with violating a federal wire fraud statute (18 U.S.C. 1343). The Massachusetts district court dismissed the case, however, ruling that Congress never envisioned protecting copyrights under the wire fraud statute. The court further noted that criminal copyright infringement law, from its origin in the Copyright Act of 1897 through passage of the Copyright Felony Act of 1992, always required prosecutors to prove that a defendant acted willfully and for commercial advantage or private financial gain. LaMacchia, as noted, did not personally benefit from his conduct. In concluding dicta, the court observed that Congress has always tread cautiously and deliberately in amending the Copyright Act, especially when devising criminal penalties for infringement; and that it is Congresss prerogative to change the law if it wishes to criminalize LaMacchia-like behavior.

In effect, H.R. 2265 does just that: it criminalizes computer theft of copyrighted works, whether or not the defendant derives a direct financial benefit from the act(s) of misappropriation, thereby preventing such willful conduct from destroying businesses, especially small businesses, that depend on licensing agreements and royalties for survival.

Hearings

The Committees Subcommittee on Courts and Intellectual Property held an oversight hearing on electronic piracy of copyrighted works and a legislative hearing on H.R. 2265, the "No Electronic Theft (NET) Act," on September 11, 1997. Testimony was received from eight witnesses who, collectively, represented two government entities, two corporations, and four industry trade associations.

Committee Consideration

On September 30, 1997, the Subcommittee on Courts and Intellectual Property met in open session and ordered reported the bill, H.R. 2265, as amended, by voice vote, a quorum being present. On October 7, 1997, the Committee met in open session and ordered reported favorably the bill, H.R. 2265, with amendment by voice vote, a quorum being present.

Committee Oversight Findings

1997 Committee Reports, October 23, 1997

In compliance with clause 2(l)(3)(A) of rule XI of the Rules of the House of Representatives, the Committee reports that the findings and recommendations of the Committee, based on oversight activities under clause 2(b)(1) of rule X of the Rules of the House of Representatives, are incorporated in the descriptive portions of this report.

Committee on Government Reform and Oversight Findings

No findings or recommendations of the Committee on Government Reform and Oversight were received as referred to in clause 2(l)(3)(D) of rule XI of the Rules of the House of Representatives.

New Budget Authority and Tax Expenditures

Clause 2(l)(3)(B) of House Rule XI is inapplicable because this legislation does not provide new budget authority or increased tax expenditures.

Congressional Budget Office Cost Estimate

In compliance with clause 2(l)(3)(C) of rule XI of the Rules of the House of Representatives, the Committee sets forth,with respect to the bill, H.R. 2265, the following estimate and comparison prepared by the Director of the Congressional Budget Office under section 403 of the Congressional Budget Act of 1974:
 U.S. Congress,
 Congressional Budget Office,
 Washington, DC, October 16, 1997.
 Hon. Henry J. Hyde, Chairman,
 Committee on the Judiciary,
 House of Representatives, Washington, DC.

Dear Mr. Chairman: The Congressional Budget Office has prepared the enclosed cost estimate for H.R. 2265, the No Electronic Theft (NET) Act.

If you wish further details on this estimate, we will be pleased to provide them. The CBO staff contact is Rachel Forward (for federal costs), who can be reached at 226-2860, and Alyssa Trzeszkowski (for revenues), who can be reached at 226-2720.

Sincerely,
 June E. ONeill, Director.

Enclosure.

H.R. 2265 No Electronic Theft (NET) Act

CBO estimates that enacting H.R. 2265 would not result in any significant net costs to the federal government. The bill would affect direct spending and receipts through the imposition of criminal fines and the resulting spending from the Crime Victims Fund. Therefore, pay-as-you-go procedures would apply. CBO estimates, however, that the amounts of additional direct spending and receipts would not be significant. H.R. 2265 contains no intergovernmental or private-sector mandates as defined in the Unfunded Mandates Reform Act of 1995 and would not affect the budgets of state, local, or tribal governments.

H.R. 2265 would establish criminal fines and penalties for reproducing and distributing copyrighted works by electronic means even if the perpetrator does not benefit financially from the theft. Based on information from the Department of Justice (DOJ), CBO expects that enacting this bill would enable DOJ to prosecute several additional copyright infringement cases each year. Because DOJ may prosecute certain criminal cases that would not be tried under current law, enacting H.R. 2265 could result in additional costs for federal prosecutors and the federal court system, subject to the availability of appropriated funds. CBO, however, expects that any additional discretionary costs would not be significant.

Depending on whether DOJ wins a case, the fine assessed for each case could range from about $25,000 to $50,000 of more. Any collections from such fines are recorded on the budget as governmental receipts (revenues). They are deposited in the Crime Victims Fund and spent the following year. Because any increase in direct spending under H.R. 2265 would be the same as the amount collected with a one-year lag, the additional direct spending would be negligible.

H.R. 2265 also would extend from three years to five years the statute of limitations on criminal proceedings brought under the Copyright Act and would permit victims of copyright infringement to submit information on the

damages caused by the infringement during the sentencing phase of the infringers trial. CBO estimates that these provisions would not have any budgetary impact.

The CBO staff contacts for this estimate are Rachel Forward (for federal costs), who can be reached at 226-2860, and Alyssa Trzeszkowski (for revenues), who can be reached at 226-2720. This estimate was approved by Robert A. Sunshine, Deputy Assistant Director for Budget Analysis.

Constitutional Authority Statement

Pursuant to Rule XI, clause 2(l)(4) of the Rule of the House of Representatives, the Committee finds the authority for this legislation in Article I, clause 8, section 8 of the Constitution.

Section-by-Section Analysis and Discussion

Section 1 Short Title

The short title of the legislation is the "No Electronic Theft (NET) Act."

Section 2 Changes to Titles 17 and 18 of the U.S. Code

"Financial Gain" Defined

The bill amends the term "financial gain" as used in the Copyright Act to include "receipt, or expectation of receipt, of anything of value, including the receipt of other copyrighted works. " This revision, set forth in Section 2(a) of H.R. 2265, will enable authorities to prosecute someone like LaMacchia who steals or helps others to steal copyrighted works but who otherwise does not profit financially from the theft. In addition, the en bloc amendment adopted by the Subcommittee added the phrase "expectation of receipt" to the bill as drafted in deference to a suggestion by a subcommittee witness who testified that it is difficult, if not impossible, to prove that money has changed hands when the Department of Justice raids a duplicating laboratory or warehouse to seize pirated works.

Phonorecords, Other Copyrighted Works, and Related Infringement

Under the amended bills rewording of Section 506(a) of the Copyright Act,

(a)ny person who infringes a copyright willfully either (1) for purposes of commercial advantage or private financial gain; or (2) by the reproduction or distribution, including by electronic means, during any 180-day period, of 1 or more copies or phonorecords of 1 or more copyrighted works with a total retail value of more than $1,000, shall be punished as provided under Section 2319 of Title 18.

The Copyright Office recommended that the Subcommittee codify the threshold limits of Paragraph (2), id., governing time periods, number of copies misappropriated, and their retail value under Title 17 rather than Title 18. This change was incorporated in the Subcommittee en bloc amendment and remains a part of the bill.

In addition, the full Committee, as part of its en bloc amendment, revised the misdemeanor threshold under the bill. Pursuant to this change, a misdemeanor is defined as an offense in which an individual reproduces or distributes one or more copies or phonorecords of one or more copyrighted works with a total retail value of more than $1,000. The Committee adopted this change in response to a suggestion by the Department of Justice, which envisions prosecuting some infringement cases that would fall below the misdemeanor standard incorporated in the bill as reported by the Subcommittee (10 or more copies with a total retail value of between $1,000 and $2,500). The Department believes it will want to pursue some actions involving thefts of fewer than 10 copies or phonorecords of especially popular or valuable copyrighted works.

The practical significance of these changes is that they criminalize LaMacchia-like behavior; that is, "computerized" misappropriation in which the infringer does not realize a direct financial benefit but whose actions nonetheless substantially damage the market for copyrighted works. De minimis infringement (e.g., a teen-ager copying a software program for a younger sibling) will not be punished. At the same time, however, the Department of Justice, in its discretion, will be allowed to use the newly-defined misdemeanor standard to extract plea bargains from infringers who would otherwise be prosecuted under the felony threshold (10 copies with a total retail value of $2,500 or more).

Clarification of Penalties

The bill as drafted established a higher threshold ($5,000) for felony prosecution under its terms. The Subcommittee, however, elected to retain the current threshold ($2,500) in the en bloc amendment pursuant to recommendations

made at the hearing by certain members of the copyright community. In light of their willingness to accept the substitution of a de minimis threshold for the Subcommittee misdemeanor standard (more than $1,000 but less than $2,500), the retention of the $2,500-felony offense was even more appropriate. As noted, the full Committee changed the misdemeanor standard further while retaining the Subcommittee version of the felony offense.

Taken together, the changes set forth in the bill as amended result in the following criminal penalties governing willful infringement under Section 2319 of Title 18:

(1) For purposes of commercial advantage or private financial gain:

(a) imprisonment of not more than five years, or fines of not more than $250,000 per individual ($500,000 per organization), or both,if the offense consists of the reproduction or distribution, including by electronic means, in any 180-day period, of at least 10 copies or phonorecords of one or more copyrighted works with a total retail value of $2,500;

(b) imprisonment of not more than 10 years, or fines of not more than $250,000 per individual ($500,000 per organization), or both, if the offense is a second or subsequent offense under (a), id.;

(c) imprisonment of not more than one year, or fines of not more than $100,000, or both, in every other case.

(2) For reproduction or distribution, including by electronic means, during any 180-day period, of one or more copies or phonorecords of one or more copyrighted works, which have a total retail value of more than $1,000:

(a) imprisonment of not more than three years, or fines of not more than $250,000 per individual ($500,000 per organization), or both, in a case involving a total retail value of $2,500 or more;

(b) imprisonment of not more than six years, or fines of not more than $250,000 per individual ($500,000 per organization), or both, if the offense is a second or subsequent offense under (a), id.; and

(c) imprisonment of not more than one year, or fines of not more than $100,000, or both, in a case involving a total retail value of $1,000.

Victims Impact Statement and Sentencing

Section 2319 of Title 18 addresses criminal infringement of copyrights, while Section 2319A of that same Title prohibits "bootlegging" (audio taping and videotaping) of live musical performances, as well as trafficking in bootlegged products. Section 2320 proscribes the act of trafficking in counterfeit (pirated) goods or services.

Sections 2(d) and (e) of the bill permit three classes of "victims" to submit impact statements during the sentencing phase of an infringers trial. See Fed. R. Crim. P. 32(c). The three classes are comprised of producers and sellers of legitimate works affected by criminal conduct that is the subject of Sections 2319, 2319A, and 2320; the relevant copyright holders; and the legal representatives of the producers, sellers, and copyright holders.

Any such statement will be made part of the presentence report which a sentencing judge reviews before rendering a decision, and elaborates on the scope of the defendants behavior, especially as it contributed to a victims economic loss as a result of infringement. Egregious conduct as documented by a victims impact statement would compel a judge to deliver a tougher sentence in a given case.

Sentencing Commission

Section 2(g) of H.R. 2265 directs the U.S. Sentencing Commission to ensure that its guideline range is "sufficiently stringent" to deter crime against intellectual property, including those offenses set forth in Section 506(a) of the Copyright Act and Sections 2319, 2319A, and 2320 of Title 18.

"Willful" Misconduct Defined

The Ranking Member from Massachusetts made clear when questioning witnesses during the September 11 hearing that the Subcommittee could improve the bill by amending it to define "willful" misconduct. In the absence of such clarification, those with questions concerning the meaning of the word and its application in the electronic environment were reluctant to rely on report language or existing case law for guidance.

Accordingly, the en bloc amendment adopted by the Subcommittee contains a provision, now set forth in Section Four, which states that nothing in the bill ". . . modifies liability for copyright infringement, including the standard of willfulness for criminal infringement." By accepting this provision, the Subcommittee (and full Committee) intend that

H.R. 2265 will not change the current interpretation of the word as developed by case law and as applied by the Department of Justice.

The issue was resurrected during full Committee consideration of the bill when Representative Goodlatte offered, but eventually withdrew, an amendment to clarify the point further. The Goodlatte amendment stated that, for purposes of Section 506(a) of the Copyright Act only, ".  .  . a person does not infringe a copyright willfully unless that person has an intent to violate another persons copyright" (italic added). Some members noted that federal case law on the subject was not entirely uniform, and that the Goodlatte amendment might make it more difficult for the Department of Justice, in some instances, to prosecute cases. Chairman Coble observed that the use of the word "intent" in the Goodlatte amendment might inadvertently cause some to ascribe a different meaning to "willfully" as it is currently understood, since the majority view on the matter is that "willful" conduct necessitates "intent."

Chairman Coble also emphasized that other parties interested in shaping H.R. 2265 might use the bill to influence the progress of separate legislation, H.R. 2180, which speaks to the liability of on-line service providers in the electronic environment. The bills are unrelated on the point of willfulness, since H.R. 2180 addresses civil infringment of copyrights, while H.R. 2265 deals with criminal misconduct. In fact, the Department of Justice contrasts criminal copyright actions with civil copyright infringement by noting that the latter ".  .  . remains a strict liability tort." Federal Prosecution of Violations of Intellectual Property Rights, U.S. Dept. Of Justice (May 1997) at p. 24.

Non-Application to Intelligence Gathering Activities

The National Security Agency (NSA) informed the Subcommittee that the bill as written might technically apply to, and therefore inhibit, the legitimate intelligence gathering activities of various federal entities and workers on behalf of the U.S. government. The NSA sought assurance from the Subcommittee that H.R. 2265 would not interfere with current federal law on the matter, codified at 28 U.S.C. 1498. In brief, that statute confines copyright infringement cases against the government to the Court of Federal Claims for the recovery of damages. Language set forth in the en bloc amendment adopted by the full Committee makes clear that the ".  .  . exclusive action which may be brought for .  .  . infringement shall be an action by the copyright owner .  .  ." under 28 U.S.C. 1498 (italic added). Since an action is either civil or criminal, and the existing statute addressing the matter speaks only to a civil remedy, the language added to the bill in Section Three ensures that H.R. 2265 will not apply to intelligence gathering activities that are protected and dealt with in 28 U.S.C. 1498.

Statute of Limitations

Finally, the bill requires that any criminal proceeding brought under the Copyright Act must commence within five years from the time the cause of action arose. The current limit, as contained in Section 507(a) of the Act, is three years.

Changes in Existing Law Made by the Bill, as Reported

In compliance with clause 3 of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italics, existing law in which no change is proposed is shown in roman):

TITLE 17, UNITED STATES CODE

* * * * * * *CHAPTER 1 SUBJECT MATTER AND SCOPE OF COPYRIGHT

* * * * * * * 101.  Definitions

Except as otherwise provided in this title, as used in this title, the following terms and their variant forms mean the following:

* * * * * * *

To "display" a work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process or, in the case of a motion picture or other audiovisual work, to show individual images nonsequentially.

The term "financial gain" includes receipt, or expectation of receipt, of anything of value, including the receipt of other copyrighted works.

* * * * * * *CHAPTER 5 COPYRIGHT INFRINGEMENT AND REMEDIES

\* \* \* \* \* \* \* 506. Criminal offenses

(a) Criminal Infringement. Any person who infringes a copyright willfully and for purposes of commercial advantage or private financial gain shall be punished as provided in section 2319 of title 18.

(a) Criminal Infringement. Any person who infringes a copyright willfully either

(1) for purposes of commercial advantage or private financial gain, or

(2) by the reproduction or distribution, including by electronic means, during any 180-day period, of 1 or more copies or phonorecords of 1 or more copyrighted works, which have a total retail value of more than $1,000,

shall be punished as provided under section 2319 of title 18.

\* \* \* \* \* \* \* 507. Limitations on actions

(a) Criminal Proceedings. No criminal proceeding shall be maintained under the provisions of this title unless it is commenced within three 5 years after the cause of action arose.

\* \* \* \* \* \* \*

CHAPTER 113 OF TITLE 18, UNITED STATES CODE

CHAPTER 113 STOLEN PROPERTY

\* \* \* \* \* \* \* 2319. Criminal infringement of a copyright

(a) Whoever violates section 506(a) (relating to criminal offenses) of title 17 shall be punished as provided in subsection (b) subsections (b) and (c) of this section and such penalties shall be in addition to any other provisions of title 17 or any other law.

(b) Any person who commits an offense under subsection (a) of this section section 506(a)(1) of title 17

(1) shall be imprisoned not more than 5 years, or fined in the amount set forth in this title, or both, if the offense consists of the reproduction or distribution, including by electronic means, during any 180-day period, of at last 10 copies or phonorecords, of 1 or more copyrighted works, with a retail value of more than $2,500 which have a total retail value of more than $2,500;

\* \* \* \* \* \* \*

(c) Any person who commits an offense under section 506(a)(2) of title 17

(1) shall be imprisoned not more than 3 years, or fined in the amount set forth in this title, or both, if the offense consists of the reproduction or distribution of 10 or more copies or phonorecords of 1 or more copyrighted works, which have a total retail value of $2,500 or more;

(2) shall be imprisoned not more than 6 years, or fined in the amount set forth in this title, or both, if the offense is a second or subsequent offense under paragraph (1); and

(3) shall be imprisoned not more than 1 year, or fined in the amount set forth in this title, or both, if the offense consists of the reproduction or distribution of 1 or more copies or phonorecords of 1 or more copyrighted works, which have a total retail value of more than $1,000.

(d)(1) During preparation of the presentence report pursuant to Rule 32(c) of the Federal Rules of Criminal Procedure, victims of the offense shall be permitted to submit, and the probation officer shall receive, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim, including the estimated economic impact of the offense on that victim.

(2) Persons permitted to submit victim impact statements shall include

(A) producers and sellers of legitimate works affected by conduct involved in the offense;

(B) holders of intellectual property rights in such works; and

(C) the legal representatives of such producers, sellers, and holders.

(c) (e) As used in this section

1997 Committee Reports, October 23, 1997

(1) the terms "phonorecord" and "copies" have, respectively, the meanings set forth in section 101 (relating to definitions) of title 17; and

(2) the terms "reproduction" and "distribution" refer to the exclusive rights of a copyright owner under clauses (1) and (3) respectively of section 106 (relating to exclusive rights in copyrighted works), as limited by sections 107 through 120, of title 17.

2319A.  Unauthorized fixation of and trafficking in sound recordings and music videos of live musical performances

(a) * * *

(d) Victim Impact Statement. (1) During preparation of the presentence report pursuant to Rule 32(c) of the Federal Rules of Criminal Procedure, victims of the offense shall be permitted to submit, and the probation officer shall receive, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim, including the estimated economic impact of the offense on that victim.

(2) Persons permitted to submit victim impact statements shall include

(A) producers and sellers of legitimate works affected by conduct involved in the offense;

(B) holders of intellectual property rights in such works; and

(C) the legal representatives of such producers, sellers, and holders.

* * * * * * *

(d) (e) Definitions. As used in this section

(1) the terms "copy", "fixed", "musical work", "phonorecord", "reproduce", "sound recordings", and "transmit" mean those terms within the meaning of title 17; and

(2) the term "traffic in" means transport, transfer, or otherwise dispose of, to another, as consideration for anything of value, or make or obtain control of with intent to transport, transfer, or dispose of.

(e) (f) Applicability. This section shall apply to any Act or Acts that occur on or after the date of the enactment of the Uruguay Round Agreements Act. 2320. Trafficking in counterfeit goods or services

(a) * * *

* * * * * * *

(d)(1) During preparation of the presentence report pursuant to Rule 32(c) of the Federal Rules of Criminal Procedure, victims of the offense shall be permitted to submit, and the probation officer shall receive, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim, including the estimated economic impact of the offense on that victim.

(2) Persons permitted to submit victim impact statements shall include

(A) producers and sellers of legitimate goods or services affected by conduct involved in the offense;

(B) holders of intellectual property rights in such goods or services; and

(C) the legal representatives of such producers, sellers, and holders.

(d) (e) For the purposes of this section

(1) * * *

* * * * * * *

(e) (f) Beginning with the first year after the date of enactment of this subsection, the Attorney General shall include in the report of the Attorney General to Congress on the business of the Department of Justice prepared pursuant to section 522 of title 28, an accounting, on a district by district basis, of the following with respect to all actions taken by the Department of Justice that involve trafficking in counterfeit labels for phonorecords, copies of computer programs or computer program documentation or packaging, copies of motion pictures or other audiovisual works (as defined in section 2318 of title 18), criminal infringement of copyrights (as defined in section 2319 of title 18), unauthor-

ized fixation of and trafficking in sound recordings and music videos of live musical performances (as defined in section 2319A of title 18), or trafficking in goods or services bearing counterfeit marks (as defined in section 2320 of title 18):

(1) * * *

* * * * * * *

SECTION 1498 OF TITLE 28, UNITED STATES CODE 1498. Patent and copyright cases

(a) * * *

(b) Hereafter, whenever the copyright in any work protected under the copyright laws of the United States shall be infringed by the United States, by a corporation owned or controlled by the United States, or by a contractor, subcontractor, or any person, firm, or corporation acting for the Government and with the authorization or consent of the Government, the exclusive remedy of the owner of such copyright shall be by action action which may be brought for such infringement shall be an action by the copyright owner against the United States in the Court of Federal Claims for the recovery of his reasonable and entire compensation as damages for such infringement, including the minimum statutory damages as set forth in section 504(c) of title 17, United States Code: Provided, That a Government employee shall have a right of action against the Government under this subsection except where he was in a position to order, influence, or induce use of the copyrighted work by the Government: Provided, however, That this subsection shall not confer a right of action on any copyright owner or any assignee of such owner with respect to any copyrighted work prepared by a person while in the employment or service of the United States, where the copyrighted work was prepared as a part of the official functions of the employee, or in the preparation of which Government time, material, or facilities were used: And provided further, That before such action against the United States has been instituted the appropriate corporation owned or controlled by the United States or the head of the appropriate department or agency of the Government, as the case may be, is authorized to enter into an agreement with the copyright owner in full settlement and compromise for the damages accruing to him by reason of such infringement and to settle the claim administratively out of available appropriations.

* * * * * * *

* * * * * * *

**SUBJECT:** COPYRIGHT (91%); COPYRIGHT LAW (90%); COMPUTER CRIME (90%); LARCENY & THEFT (89%); INTELLECTUAL PROPERTY LAW (89%); CRIMINAL OFFENSES (59%); INTELLIGENCE SERVICES (59%); LAW ENFORCEMENT (59%); BUSINESS TORTS (59%); BUDGET (59%); JUSTICE DEPARTMENTS (59%); LEGISLATION (59%); US FEDERAL GOVERNMENT (59%); ENTERTAINMENT & ARTS (59%); SENTENCING (59%); MISCONDUCT (59%); FINES & PENALTIES (59%); GOVERNMENT BUDGETS (59%); LEGISLATIVE BODIES (59%); VICTIMS RIGHTS (59%);

**LOAD-DATE:** December 1, 1997

# EXHIBIT O

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

_____

CAPITOL RECORDS INC.,
a Delaware corporation;
SONY BMG MUSIC ENTERTAINMENT,
a Delaware general partnership;
ARISTA RECORDS LLC,
a Delaware limited liability company;
INTERSCOPE RECORDS,
a California general partnership;
WARNER BROS. RECORDS INC.,
a Delaware corporation; and
UMG RECORDINGS, INC.,
a Delaware corporation;

          Plaintiffs,

v.                        **MEMORANDUM OF LAW & ORDER**
                              Civil File No. 06-1497 (MJD/RLE)

JAMMIE THOMAS-RASSET,

          Defendant.

_____

Andrew B. Mohraz, David A. Tonini, and Timothy M. Reynolds, Holme Roberts
& Owen, LLP; Felicia J. Boyd, Kara L. B. Barrow, and Mary Andreleita Walker,
Faegre & Benson, LLP; and Matthew J. Oppenheim, Oppenheim Group, LLP;
counsel for Plaintiffs.

Joe Sibley and K. A. D. Camara, Camara & Sibley, LLP, and Brant D. Penney and
Garrett D. Blanchfield, Jr., Reinhardt Wendorf & Blanchfield, counsel for
Defendant.

_____

## I.     INTRODUCTION

This matter is before the Court on Defendant's Motion for a New Trial,

Remittitur, and to Alter or Amend the Judgment [Docket No. 344] and Plaintiffs'

Motion to Amend Judgment.  [Docket No. 342]

## II.    SUMMARY OF THE COURT'S OPINION

After long and careful deliberation, the Court grants in part and denies in

part Thomas-Rasset's motion and remits the damages award to $2,250 per song –

three times the statutory minimum.  The need for deterrence cannot justify a $2

million verdict for stealing and illegally distributing 24 songs for the sole purpose

of obtaining free music.  Moreover, although Plaintiffs were not required to

prove their actual damages, statutory damages must still bear *some* relation to

actual damages.

The Court has labored to fashion a reasonable limit on statutory damages

awards against noncommercial individuals who illegally download and upload

music such that the award of statutory damages does not veer into the realm of

gross injustice.  Finding a precise dollar amount that delineates the border

between the jury's wide discretion to calculate its own number to address

2

Thomas-Rasset's willful violations, Plaintiffs' far-reaching, but nebulous

damages, and the need to deter online piracy in general and the outrageousness

of a $2 million verdict is a considerable task.  The Court concludes that setting the

limit at three times the minimum statutory damages amount in this case is the

most reasoned solution.

This award constitutes the maximum amount a jury could reasonably

award to both compensate Plaintiffs and address the deterrence aspect of the

Copyright Act.  **This reduced award is significant and harsh.**  It is a higher

award than the Court might have chosen to impose in its sole discretion, but the

decision was not entrusted to this Court.  It was the jury's province to determine

the award of statutory damages and this Court has merely reduced that award to

the maximum amount that is no longer monstrous and shocking.  Plaintiffs have

seven days from the date of this Order to decide whether to accept the remittitur

or request a new trial on the issue of damages.

The Court denies Thomas-Rasset's motion for a new trial based on the

admission of evidence collected by MediaSentry.  It further denies her motion for

a new trial based on Plaintiffs' failure to produce certified copies of the sound

recordings deposited with the Copyright Office.

3

Finally, the Court grants Plaintiffs' request to amend the Judgment to include a permanent injunction.

## III.    BACKGROUND

Plaintiffs are recording companies that owned or controlled exclusive rights to copyrights in sound recordings, including 24 at issue in this lawsuit.  On April 19, 2006, Plaintiffs filed a Complaint against Defendant Jammie Thomas-Rasset alleging that she infringed Plaintiffs' copyrighted sound recordings pursuant to the Copyright Act, 17 U.S.C. §§ 101, 106, 501-505, by illegally downloading and distributing the recordings via the online peer-to-peer file sharing application known as Kazaa.  Plaintiffs sought injunctive relief, statutory damages, costs, and attorney fees.

Trial on this matter began on October 2, 2007.  On October 4, 2007, the jury found that Thomas-Rasset had willfully infringed all 24 of Plaintiffs' sound recordings at issue and awarded Plaintiffs statutory damages in the amount of $9,250 for each willful infringement.  [Docket No. 100]  The total damages award was $222,000.  On October 5, the Court entered judgment on the jury's verdict. [Docket No. 106]

On October 15, Defendant filed a Motion for New Trial, or in the

4

Alternative, for Remittitur, based solely on the issue of the constitutionality of the

Copyright Act's statutory damages provision in the case.  [Docket No. 109]  On

September 24, 2008, the Court vacated the verdict and granted a new trial based

on its conclusion that it had erred in giving Jury Instruction No. 15, which

addressed the existence of a making-available right.  [Docket No. 197]  The Court

made no findings regarding the constitutionality of the damages award.

The second trial of this matter began on June 15, 2009.  On June 18, 2009,

the jury returned a verdict finding that Thomas-Rasset had willfully infringed all

24 sound recordings and awarding statutory damages in the amount of $80,000

for each song, for a total verdict of $1,920,000.  [Docket No. 336]  On June 19,

2009, the Court entered judgment on the jury's verdict.  [Docket No. 338]

Now, Thomas-Rasset requests that the Court set aside the award of

statutory damages and provides three alternatives: 1) the statutory damages

provision of the Copyright Act, as applied to Thomas-Rasset, violates the Due

Process Clause of the U.S. Constitution; therefore, Plaintiffs must accept a $0

verdict; 2) the jury's application of the statutory damages provision of the

Copyright Act is excessive and shocking so the Court should remit the verdict to

the minimum statutory damages of $750 per sound recording infringed; or 3) the

5

jury's application of the statutory damages provision of the Copyright Act is

excessive and shocking so the Court should grant a new trial.  She also requests a

new trial on the ground that there is insufficient evidence to sustain the verdict

because the evidence collected by MediaSentry should not have been admitted at

trial.  Finally, she asserts that the Court erred in permitting Plaintiffs to proceed

without producing certified copies of the sound recordings deposited with the

Copyright Office.

Plaintiffs request that the Court amend the June 19, 2009 Judgment to

include a permanent injunction.

## IV.    DISCUSSION

### A.    Remittitur

#### 1.    Standard for Remittitur

"[A] district court should order remittitur only when the verdict is so

grossly excessive as to shock the conscience of the court.  A verdict is not

considered excessive unless there is plain injustice or a monstrous or shocking

result."  Eich v. Bd. of Regents for Cent. Mo. State Univ., 350 F.3d 752, 763 (8th

Cir. 2003) (citations omitted).  When deciding a motion for a new trial or

remittitur, the Court can rely on its own reading of all of the trial evidence

6

presented.  <u>Schaefer v. Spider Staging Corp.</u>, 275 F.3d 735, 738 (8th Cir. 2002).

> The scope of review of a district court's damage award is extremely narrow and the district court's award may not be reversed except for a manifest abuse of discretion.  In determining whether the trial court abused its discretion in ordering a remittitur, [the appellate court will] analyze whether the remittitur was ordered for an amount less than the jury could reasonably find.

<u>Taylor v. Otter Tail Corp.</u>, 484 F.3d 1016, 1019 (8th Cir. 2007) (citations omitted).

### 2.    Whether the Court Has the Power to Remit Statutory Damages Awards

Plaintiffs argue that this Court does not have the power to remit an award

of statutory damages.  They note that the Supreme Court has held that "the

Seventh Amendment provides a right to a jury trial on all issues pertinent to an

award of statutory damages under § 504(c) of the Copyright Act, including the

amount itself."  <u>Feltner v. Columbia Pictures Television, Inc.</u>, 523 U.S. 340, 355

(1998).  Plaintiffs conclude that the jury, alone, has the authority to determine the

amount of statutory damages within the statutory range.

The Court is hesitant to interfere with the jury's role in determining the

proper amount of damages.  And the Court is cognizant that Congress chose the

range of statutory damages available for copyright infringement, within which

the jury's decisionmaking was bounded.  However, despite the Court's

7

reluctance to interfere, there is no authority for Plaintiffs' assertion that the Court does not have the power to remit an award of statutory damages.

Moreover, the fact that Plaintiffs have a Seventh Amendment right to a jury trial regarding damages under the Copyright Act does not prevent the Court from ordering remittitur. Rather, the Seventh Amendment merely requires that, if this Court does order remittitur, it also offer Plaintiffs the option of choosing to reject the remittitur and exercise their right to a new jury trial solely on the issue of damages. Corpus v. Bennett, 430 F.3d 912, 917 (8th Cir. 2005); Thorne v. Welk Inv., Inc., 197 F.3d 1205, 1212 (8th Cir. 1999).

### 3. Whether the Award Is Grossly Excessive

### a. Statutory Damages Framework

The Copyright Act provides that "an infringer of copyright is liable for either . . . the copyright owner's actual damages and any additional profits of the infringer . . . or . . . statutory damages." 17 U.S.C. § 504(a).

The statute further provides:

(1) Except as provided by clause (2) of this subsection, the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually . . .

8

in a sum of not less than $750 or more than $30,000 as the court
considers just.  For the purposes of this subsection, all the parts of a
compilation or derivative work constitute one work.

(2) In a case where the copyright owner sustains the burden of
proving, and the court finds, that infringement was committed
willfully, the court in its discretion may increase the award of
statutory damages to a sum of not more than $150,000.

17 U.S.C. § 504(c).

Congress last amended the statutory damages section of the Copyright Act

in 1999, significantly increasing the minimum and maximum statutory awards to

their current levels.  Congress intended the statutory damages to be

"substantially" higher than actual damages:

Courts and juries must be able to render awards that deter others
from infringing intellectual property rights.  It is important that the
cost of infringement substantially exceed the costs of compliance, so
that persons who use or distribute intellectual property have a
strong incentive to abide by the copyright laws.

H.R. Rep. No. 106-216, at 6 (1999).

The statutory damages provision of the Copyright Act has both deterrent

and compensatory components.  Cass County Music Co. v. C.H.L.R., Inc., 88 F.3d

635, 643 (8th Cir. 1996).  If a plaintiff requests that a jury decide the amount of

statutory damages, then "a jury must determine the actual amount of statutory

9

damages under § 504(c)."  Feltner, 523 U.S. at 355.

A plaintiff can recover statutory damages even though it did not submit

evidence regarding actual damages, such as lost profits:

> [S]tatutory damages for copyright infringement are not only "restitution of profit and reparation for injury," but also are in the nature of a penalty, "designed to discourage wrongful conduct." "The discretion of the court is wide enough to permit a resort to statutory damages for such purposes.  Even for uninjurious and unprofitable invasions of copyright the court may, if it deems it just, impose a liability within statutory limits to sanction and vindicate the statutory policy."

Cass County Music Co., 88 F.3d at 643 (quoting F.W. Woolworth Co. v.

Contemporary Arts, Inc., 344 U.S. 228, 233 (1952)) (footnote and emphasis

omitted).

### b.    Relationship Between Statutory Damages and Actual Damages

Thomas-Rasset argues that the ratio of the statutory damages award to

actual damages in this case, when measured in songs, is 1:62,015.  She bases this

calculations on a cost of $1.29 per song online.  She further argues that, based on

a cost of $15 per album, the ratio is still 1:5,333.  (Alasdair McMullan, the

executive vice president of legal affairs for EMI Music North America, testified

that Richard Marx's "Now and Forever" probably retailed for $1.29 on iTunes

10

and the album probably cost less than $20.00 in a retail store.)  Thomas-Rasset

concludes that these ratios are monstrous and shocking.

Plaintiffs accurately point out that, because they chose to seek statutory

damages rather than actual damages, they were not required to present proof of

the actual damages caused by Thomas-Rasset's infringement.  See, e.g., Cass

County Music Co., 88 F.3d at 643 ("[S]tatutory damages are by definition a

substitute for unproven or unprovable actual damages."); Lowry's Reports, Inc.

v. Legg Mason, Inc., 302 F. Supp. 2d 455, 459 (D. Md. 2004) ("Because statutory

damages are an alternative to actual damages, there has never been a

requirement that statutory damages must be strictly related to actual injury.")

(citations omitted).  However, because statutory damages have, in part, a

compensatory purpose, "assessed statutory damages should bear some relation

to the actual damages suffered."  Bly v. Banbury Books, Inc., 638 F. Supp. 983, 987

(E.D. Pa. 1986).

### c.      Factual Support for Actual Damages Inflicted

Thomas-Rasset asserts that, at most, she was a single mother who merely

downloaded and shared music when she had already lawfully bought CDs of

much of that music and had no commercial motive to infringe.  Defendant notes

11

that, if her conduct caused any harm, it was only economic harm. She caused no

danger to the safety of others. Additionally, Thomas-Rasset argues that the

victims of her conduct were not vulnerable – they are the largest recording

companies in the United States.

Plaintiffs contend that their actual damages were far greater than the $1.29

cost of Richard Marx's "Now and Forever" on iTunes or the less than $20 cost of

an album containing that song. They note that the evidence showed that

Thomas-Rasset willfully infringed 24 of their copyrighted sound recordings. The

songs, along with almost 1,700 others, were in Thomas-Rasset's directory, which

she shared with the millions of users of the Kazaa network. Therefore, the songs

at issue were accessible for free downloading by millions of Kazaa users who

could subsequently share them with others. Plaintiffs argue that the valuation of

actual damages cannot be limited to the harm only caused by reproducing 24

songs.

Plaintiffs further note that Gary Wade Leak, the deputy general counsel for

Sony Music Entertainment, testified that, in the case of an illegal download, the

damage to the recording company is the loss of the sale of that particular song,

but in the case of an illegal online distribution, the recording company has lost

12

exponential sales for that song. He testified that, generally, online piracy has caused the recording industry to lose billions of dollars in the last several years and has caused the layoffs of thousands of employees.

Leak further testified that the cost of obtaining a license to engage in Thomas-Rasset's conduct would be prohibitive. Specifically, he testified that, in order to obtain an unlimited license to distribute music online for free, a person would have to buy the entire recording company and shut it down. As Defendant notes, Leak could not quantify the harm caused to Sony by Thomas-Rasset, because he could not determine how many times the recordings were downloaded from her share file by other Kazaa users. Thomas-Rasset argues that it would be unconstitutional to punish her for the harms caused by illegal music downloading in general.

### d. Evidence of Willfulness and the Need for Deterrence

As the Court instructed the jury, factors other than the damages caused and gains obtained by the defendant's infringement are relevant to the decision of the proper amount of statutory damages. Facts that go to the deterrence aspect of statutory damages, such as a defendant's willfulness or innocence, and incorrigibility, are also relevant. Here, the jury found that Thomas-Rasset acted

13

willfully.  Thomas-Rasset testified that she had studied Napster in college and that, while still in college, she later learned that copying and distributing copyrighted music recordings over the Internet was against the law.  Therefore, she was aware that downloading songs off of and distributing songs via Kazaa was illegal.

Moreover, Thomas-Rasset refused to accept responsibility for downloading and distributing the infringing sound recordings.  Thomas-Rasset previously provided sworn interrogatory answers that there had never been any type of online media distribution on her computer in the three years before the Complaint was filed and that she did not contend that anyone else was responsible for the infringement.  Despite never implicating others during her depositions or testimony in the previous trial, in this second trial, she suddenly leveled new accusations against her children and ex-boyfriend, asserting that they might have committed the infringement.  Thomas-Rasset's refusal to accept responsibility for her actions and her decision to concoct a new theory of the infringement casting possible blame on her children and ex-boyfriend for her actions demonstrate a refusal to accept responsibility and raise the need for strong deterrence.

14

### e.      Need for Remittitur

Although Plaintiffs highlight valid reasons that Thomas-Rasset must pay a statutory damages award, these facts simply cannot justify a $2 million verdict in this case.  Thomas-Rasset was not a business acting for profit.  Instead, she was an individual consumer illegally seeking free access to music for her own use. Congress set a high maximum for statutory damages in order to ensure that damages awards could be large enough to outweigh the potential gain from infringing.  As the Court noted in its September 2008 Order, in the case of commercial actors, the potential gain in revenues is enormous and enticing to potential infringers.  In the case of individuals who infringe by using peer-to-peer networks, the potential gain from infringement is access to free music, not the possibility of hundreds of thousands  – or even millions – of dollars in profits. The need for deterrence cannot justify a $2 million verdict for stealing and illegally distributing 24 songs for the sole purpose of obtaining free music.

Similarly, the damage to Plaintiffs cannot support this verdict.  While Plaintiffs were not required to prove their actual damage, the possible actual damage weighs in the Court's analysis.  One purpose of statutory damages under the Copyright Act is to act as a substitute for actual damages when they are

15

difficult to calculate.  However, as the Court has already explained, statutory

damages must still bear *some* relation to actual damages.

It may be impossible to calculate how many other computer users

committed infringement with the illegal copies of works accessed from Thomas-

Rasset or the amount of damage that their access caused.  Additionally, trial

testimony made clear that detecting online piracy and identifying infringers on

peer-to-peer networks is difficult and costly.  The recovery to Plaintiffs must be

sufficient to justify their expenditure in pursuing infringers.

All of the potential ills caused by unauthorized peer-to-peer networking

and illegal downloading are relevant to the damages award.  The Court does not

discount that, in aggregate, illegal downloading has caused serious, widespread

harm to the recording industry.  These facts justify a statutory damages award

that is many multiples higher than the simple cost of buying a CD or legally

purchasing the songs online.

The Court has considered the strong need for deterrence in this particular

case, the difficulty in quantifying the damages caused by the chain effect of

Thomas-Rasset's distribution of copyrighted sound recordings over the Internet,

the large scale damages caused by online piracy in aggregate, and the substantial

16

impediments to identifying and pursuing infringers. However, despite the combination of these justifications and the Court's deference to the jury's verdict, $2 million for stealing 24 songs for personal use is simply shocking. No matter how unremorseful Thomas-Rasset may be, assessing a $2 million award against an individual consumer for use of Kazaa is unjust. Even Plaintiffs admit that Thomas-Rasset is unlikely to ever be able to pay such an award. Having determined that the current verdict is so shocking that it must be remitted, the Court next faces the task of assessing the proper amount of remittitur.

### 4.  Proper Amount of Remittitur

Thomas-Rasset requests that the Court remit the statutory damages award to $18,000, which consists of the statutory minimum, $750, per song. Plaintiffs assert that there is no basis for remittitur. However, they represent that they will consider a remittitur, so long as it takes into account Defendant's willful conduct, the substantial damage cause by her actions, and the significant number of copyright sound recordings upon which she infringed.

### a.  Standard for Determining Proper Amount of Remittitur

The Court's task is not to choose the statutory damages amount it thinks

would be most appropriate in this matter.  Rather, under the "maximum recovery rule," the Court reduces the damages to the "maximum amount the jury could properly have awarded."  K-B Trucking Co. v. Riss Int'l Corp., 763 F.2d 1148, 1163 (10th Cir. 1985) (citation omitted), cited with approval in In re Knickerbocker, 827 F.2d 281, 289 n.6 (8th Cir. 1987).  See also Stogsdill v. Healthmark Partners, L.L.C., 377 F.3d 827, 834 (8th Cir. 2004) ("When a jury awards excessive damages, remittitur to the maximum amount proved is an appropriate remedy.") (citation omitted); Ogilvie v. Fotomat Corp., 641 F.2d 581, 586 n.13 (8th Cir. 1981) (holding remittitur to "the maximum amounts that would be sustained by [plaintiffs'] proof" is the proper standard) (footnote omitted); Slatton v. Martin K. Eby Constr. Co., Inc., 506 F.2d 505, 509 (8th Cir. 1974) (upholding district court's remittitur to $50,000 as "the maximum limit sustainable on a jury verdict even though it thought that $15,000 to $20,000 was fair and reasonable compensation" because remittitur was not "ordered for an amount less than the jury could reasonably find").  The Court will not substitute its judgment for the judgment of the jury.  Rather, it will remit the award to the maximum amount sustainable by the record, so that the statutory damages award is no longer shocking or monstrous.

18

### b.     Evidence of Other Jury Verdicts

Plaintiffs argue that the Court should look to other jury verdicts in similar cases to determine the amount of the remittitur.  They point out that, in the first trial in this case, the jury awarded $9,250 for each of the 24 infringed works.  In the recent similar trial in the District of Massachusetts, the jury awarded $22,500 for each of 30 works infringed.  (Sony BMG Music Entm't v. Tenenbaum, Case No. 07-cv-11446-NG, July 31, 2009, Jury Verdict.)

In evaluating the propriety of remittitur, the Eighth Circuit has held that comparing jury verdicts for similar injuries in different cases is "not greatly helpful because each case must be evaluated as an individual one, within the framework of its distinctive facts."  Vanskike v. Union Pac. R.R. Co., 725 F.2d 1146, 1150 (8th Cir. 1984) (citation omitted).  Additionally, "[e]ach case is evaluated by a different, randomly selected group of individual jurors."  Id.  In this case, the previous jury award was vacated by this Court and, in the Tenenbaum case, the court has not yet decided the pending motion to reduce the damages award.  Therefore, although the Court is aware of these other two awards, it does not consider them to carry weight in its remittitur analysis.

### c.     Request for Reduction to the Statutory Minimum

19

Defendant advocates that the Court remit the damages award to the statutory minimum.  Even statutory damages of $750 per sound recording initially appears surprisingly high when the retail cost of such downloads is considered.  However, the Court declines Thomas-Rasset's request to remit the award to the statutory minimum.

Congress set the statutory range for copyright infringement and evinced a clear intent that each work willfully infringed justifies at least $750 in statutory damages.  Reducing the statutory damages award to that minimum amount would still result in a total damages award of $18,000.  An award of $750 per song infringed would constitute a substantial amount to a noncommercial consumer and would cost more than forty times the cost of a CD.  Such an award would uphold Congress's intent "that the cost of infringement substantially exceed the costs of compliance, so that persons who use or distribute intellectual property have a strong incentive to abide by the copyright laws."  H.R. Rep. 106-216, at 6.

However, Congress has set the floor of $750 per sound recording infringed, even without a finding of willfulness.  Some increase in the damages awarded is reasonable in a case of willful infringement.  The jury explicitly found that

Thomas-Rasset willfully infringed on Defendants' copyrights.  The statute

demonstrates Congress's intent that willful infringers can be – but do not have to

be – treated more harshly that non-willful infringers.

Additionally, Thomas-Rasset lied on the witness stand by denying

responsibility for her infringing acts and, instead, blamed others, including her

children, for her actions.  A reasonable jury could have used the facts in this case

to conclude that additional deterrence was required.

The Court further notes that simply comparing the amount of the award

with the cost of a song on iTunes or a CD is inadequate – the damages caused to

Plaintiffs are far ranging and difficult to calculate.  A reasonable jury could also

have used Leak's testimony to conclude that Thomas-Rasset's infringement

posed great harm to the recording industry because, by distributing the songs

online for free, she exponentially increased their damages.  Additionally,

Plaintiffs elected to recover statutory damages in lieu of actual damages.

Therefore, it would be inappropriate to limit Plaintiffs' recovery based on a strict

multiple of Plaintiffs' actual damages.  In fact, even if the Court were inclined to

attempt such a calculation, it would surely fail: the damages caused by

Thomas-Rasset's infringement cannot be calculated with precision.  Moreover,

unlike actual damages, statutory damages can include a deterrence component, which can justify a higher award.

Based on all of these factors, the jury could reasonably award damages above the statutory minimum of $750 per song in order to achieve deterrence and compensate for large, uncertain damages. The Court must remit the award to the highest part of the range that the jury could reasonably have chosen. Therefore, the Court concludes that remittitur to the statutory minimum is unsupportable.

### d. Remittitur to Three Times the Statutory Minimum

The Court concludes that remittitur to $2,250 – 3 times the statutory minimum – per sound recording infringed is appropriate. There is a broad legal practice of establishing a treble award as the upper limit permitted to address willful or particularly damaging behavior. Federal statutes allow for an increase in statutory damages, up to triple statutory damages, when the statutory violation is willful or demonstrates a particular need for deterrence. See, e.g., Digital Millennium Copyright Act, 17 U.S.C. § 1203(c)(3) (providing that "the court may increase the award of damages up to triple the amount that would otherwise be awarded" if the person committed the violation "within 3 years after a final judgment was entered against the person for another such

22

violation"); Telephone Consumer Protection Act, 47 U.S.C. § 227(b)(3), (c)(5)

(permitting court to increase statutory damages award "to an amount equal to

not more than 3 times" the statutory damages amount of $500, for willful or

knowing violations).  In these other contexts, treble statutory damages have been

set as the permissible outer limit of statutory damages awards, even in the face of

willful behavior.

Other statutes, while not trebling statutory damages, allow tripling of a

dollar amount other than actual damages, such as the cost of settlement service,

the defendant's profits, the amount of a fraudulent claim, or a month's rent.  See,

e.g., Real Estate Settlement Procedures Act, 12 U.S.C. § 2607(d)(2) ("Any person

or persons who violate the prohibitions or limitations of this section shall be

jointly and severally liable to the person or persons charged for the settlement

service involved in the violation in an amount equal to three times the amount of

any charge paid for such settlement service."); Lanham Act, 15 U.S.C. § 1117(b)

(providing that, under certain circumstances involving the use of a counterfeit

mark or designation, "the court shall, unless the court finds extenuating

circumstances, enter judgment for three times such profits or damages,

whichever amount is greater"); Civil Monetary Penalties Law, 42 U.S.C.

§ 1320a-7a(a) ("In addition, such a person shall be subject to an assessment of not

more than 3 times the amount claimed for each such item or service in lieu of

damages sustained by the United States or a State agency because of such [false]

claim . . . ."); Mass. Gen. Laws ch. 186, § 14 ("Any person who commits any act in

violation of this section [by interfering with a tenant's quiet enjoyment] shall also

be liable for actual and consequential damages or three month's rent, whichever

is greater . . .").

Finally, a myriad of statutes permit the recovery of treble actual damages,

either because of willful behavior or as a matter of course when Congress has

found the violation to be particularly serious.  <u>See, e.g.</u>, Clayton Act, 15 U.S.C.

§ 15(a) (providing that "any person who shall be injured in his business or

property by reason of anything forbidden in the antitrust laws . . . shall recover

threefold the damages by him sustained"); Racketeer Influenced and Corrupt

Organizations Act, 18 U.S.C. § 1964(c) (providing that "[a]ny person injured in

his business or property by reason of a violation of section 1962 of this chapter . . .

shall recover threefold the damages he sustains"); False Claims Act, 31 U.S.C.

§ 3729(a)(1) (establishing "civil penalty of not less than $5,000 and not more than

$10,000 . . . plus 3 times the amount of damages which the Government sustains

24

because of the act of that person"); Patent Act, 35 U.S.C. § 284 (providing that

"the court may increase the damages up to three times the amount found or

assessed"); Residential Lead-Based Paint Hazard Reduction Act, 42 U.S.C.

§ 4852d(b)(3) ("Any person who knowingly violates the provisions of this section

shall be jointly and severally liable to the purchaser or lessee in an amount equal

to 3 times the amount of damages incurred by such individual.").

Of course, the Copyright Act contains no treble damages provision.  The

Court's remittitur is not an attempt to create such a provision.  Rather, the Court

has labored to fashion a reasonable limit on statutory damages awards against

noncommercial individuals who illegally download and upload music such that

the award of statutory damages does not veer into the realm of gross injustice.

Finding a precise dollar amount that delineates the border between the jury's

wide discretion to calculate its own number to address Thomas-Rasset's willful

violations, Plaintiffs' far-reaching, but nebulous damages, and the need to deter

online piracy in general and the outrageousness of a $2 million verdict is a

considerable task.  The Court concludes that setting the limit at three times the

minimum statutory damages amount in this case is the most reasoned solution.

This award constitutes the maximum amount a jury could reasonably

25

award to both compensate Plaintiffs and address the deterrence aspect of the

Copyright Act. This reduced award is significant and harsh. It is a higher award

than the Court might have chosen to impose in its sole discretion, but the

decision was not entrusted to this Court. It was the jury's province to determine

the award of statutory damages and this Court has merely reduced that award to

the maximum amount that is no longer monstrous and shocking.

### 5. Constitutional Challenge

Because the Court determines that remittitur is appropriate in this case, it

will not reach the question of the constitutionality of the jury's damages award.

See United States v. Allen, 406 F.3d 940, 946 (8th Cir. 2005) ("When we are

confronted with several possible grounds for deciding a case, any of which

would lead to the same result, we choose the narrowest ground in order to avoid

unnecessary adjudication of constitutional issues.") (citation omitted).

### B. Reconsideration of the Court's Denial of the Motion to Suppress

### 1. The Court's Previous Ruling

In the Court's June 11, 2009 Order on the motions in limine, the Court

denied Thomas-Rasset's motion to suppress evidence gathered by MediaSentry.

Defendant had asserted that MediaSentry violated the Minnesota Private

Detectives Act ("MPDA") by acting as a detective although it held no Minnesota private detective license. The Court held that MediaSentry was not subject to the MPDA because it did not operate within the state of Minnesota.

The Court further noted that "[a]lthough Defendant has vaguely alluded to private detective licensing laws from other states, there is no evidence or legal argument before the Court upon which the Court could conclude that MediaSentry was subject to and violated another state's private detective law in this case." (June 11 Order at 10-11.) The Court also held that, even if "MediaSentry had incidentally violated a private detective licensing statute from some other state," it did not act "for the purpose of committing a tort or crime," so the federal Wiretap Act would not apply. (Id. at 11.)

### 2. Defendant's Current Motion for a New Trial

In the current motion for a new trial, Defendant reasserts her previous arguments. She then argues that the Court's previous Order denying the motion to suppress was based on its erroneous conclusion that MediaSentry did not violate any law in its investigation of Thomas-Rasset.

Thomas-Rasset notes that, during trial, the MediaSentry representative testified that he was operating in New Jersey when he interacted with Thomas-

27

Rasset's computer. Defendant asserts that New Jersey has private investigator and wiretap statutes that were violated when Media Sentry had operated in that state. She cursorily cites to N.J. Stat. §§ 45.19, 2A:156A-2. She concludes that Media Sentry's actions were illegal under New Jersey law, and, therefore, all of the evidence gathered by Media Sentry should have been suppressed. She argues that, without that evidence, there would have been insufficient evidence to support a verdict of liability. Therefore, the Court should grant a new trial under Rule 59.

### 3. Conclusion

The Court denies Thomas-Rasset's motion for a new trial based on the suppression issue. New Jersey Statute § 45:19-10 provides that if a private detective business fails to obtain a private detective license, it is guilty of a misdemeanor. However, Defendant points to no New Jersey case or statute that holds that evidence obtained by an unlicensed private detective is subject to suppression. Furthermore, while Defendant reprints her cursory argument from her reply to the motions in limine, she provides no substantive legal argument or factual analysis of whether the New Jersey statute would apply at all in this case.

As for New Jersey's wiretap statute, New Jersey is a single-consent state,

28

with a wiretap statute almost identical to the federal Wiretap Act.  <u>See</u> N.J. Stat.

§ 2A:156A-4(d).  As the Court already held with respect to the federal Wiretap

Act, MediaSentry was a party to the electronic communication with Thomas-

Rasset.  Additionally, the Court already held that MediaSentry did not commit a

crime or tort in relation to the interception.  Finally, as the Court previously held

that, even if MediaSentry did violate a private detective licensing statute from

some state other than Minnesota, it did not intercept or use the communication

<u>for the purpose</u> of committing a crime or tort.  Therefore, the Court will not

reverse its decision denying Thomas-Rasset's motion in limine to suppress the

evidence gathered by MediaSentry.

### C.     Reconsideration of the Court's Admission of Non-Certified Copies

Thomas-Rasset states that she intends to appeal the Court's Order allowing

Plaintiffs to prove the content of a registered sound recording without a certified

copy of the sound recording deposited with the Copyright Office.  However, she

provides no argument or analysis with regard to that point.  Therefore, the

Court's previous ruling stands and it will not grant a new trial on this basis.

### D.     Request for Injunctive Relief

#### 1.     Propriety of an Injunction

29

Plaintiffs request that, under Federal Rule of Civil Procedure 59(e), the

Court amend the Judgment in this case to include an injunction, as requested in

Plaintiffs' Complaint.  The Copyright Act provides:

> Any court having jurisdiction of a civil action arising under this title
> may . . . grant temporary and final injunctions on such terms as it
> may deem reasonable to prevent or restrain infringement of a
> copyright.

17 U.S.C. § 502(a).  "Injunctions regularly are issued pursuant to the mandate of

Section 502, because the public interest is the interest in upholding copyright

protections."  Taylor Corp. v. Four Seasons Greetings, LLC, 403 F.3d 958, 968 (8th

Cir. 2005) (citation omitted).  Additionally, the Court has the equitable power to

order destruction of all infringing copies in Defendant's possession.  17 U.S.C.

§ 503(b).

> To determine whether permanent injunctive relief is warranted, [the
> Court] balance[s] three factors: (1) the threat of irreparable harm to
> the moving party; (2) the balance of harm between this harm and the
> harm suffered by the nonmoving party if the injunction is granted;
> and (3) the public interest.

Taylor, Corp., 403 F.3d at 967.

### a.    Irreparable Harm

The parties expend considerable energy debating whether, in light of the

30

Supreme Court's decision in the patent case of <u>eBay, Inc. v. MercExchange L.L.C.</u>, 547 U.S. 388, 394 (2006), this Court can continue to apply the long line of case law which presumes the existence of irreparable harm based upon a finding of copyright infringement. <u>See, e.g.</u>, <u>Nat'l Football League v. McBee & Bruno's, Inc.</u>, 792 F.2d 726, 729 (8th Cir. 1986) ("Copyright law has long held that irreparable injury is presumed when the exclusive rights of the holder are infringed.") (citation omitted). The Court concludes that it does not need to determine the applicability of <u>eBay</u> to copyright injunctions because, through the evidence introduced at trial, Plaintiffs have demonstrated irreparable harm even in the absence of the traditional presumption.

Defendant argues that the large monetary judgment Plaintiffs have obtained is more than enough to compensate them for any past infringing acts and deter future infringement. However, there are strong doubts whether Plaintiffs will ever recover the monetary award from Defendant.

Thomas-Rasset further claims that Plaintiffs have not offered evidence that she is likely to continue infringing. Although Plaintiffs have not submitted any direct evidence regarding continued infringement by Thomas-Rasset, the Court holds that the likelihood of future infringement is raised because Defendant has

31

not accepted responsibility for her actions and online infringement is easy to accomplish, but difficult to detect.

The Court rejects Thomas-Rasset's assertion that Plaintiffs' failure to seek a preliminary injunction prevents entry of a permanent injunction at this point in the litigation. Cf. MercExchange, L.L.C. v. eBay, Inc., 500 F. Supp. 2d 556, 573 (E.D. Va. 2007) (holding plaintiff's failure to seek a preliminary injunction was "plainly not dispositive" and concluding that failure was only relevant in that particular case because it was "consistent with [the plaintiff's] strategy of pursuing market participants to exact licenses for infringement") (footnote omitted). There is no indication that Plaintiffs' decision to forgo seeking a preliminary injunction was part of an overall strategy to attempt to exact licenses or was otherwise contrary to the propriety of entry of a permanent injunction at this time.

Thomas-Rasset claims that the risk of future harm is speculative and notes that Plaintiffs did not present any evidence of actual lost market share. This argument is unavailing. Congress provided for – and Plaintiffs sought and recovered – statutory damages for the very reason that actual damages for copyright infringement are difficult to prove. It would be contrary to Congress's

intent and the jury's verdict to deny injunctive relief to Plaintiffs because they took advantage of the option of seeking statutory damages due to the difficulty of proving actual damages. It is this very difficulty of measuring damages that contributes to a finding of irreparable harm.

As the Court has already discussed in this Order, illegal distribution over peer-to-peer networks, such as Kazaa, causes Plaintiffs lost revenues and layoffs. Additionally, a license to engage in Defendant's activity would be prohibitively expensive because to obtain the license, one would have to buy the company. The downloaded sound recordings in this case were exact replicas of Plaintiffs' copyrighted sound recordings. Therefore, by distributing these recordings to other Kazaa users, Thomas-Rasset directly competed with Plaintiffs' copyrighted material. Measuring damages from peer-to-peer copyright infringement is made more difficult because, as trial testimony established, Kazaa permits anonymous file sharing, so copyright holders cannot monitor every act of infringement over the network.

The harm Plaintiffs face is irreparable and monetary damages are inadequate precisely because actual damages are difficult to compute. Given the large volume of songs in Thomas-Rasset's Kazaa share file and her continued

refusal to accept responsibility for her actions, it is reasonable to conclude that an injunction is necessary to prevent future infringement.  This threat of repeated infringement, the difficulty of detecting future infringement by Thomas-Rasset, and the viral aspect of damages weigh in favor of a finding of a threat of irreparable harm.

### b.    Balance of the Hardships

The balance of the hardships favors an injunction.  Defendant's conduct could create exponential harm to Plaintiffs, but the requested injunction would inflict minimal hardship on Thomas-Rasset.  There is no cognizable harm to Defendant from being enjoined from doing something that is against the law and for which she has already been found liable.  Thomas-Rasset fails to identify any hardship that would be inflicted upon her if the injunction is issued.  See, e.g., UMG Recordings, Inc. v. Blake, No. 5:06-CV-00120-BR, 2007 WL 1853956, at *3 (E.D.N.C. June 26, 2007) ("As to the consideration of the balance of hardship between Plaintiffs and Defendant, the fact that Plaintiffs' recordings can be replicated into infinity, for free, establishes that a distinct hardship rests with Plaintiffs.  Defendant, on the other hand, faces little, if any, harm.  These recordings will still be just as accessible to Defendant; (s)he will have to pay to

34

download them.").

### c.    Public Interest

> Injunctions regularly are issued pursuant to the mandate of section
> 502, because the public interest is the interest in upholding copyright
> protections. Since Congress has elected to grant certain exclusive
> rights to the owner of a copyright in a protected work, it is virtually
> axiomatic that the public interest can only be served by upholding
> copyright protections and, correspondingly, preventing the
> misappropriation of the skills, creative energies, and resources
> which are invested in the protected work.

Taylor Corp., 403 F.3d at 968 (citations omitted).

The public interest weighs in favor of an injunction. Defendant is correct

that the Supreme Court has noted that parodies or other critical uses of

copyrighted works that simply go beyond the fair use of the material may not

justify injunctive relief. Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 578

n.10 (1994). There is no allegation that Thomas-Rasset engaged in parody or

other critical use of Plaintiffs' copyrighted material, and her fair use defense was

waived; instead, Defendant engaged in "simple piracy." Id. (citation omitted).

The general rule applies here: the public interest is in favor of upholding

copyright protections and the copyright holder's exclusivity.

### 2.    Conclusion

The Court grants Plaintiffs' request for an injunction. First, there is undisputed statutory authority for the Court to order "destruction or other reasonable disposition of all copies . . . made or used in violation of the copyright owner's exclusive rights." 17 U.S.C. § 503(b). Thomas-Rasset offers no legitimate reason why she should keep unauthorized copies of the infringed songs. Therefore, the Court orders the destruction of those recordings, to the extent that Thomas-Rasset still has them.

Second, analysis of each equitable factor favors entry of a permanent injunction barring future infringement. Therefore, the Court grants Plaintiffs' motion to amend the judgment.

Because Plaintiffs continually create new works that will be vulnerable to infringement and would require litigation if the injunction were limited to existing works, the injunction covers works to be created in the future. See, e.g., Princeton Univ. Press v. Mich. Document Servs., Inc., 99 F.3d 1381, 1392 (6th Cir. 1996) ("The weight of authority supports the extension of injunctive relief to future works.") (citations omitted). Additionally, because the Court has held that the Copyright Act does not provide a making available right, it will not enjoin Thomas-Rasset from making the copyrighted sound recordings available to the

36

public.

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED**:

1.  Defendant's Motion for a New Trial, Remittitur, and to Alter or Amend the Judgment [Docket No. 344] is **DENIED IN PART** and **GRANTED IN PART** as follows: The Judgment is amended to remit the damages award to $2,250 per sound recording infringed. Plaintiffs are directed to either accept the remittitur or to schedule a new trial on the issue of damages. Plaintiffs shall file a notification of their decision regarding remittitur no later than seven days from the date of this Order. The Court will defer amending the Judgment pending notification of Plaintiffs' position with regard to remittitur.

2.  Plaintiffs' Motion to Amend Judgment [Docket No. 342] is **DENIED IN PART** and **GRANTED IN PART** as follows: The Judgment will be amended to include the following permanent injunction:

    Defendant shall be and hereby is enjoined from directly or indirectly infringing Plaintiffs' rights under federal or state law in the copyrighted recordings and any sound recording, whether now in existence or later created, that is owned or controlled by Plaintiffs (or any parent, subsidiary, or affiliate record label of Plaintiffs) ("Plaintiffs' Recordings"), including without limitation by using the Internet or any online media distribution system to reproduce (i.e., download) any of Plaintiffs' Recordings, or to distribute (i.e., upload) any of Plaintiffs' Recordings, except pursuant to a lawful license or with the express authority of Plaintiffs. Defendant also shall destroy all copies of Plaintiffs' Recordings that Defendant has downloaded onto any computer hard drive or server without Plaintiffs'

37

authorization and shall destroy all copies of those downloaded recordings transferred onto any physical medium or device in Defendant's possession, custody, or control.

3. Amendment of the Judgment is deferred pending notification of Plaintiffs' position with regard to remittitur.


Dated:  January 22, 2010                    s/ Michael J. Davis
                                            Michael J. Davis
                                            Chief Judge
                                            United States District Court